Michael R. Johnson, Esq. (A7070)
Douglas M. Monson, Esq. (A2293)
David H. Leigh, Esq. (A9433)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email:  dmonson@rqn.com
Email:  dleigh@rqn.com

*Counsel for Gil A. Miller, Chapter 11 Trustee of the Consolidated Estate*

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>DEE ALLEN RANDALL, et al.,<br><br>      Debtors. | **Bankruptcy Case No. 10-37546**<br><br>(Substantively Consolidated with Case Nos. 11-34826, 11-34830, 11-34831, 11-34833 and 11-34834)<br><br>Chapter 11<br><br>Honorable Joel T. Marker<br><br>(Filed via ECF) |

**NOTICE OF REVISIONS TO THE TRUSTEE'S LIQUIDATING PLAN OF REORGANIZATION DATED APRIL 3, 2013 AND TO THE TRUSTEE'S DISCLOSURE STATEMENT**

Gil A. Miller (the "**Trustee**"), the Chapter 11 Trustee of the substantively consolidated

Chapter 11 estate of Dee Allen Randall, Horizon Auto Funding, LLC, Independent Commercial

Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage and Investment Inc., and

Horizon Financial & Insurance Group Inc. (collectively, the "**Debtors**"), through counsel, hereby

provides notice of the revisions that he has made to his "[Proposed] Chapter 11 Trustee's

Liquidating Plan of Reorganization Dated April 3, 2013" (the "**Plan**") that was filed on April 3,

2013 [Docket 1070] and to his "Disclosure Statement for Chapter 11 Trustee's Liquidating Plan

of Reorganization Dated April 3, 2013"  (the "**Disclosure Statement**") that was filed on July 2,

2013 [Docket 1174].  A redlined copy of the revised Disclosure Statement showing the revisions

made to the Disclosure Statement by the Trustee since its filing is attached hereto as Exhibit A.

A redlined copy of the revised Plan showing the revisions made to the Plan by the Trustee since

its filing is attached hereto as Exhibit B.

DATED this 9th day of September, 2013.

RAY QUINNEY & NEBEKER P.C.


/s/ Michael R. Johnson
Michael R. Johnson
Douglas M. Monson
David H. Leigh
*Counsel for the Trustee*


1248525.01/dmm/rqn

# Exhibit "A"

Michael R. Johnson, Esq. (A7070)
Douglas M. Monson, Esq. (A2293)
David H. Leigh, Esq. (A9433)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email:  dmonson@rqn.com
Email:  dleigh@rqn.com

*Counsel for Gil A. Miller, Chapter 11 Trustee of the Consolidated Estate*

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 10-37546 |
| **DEE ALLEN RANDALL, et al.,** | (Substantively Consolidated with Case Nos. 11-34826, 11-34830, 11-34831, 11-34833 and 11-34834) |
| Debtors. | Chapter 11 |
| | Honorable Joel T. Marker |

**DISCLOSURE STATEMENT FOR CHAPTER 11 TRUSTEE'S LIQUIDATING PLAN OF REORGANIZATION DATED APRIL 3, 2013**

# TABLE OF CONTENTS

SECTION 1.    PRELIMINARY STATEMENTS...................................................................1
    1.1    General Information Concerning this Disclosure Statement and the Plan .................1
    1.2    Disclaimers ........................................................................................................2

SECTION 2.    EXECUTIVE SUMMARY OF THIS DISCLOSURE STATEMENT ....................4
    2.1    The Randall Enterprise Was A Financial Scheme that had the
        Characteristics of a Ponzi Scheme...........................................................................4
    2.2    Randall Used his Solicitation Program for Selling Union Central Life
        Insurance Policies to Perpetuate the Randall Enterprise Scheme...............................4
    2.3    The Plan Provides a Mechanism for Pursuing the Claims of Victims and
        the Consolidated Estate Against Those Who Facilitated the Randall
        Enterprise Scheme. ...................................................................................................5
    2.4    By Voting for the Plan, the Victims of the Randall Enterprise Scheme Can
        Also Elect to Assign their Individual Claims Against Facilitators to the
        Private Actions Trust, Which will Allow Them to Participate in any
        Recovery from Such Facilitators. ...............................................................................6
    2.5    The Victim Causes of Action Assigned to the Private Actions Trust Will
        be Asserted on a Contingency Basis, and the Individual Victims Will Not
        Need to Pay Anything to have their Victim Causes of Action Pursued. ....................7
    2.6    The Percentage Interest (for Recovery Purposes) of an Individual Victim
        Who Participates in the Private Actions Trust Will be Calculated Pursuant
        to the Beneficial Interest Calculation.........................................................................8
    2.7    The Consolidated Estate will be Compensated for Setting Up the Private
        Actions Trust and Proposing the Plan Through a Sharing Arrangement for
        any Recovery by the Private Actions Trust. ...............................................................9
    2.8    The Trustee has been Liquidating the Assets of the Consolidated Estate,
        Negotiating with the IRS on the IRS Priority Tax Claim, and Estimating
        the Allowed Claims of the Class 17 Victims, in Preparation for Carrying
        Out the Distribution Scenario Under the Plan. ..........................................................10
    2.9    The Plan Provides for Class 17 Victims to Be Paid Under the Plan
        Pursuant to the Rising Tide Distribution Method.......................................................11

SECTION 3.    DEFINITIONS AND CONSTRUCTION OF TERMS ...........................................11

SECTION 4.    INTRODUCTION..............................................................................................26

SECTION 5.    SUMMARY OF PLAN AND TREATMENT OF ALLOWED CLAIMS
              AND INTERESTS ..............................................................................................34
    5.1    Introduction..............................................................................................................34
    5.2    Post-Confirmation Administration and the Effective Date........................................34
    5.3    Treatment of Unclassified Claims and Applicable Claims Bar Dates.......................34
    5.4    Treatment of Classified Claims and Equity Interests ...............................................39
    5.5    Treatment of Victims ...............................................................................................45

5.6      Treatment of Executory Contracts and Unexpired Leases and the
          Deadline to File Claims Related to Rejected Contracts or Leases ...........................50
5.7      Preservation of Causes of Action and Defenses .......................................................50
5.8      Non-Discharge of Debtors and Injunction................................................................51
5.9      Releases and Limitation of Liability..........................................................................52
5.10     Binding Nature of the Plan .......................................................................................52

SECTION 6.      DATE AND TIME OF HEARING ON CONFIRMATION OF THE
                PLAN .............................................................................................................52
6.1      Confirmation Hearing ...............................................................................................52
6.2      Confirmation Objection Deadline.............................................................................52

SECTION 7.      THE RANDALL ENTERPRISE AND POST-PETITION
                ADMINISTRATION OF THE CONSOLIDATED ESTATE.............................53
7.1      The Pre-Petition Randall Enterprise Scheme...........................................................53
7.2      The Bankruptcy Case Prior to the Trustee's Appointment.......................................53
7.3      The Trustee's Administration of the Consolidated Estate .........................................55
7.4      Governmental Investigations Related to the Randall Enterprise ..............................63

SECTION 8.      OTHER CONSIDERATIONS ..................................................................64
8.1      Feasibility of the Plan ...............................................................................................64
8.2      Effect of a Denial of Confirmation of the Plan........................................................64
8.3      Conditions to Confirmation. .....................................................................................67
8.4      Risk Factors ..............................................................................................................68
8.5      Tax Consequences ....................................................................................................68
8.6      Information Reporting and Backup Withholding ......................................................70
8.7      Importance of Obtaining Professional Assistance ....................................................70

SECTION 9.      VOTING PROCEDURES AND REQUIREMENTS ...........................................71
9.1      Ballots and Voting Deadline.....................................................................................71
9.2      Creditors Entitled to Vote.........................................................................................71
9.3      Nonconsensual Confirmation ...................................................................................71
9.4      Voting Procedures.....................................................................................................72
9.5      Vote Required for Class Acceptance ........................................................................72

**EXHIBITS TO DISCLOSURE STATEMENT**

EXHIBIT 1       Copy of Trustee's Liquidating Plan of Reorganization Dated April 3, 2013
                [Docket 1070]

                Exhibit A to Plan:  Randall Private Actions Trust Agreement
                Exhibit B to Plan:  List of Non-Investor Trade Creditor Unsecured Claims
                Exhibit C to Plan:  List of Estate Litigation Claims

EXHIBIT 2          Summary of Trustee's Evidence Concerning Commingling and Supporting Substantive Consolidation

EXHIBIT 3          Copy of Affidavit of John H. Curtis [Docket 407]

EXHIBIT 4-1        List of Debtors' Real Properties and Summary of Disposition of Debtors' Real Properties

EXHIBIT 4-2        Summary of Net Sale Proceeds for 11 of the Debtors' Real Properties

EXHIBIT 5          Analysis of Sources of Cash Used to Purchase Debtors' Real Properties and Cash Flow Analysis – 1999, 2002-2008 – for Horizon Mortgage

EXHIBIT 6          Charts Summarizing Horizon Mortgage Cash Flow, 2002-2008

EXHIBIT 7          Summary of Unpaid Professional Administrative Claims, and Estimate of Additional Professional Administrative Claims Through the Effective Date

EXHIBIT 8          Copy of IRS Claim No. 7-5

EXHIBIT 9          Summary of Secured Claims Asserted against the Consolidated Estate, Trustee's Estimate of Allowed Secured Claims, and Description of Disputed Secured Claims that are Disputed by the Trustee

EXHIBIT 10         Summary of Asserted Victim Claims and Trustee's Estimate of Allowed Victim Claims

EXHIBIT 11         Summary of Liquidated and Unliquidated Assets Currently Held by the Consolidated Estate

EXHIBIT 11-1       Copy of Consolidated Estate's Chapter 11 Monthly Operating Report For Period Ending May 31, 2013 (Docket 1146)

EXHIBIT 11-2       Summary of Net Proceeds from Sales of Consolidated Estate's Real Properties

EXHIBIT 11-3       Summary of the Trustee's Recoveries to Date on Estate Litigation Claims

# IMPORTANT

THIS DISCLOSURE STATEMENT IS SUBMITTED TO CREDITORS OF DEBTORS DEE ALLEN RANDALL, HORIZON AUTO FUNDING, LLC, INDEPENDENT COMMERCIAL LENDING, LLC, HORIZON FINANCIAL CENTER I, LLC, HORIZON MORTGAGE AND INVESTMENT, INC., AND HORIZON FINANCIAL & INSURANCE GROUP, INC. (INDIVIDUALLY AND COLLECTIVELY, AS DEFINED HEREIN, THE "DEBTORS") ENTITLED TO VOTE ON THE TRUSTEE'S LIQUIDATING PLAN OF REORGANIZATION (AS DEFINED HEREIN, THE "PLAN") UNDER CHAPTER 11 OF THE BANKRUPTCY CODE HEREIN DESCRIBED, AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. ALL CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO READ THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS TO THIS DISCLOSURE STATEMENT WITH CARE AND IN THEIR ENTIRETY.

ON ~~JULY ___,~~SEPTEMBER 9, 2013, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN DESCRIBED HEREIN AND ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1** IS BEING SOUGHT FROM CREDITORS AND OTHER PARTIES IN INTEREST WHOSE CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE IMPAIRED UNDER THE PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  CREDITORS AND OTHER PARTIES IN INTEREST ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO FILL OUT AND RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT IN THE ENVELOPE PROVIDED.

## SECTION 1.

## PRELIMINARY STATEMENTS

### 1.1   General Information Concerning this Disclosure Statement and the Plan

Gil A. Miller, the duly appointed Chapter 11 Trustee in the Bankruptcy Case (hereinafter, the "Trustee"), submits this Disclosure Statement under Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016.  The purpose of this Disclosure Statement is to disclose information adequate to enable Creditors of the Debtors who are entitled to vote for the confirmation of the Trustee's Plan to arrive at a reasonably informed decision

in exercising their rights to vote on the Plan.  A copy of the Plan is attached to this Disclosure Statement as **Exhibit 1**.  Capitalized terms used in this Disclosure Statement shall have the meanings assigned to them in Section 3 (the Definitions Section) of this Disclosure Statement or in the Bankruptcy Code and Bankruptcy Rules.  All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Trustee has promulgated the Plan consistent with the provisions of the Bankruptcy Code and applicable Federal and Local Bankruptcy Rules.  The purpose of the Plan is to provide the maximum and most speedy recovery to each Class of Claims, considering the assets and anticipated funds available for distribution to Creditors.  The Trustee believes that the Plan permits the maximum recovery for all Classes of Claims.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims under the Plan.  It is submitted as an aid and supplement to your review of the Plan to explain the terms of the Plan.  Every effort has been made to explain fully various aspects of the Plan as they affect Creditors.  If any questions arise, the Trustee urges you to contact his counsel (the contact information for the Trustee's counsel is on the front page of this Disclosure Statement) to attempt to resolve your questions.  You may, of course, wish to consult your own counsel.  All information contained in the introductory provisions of this Disclosure Statement and in the **Section 2 Executive Summary** of this Disclosure Statement is qualified in its entirety by the more detailed explanations and financial information found elsewhere in this Disclosure Statement.

**1.2**   **Disclaimers**

**NO SOLICITATION OF VOTES CONCERNING THE PLAN HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE, AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTORS TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  CREDITORS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, PAST OPERATIONS, OR CONCERNING THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON, IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE TRUSTEE.**

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THIS DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR SINCE THE DATES THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

WHILE THE INFORMATION PROVIDED HEREIN IS BELIEVED RELIABLE, THE TRUSTEE MAKES NO REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION.  IN PARTICULAR, THE TRUSTEE NOTES THAT PRIOR TO HIS APPOINTMENT HE HAD NO INVOLVEMENT WITH THE DEBTORS AND, THEREFORE, LACKS PERSONAL KNOWLEDGE OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS PRIOR TO HIS APPOINTMENT.  MUCH OF THE INFORMATION CONTAINED HEREIN AND IN THE ATTACHED EXHIBITS IS BASED UPON A REVIEW OF THE DEBTORS' BUSINESS AND FINANCIAL RECORDS BY THE TRUSTEE AND THE TRUSTEE'S PROFESSIONALS.  THE TRUSTEE MAKES NO REPRESENTATIONS OR WARRANTIES, OF ANY KIND, REGARDING THE RELIABILITY OF THE DEBTORS' BUSINESS AND FINANCIAL RECORDS PRIOR TO HIS APPOINTMENT.

FURTHERMORE, DISTRIBUTION OF THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE TRUSTEE OR HIS PROFESSIONALS THAT THE PLAN IS FREE FROM RISK OR THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE DISTRIBUTION OF ASSETS.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS ATTACHED HERETO) AND THE PLAN ATTACHED TO THIS DISCLOSURE STATEMENT SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR

**ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY
INCONSISTENCY.**

## SECTION 2.

## EXECUTIVE SUMMARY OF THIS DISCLOSURE STATEMENT

**2.1    The Randall Enterprise Was A Financial Scheme that had the
Characteristics of a Ponzi Scheme.**

The Debtors in this Bankruptcy Case, i.e., Dee Randall and the Corporate Debtors
that he controlled, were engaged in a financial scheme that had the characteristics of a
Ponzi Scheme.  Randall owned and controlled the Corporate Debtors as part of the
Randall Enterprise.[1]  Randall represented to his Victims that he was investing their
Investment Cash in his various real estate projects.  Randall also represented to his
Victims that his real estate investments were highly successful and would generate a high
rate of return to the Victims.

However, in reality, since at least the late 1990's, the Randall Enterprise never
made a profit, and Randall propped up his Scheme by using the Investment Cash of new
Victims to make promised "returns" to existing Victims.  In common with most Ponzi
schemes, the Randall Enterprise Ponzi Scheme eventually ran out of new Victims, and
collapsed into bankruptcy.  The Trustee's job has been to investigate the complicated
history of the Randall Enterprise Scheme (referred to herein as the "Scheme" or the
"Ponzi Scheme"), determine which unpaid Victims are legitimate creditors of the
Debtors, liquidate the remaining assets of the Randall Enterprise, and propose (through
the Plan) various ways to maximize the recovery to the defrauded unpaid Victims.

**2.2    Randall Used his Solicitation Program for Selling Union Central Life
Insurance Policies to Perpetuate the Randall Enterprise Scheme.**

Along with his real estate investments that he controlled and operated, Randall
was also a life insurance agent.  Randall used his life insurance agent business to expand
and maintain his Scheme.  In or around February of 2000, Randall was appointed as a
General Agent of Union Central Life Insurance Company, and he and his subagents
began soliciting and selling Union Central life insurance products to his Victims.  Many
of the Union Central life insurance policies that Randall (either individually or through
his subagents) was pitching to his Victims were very expensive whole life policies, and
required large premium payments that his Victims could not afford on their own.  Randall

---

[1] In this Disclosure Statement, the organizational structure used by Randall to conduct his
Scheme, which included all of the Debtors, is defined and referred to as the Randall Enterprise.

4

convinced his Victims that if they would invest in his real estate projects, the high returns from these real estate investments would be sufficient to pay the life insurance premiums.

### 2.3    The Plan Provides a Mechanism for Pursuing the Claims of Victims and the Consolidated Estate Against Those Who Facilitated the Randall Enterprise Scheme.

The Consolidated Estate and the Victims may have claims against Union Central and other facilitators (collectively the "Facilitators") of the Randall Enterprise Scheme for losses incurred as a result of the Scheme.  The Trustee has retained the Reid Collins Law Firm (and the Ray Quinney Law Firm as local counsel) on a contingency fee basis to investigate and, if deemed appropriate, pursue litigation claims against Facilitators of the Scheme.

There are two categories of plaintiffs with litigation Causes of Action against Facilitators:  the Trustee, on behalf of the Consolidated Estate and all creditors of the Consolidated Estate, and Victims of the Scheme.  The Trustee's litigation Causes of Action against Facilitators belong to and are being pursued on behalf of the Consolidated Estate.  In addition, each Victim has separate Causes of Action (referred to collectively as the "Victim Causes of Action") against Facilitators.  One of the central features of the Trustee's Plan is the creation of a litigation trust, referred to as the Private Actions Trust (the "Private Actions Trust"), to hold and allow for the collective pursuit of the Victim Causes of Action.  Under the Plan, the Trustee will not only continue to be the Trustee for the Debtors, and complete the liquidation of the Debtors' assets and the distributions to Creditors under the Plan, but the Trustee will also act as the trustee of the Private Actions Trust and supervise the pursuit of the Victim Causes of Action against the Facilitators of the Scheme and the distribution of any funds received from the Victim Causes of Action.

Union Central has become aware of the possibility that the Consolidated Estate and the Victims may be asserting claims against Union Central and other Facilitators. Union Central has asserted that the Consolidated Estate does not have claims against Union Central and other Facilitators because of the legal doctrine of *in pari delicto*, which Union Central intends to assert as a defense to any claims asserted by the Consolidated Estate in conjunction with the Victim Causes of Action to be asserted by the Private Actions Trust.  The Trustee disagrees with Union Central's *in pari delicto* argument.  If the Consolidated Estate asserts claims against Union Central, and Union Central asserts *in pari delicto* defenses, then whichever court has jurisdiction over the claims will weigh the facts and apply the law and make its legal determination whether or not the Consolidated Estate's claims against Union Central can be pursued.

Union Central has also asserted that the Trustee and the Consolidated Estate's lawyers cannot prosecute any claims against Union Central and other Facilitators because that will create a nonwaiveable conflict of interest for such Professionals.  The Trustee disagrees with this assertion by Union Central.  If the Consolidated Estate asserts claims against Union Central, and Union Central objects and asserts that the Consolidated Estate's Professionals have a nonwaiveable conflict of interest, then whichever court has

jurisdiction over the claims will weigh the facts and apply the law and make its legal determination whether or not there is a conflict of interest, and if so, if that conflict of interest can be resolved through some other means of pursuing the Consolidated Estate's claims, such as hiring other attorneys to prosecute the Consolidated Estate's claims.

Union Central also has objected to the disclosures made by the Trustee in this Disclosure Statement, arguing that the Disclosure Statement does not disclose to the Victims that "participation in the [Private Actions] Trust will greatly reduce the recoveries of Victims who assign relatively good claims to the [Private Actions] Trust, if such claims exist." Union Central complains about the distribution method from the Private Actions Trust that the Trustee has proposed, which is disclosed in Section 2.6 of this Disclosure Statement, and contends that the distribution method will dilute the recoveries for Victims with "relatively good claims". Union Central argues that Victims that Union Central contends have no or poor claims against Union Central and other Facilitators will likely be drawn to join the Private Actions Trust, as it may be their last hope for recovery in these Cases, while Victims who believe they have relatively better claims against Union Central and other Facilitators will likely not join the Private Actions Trust.

The Trustee asserts that these arguments by Union Central are not motivated by Union Central's concern for the best interests of the Victims, but rather are clearly motivated by a desire on the part of Union Central to create dissension between the Victims and the Trustee and to dissuade Victims from participating in the Private Actions Trust. Moreover, each Victim is free under the Plan to do whatever he or she wishes to do with respect to his or her Victim Claims against Union Central and other Facilitators. The Plan does not require any Victim to assign his or her Victim Claims to the Private Actions Trust. A Victim can vote for the Plan and still affirmatively elect to not assign his or her Victim Claims to the Private Actions Trust. Such Victim will be free to pursue his or her Victim Claims outside of the Private Actions Trust by hiring his or her own attorney to pursue such Victim Claims. It is possible that such Victim could end up with a greater recovery on his or her own than the recovery such Victim could receive by joining the Private Actions Trust. However, the Trustee believes that there will be definite benefits to most, if not all, of the Victims for them to combine their Victim Claims together against Union Central and other Facilitators through assigning them to the Private Actions Trust. Many of the Victims have relatively small amounts of Victim Claims to assert individually, and it may be difficult for such Victims to locate attorneys who are willing to investigate and pursue small Victim Claims (whether on a contingency fee basis or on an hourly basis) against a large insurance company that is motivated to devote lots of its resources to defeat the Victim Claims.

**2.4    By Voting for the Plan, the Victims of the Randall Enterprise Scheme Can Also Elect to Assign their Individual Claims Against Facilitators to the Private Actions Trust, Which will Allow Them to Participate in any Recovery from Such Facilitators.**

In connection with their votes in favor of the Plan, the Victims will also be able to assign to the Private Actions Trust their Victim Causes of Action against Facilitators.

After the Plan is confirmed and the Private Actions Trust become effective, the individual assigned Victim Causes of Action will likely be pursued in conjunction with the Consolidated Estate's claims against the Facilitators of the Scheme. The Trustee, on behalf of the Consolidated Estate and the Private Actions Trust, will be supervising the pursuit of both of these categories of Causes of Action.

Under the Plan, the Trustee has classified the unsecured Claims of the various unpaid Investor Victims of the Randall Enterprise as Class 17 Victim Claims. Each of the unsecured Claims of the Class 17 Victims will be calculated at the Victim Net Claim Amount, which for any particular Class 17 Victim, means the difference between the principal amount of each Victim's Investment and all funds previously received by such Victim (whether or not the funds received were characterized as a return of principal or interest or anything else). In other words, the Trustee will not recognize any Claims for interest on the principal amount of any Victim's Investment, because the Randall Enterprise had no profits and had the characteristics of and appears to have been operated as a Ponzi Scheme, and federal courts have ruled in other Ponzi scheme cases that interest should not be allowed on Investments that in reality were fictitious Investments. The Trustee anticipates that the total allowed amount of the Class 17 Victim Claims (i.e., the total unpaid principal amount of the Investments made by the defrauded Victims of the Randall Enterprise) will be approximately $39.2 million.

The ballots that are mailed to the Class 17 Victims along with this Disclosure Statement will include a box to be checked that will allow the Class 17 Victims to vote for the Plan. The ballots will also state that a vote for the Plan by a Class 17 Victim is also an election to participate in the Private Actions Trust and will result in the assignment of his or her Victim Causes of Action against Facilitators of the Scheme to the Private Actions Trust, unless such Class 17 Victim affirmatively elects to not participate in the Private Actions Trust and to not assign his or her Victim Causes of Action to the Private Actions Trust.

**2.5     The Victim Causes of Action Assigned to the Private Actions Trust Will be Asserted on a Contingency Basis, and the Individual Victims Will Not Need to Pay Anything to have their Victim Causes of Action Pursued.**

The Reid Collins Law Firm that has investigated and will likely pursue the Victim Causes of Action against Facilitators of the Scheme have agreed to do so on a contingency basis, which means that the Reid Collins Law Firm will not charge anything for its services to the Consolidated Estate or to any of the Class 17 Victims unless there is a recovery on the Private Actions Trust's Victim Causes of Action. If there is a recovery on the Victim Causes of Action assigned to the Private Actions Trust, the Reid Collins Law Firm (along with the Ray Quinney Law Firm, which will act as local counsel, and with respect only to its work with respect to the Victim Causes of Action) will be paid a percentage of the recovery, with the balance to be paid as outlined in the Private Actions Trust Agreement. Under the Reid Collins Law Firm and Ray Quinney Law Firm contingency fee arrangements, the Class 17 Victims who elect to assign their Victim Causes of Action to the Private Actions Trust will do so "cost free," and they will not

have to pay the Reid Collins Law Firm or the Ray Quinney Law Firm anything for their individual Victim Causes of Action to be investigated and pursued. They will, however, be consenting to the contingency fee arrangement negotiated with the Reid Collins Firm and the Ray Quinney Law Firm.

On February 27, 2012, the Trustee filed an Application to Employ the Reid Collins Law Firm on a contingency fee basis [Docket 498] to investigate and pursue the Estate Litigation Claims of the Consolidated Estate against Facilitators of the Scheme. On the same day, the Trustee filed a Motion [Docket 497] to modify the existing Ray Quinney Law Firm engagement letter and asked the Bankruptcy Court to approve the employment of the Ray Quinney Law Firm on a contingency fee basis to act as local counsel to the Reid Collins Law Firm in pursuing the Estate Litigation Claims against the Facilitators (for all other matters, the Ray Quinney Law Firm has been paid and will continue to be paid on an hourly basis). The Bankruptcy Court approved the Application and the Motion on March 26, 2012 [Docket 574 for the Reid Collins Law Firm, and Docket 573 for the Ray Quinney Law Firm]. The approved contingency fee for the Estate Litigation Claims against Facilitators is a 25% Gross Contingency Fee (which means 25% of the gross consideration recovered in connection with the Causes of Action, not 25% after expenses are paid) for any recoveries on the Estate Litigation Claims during the pre-suit representation (which means before a lawsuit is filed), and a 40% Gross Contingency Fee for any recoveries on the Estate Litigation Claims against Facilitators during the post-suit representation (which means after a lawsuit is filed). The Reid Collins Law Firm will receive 17.5% of all pre-suit recoveries and the Ray Quinney Law Firm will receive 7.5% of all pre-suit recoveries (equal to the total 25% Gross Contingency Fee for the pre-suit recoveries). If a lawsuit is filed, the Reid Collins Law Firm will receive 30% of all post-suit recoveries and the Ray Quinney Law Firm will receive 10% of all post-suit recoveries (equal to the total 40% Gross Contingency Fee for the post-suit recoveries). When the Private Actions Trust becomes effective, the Trustee, acting as the Private Actions Trustee, will enter into engagement letters with the Reid Collins Law Firm and the Ray Quinney Law Firm with the same contingency fee terms for the Private Actions Trust and the Victim Causes of Action against the Facilitators as the contingency fee terms for the Estate Litigation Claims of the Consolidated Estate against the Facilitators.

**2.6     The Percentage Interest (for Recovery Purposes) of an Individual Victim Who Participates in the Private Actions Trust Will be Calculated Pursuant to the Beneficial Interest Calculation.**

Pursuant to Section 2.8 of the Private Actions Trust (the Private Actions Trust Agreement is Exhibit A to the Plan – a copy of the Plan is attached to this Disclosure Statement as **Exhibit 1**), the interest in the Private Actions Trust of each Class 17 Victim who assigns his or her Victim Causes of Action to the Private Actions Trust will be calculated under the Beneficial Interest Calculation, which is the percentage derived from the following:

Step 1: divide (i) the sum of such Private Action Trust Beneficiary's Victim Net Claim Amount and all premiums (if any) paid on such Private

Action Trust Beneficiary's Terminated Policy, by (ii) the sum of all of the Victim Net Claim Amounts for all of the Private Action Trust Beneficiaries and all premiums (if any) paid on all of their Terminated Policies; and

Step 2: multiply the resulting fraction by 100.

### 2.7 The Consolidated Estate will be Compensated for Setting Up the Private Actions Trust and Proposing the Plan Through a Sharing Arrangement for  any Recovery by the Private Actions Trust.

The Trustee has made a preliminary evaluation of the Victim Causes of Action and the Estate Litigation Claims against the Facilitators of the Randall Enterprise Scheme.  The Trustee believes that the Victim Causes of Action collectively have a greater value than the Estate Litigation Claims against the same parties.  However, the Trustee has also determined that the Consolidated Estate should be compensated for setting up the Private Actions Trust structure and should share in the recovery from the Private Actions Trust for the following reasons:

- The Consolidated Estate has incurred the initial setup expenses for creating the Private Actions Trust, which is the mechanism the Trustee will be using to investigate and likely pursue the Victim Causes of Action.

- The Chapter 11 structure provides an efficient mechanism for gathering together the Victims as a group to disclose to the Victims their opportunity to participate in the Private Actions Trust.  The Plan confirmation process will also facilitate the assignment of the Victim Causes of Action to a common representative (i.e., the Trustee acting as the Private Actions Trustee).  The Victim Causes of Action should be more valuable when pursued by the Private Actions Trustee on behalf of the aggregate assigned Victims of Action, rather than each Victim locating his or her own individual attorney to pursue individual Victim Causes of Action.

- The Chapter 11 process is generally more expensive than a Chapter 7 case.  The Trustee elected to keep this Bankruptcy Case in Chapter 11, rather than converting the Bankruptcy Case to a Chapter 7 case, in order to pursue the creation of the Private Actions Trust.  The Consolidated Estate should be compensated for these additional expenses that the Consolidated Estate has incurred by keeping this Bankruptcy Case in Chapter 11.

- The defendants pursued by the Private Actions Trust will undoubtedly prefer to negotiate the final resolution of all related claims against such defendants, and the Consolidated Estate is entitled to be compensated for the enhanced settlement value resulting from the simultaneous pursuit of Victim Causes of Action and Estate Litigation Claims against the same defendants.

Consistent with the Trustee's determination that the Consolidated Estate should be compensated in connection with the formation of the Private Actions Trust, the

distributions from the Private Actions Trust will include distributions to the Consolidated Estate.  The distributions will be made pursuant to Section 5.1 of the Private Actions Trust (the Private Actions Trust Agreement is Exhibit A to the Plan – a copy of the Plan is attached to this Disclosure Statement as **Exhibit 1**), as follows:

First, to repay any loans and/or other funding obtained by the Private Actions Trust.

Second, to the Consolidated Estate in the following percentages:

(i)  30% for distributable amounts equal to or less than $1,000,000, plus

(ii) 20% for distributable amounts greater than $1,000,000, but equal to or less than $10,000,000, plus

(iii) 10% for distributable amounts greater than $10,000,000.

Third, to the Private Actions Trust Beneficiaries on a prorata basis based upon their respective percentages as calculated under the Beneficial Interest Calculation.

## 2.8  The Trustee has been Liquidating the Assets of the Consolidated Estate, Negotiating with the IRS on the IRS Priority Tax Claim, and Estimating the Allowed Claims of the Class 17 Victims, in Preparation for Carrying Out the Distribution Scenario Under the Plan.

The Trustee has either sold or abandoned all real estate assets and tangible personal property assets of the Randall Enterprise and has generated other Cash to be used to pay the Creditors of the Consolidated Estate.  These assets of the Consolidated Estate will be used and distributed as stated in detail in the Plan, and as summarized in this Disclosure Statement.  As noted in Section 5.3.3 below, an IRS Priority Tax Claim in excess of $900,000 and an IRS unsecured general claim in excess of $200,000 have been asserted against the Consolidated Estate, and the Trustee has been discussing the IRS Claims with the IRS and has requested that the IRS subordinate all of its Claims so that the distribution under the Plan to the Class 17 Victims will be increased.  If the Trustee is successful in convincing the IRS to subordinate its Claims, the vast majority of the existing Cash of the Consolidated Estate will be distributed to the Class 17 Victims.  Consistent with case law governing the treatment of defrauded investors in a Ponzi scheme, the Plan provides that the Allowed Claim of any Class 17 Victim will be calculated as the total principal amount invested by such Victim minus all distributions received by such Victim, without allowing any "interest" or other "returns" on the principal amount of the Investment of such Victim.  Certain federal courts have held that any such "interest" or other "returns" on amounts invested in a Ponzi scheme are fictitious, so as a uniform matter, such "interest" or other "returns" will not be allowed under the Plan, since the Randall Enterprise had the characteristics of a Ponzi scheme.  This means that the Victims will be treated consistently by only being entitled to an Allowed Claim for the unpaid principal of their Investments, with prior distributions to such Victims being treated as a partial repayment of their Investment.

**2.9** **The Plan Provides for Holders of Class 16(B) Allowed Unsecured Claims (if any) and Class 17 Victims to Be Paid Under the Plan Pursuant to the Rising Tide Distribution Method.**

The Plan provides that holders of Class 16(B) Allowed Unsecured Claims (if any) and Class 17 Victims with Allowed Claims will be paid consistent with the Rising Tide Distribution Method, a distribution formula which has been adopted by many federal courts supervising Ponzi scheme cases. Creditors should note that the distribution method for the Private Actions Trust under the Beneficial Interest Calculation, as outlined in Section 2.6 above, is different from the Rising Tide Distribution Method that will be used for distribution of Consolidated Estate assets under the Plan. The Rising Tide Distribution Method attempts to equalize the distributions made to all Victims of the Scheme by first making distributions to those Victims of the Scheme who received little or no return on their Investments (usually the Investors who were the last Victims to invest their Cash). There is a more complete description in the Definitions Section below of the Rising Tide Distribution Method, but in short, this distribution process provides that Victims who were not Winning Investors are allowed to retain the funds they have previously received, but the total of the funds they have previously received is subtracted from the amount of their Investment to determine their initial recovery percentage for distribution purposes. Victims who previously received funds or prior distributions that resulted in a percentage return of their Investment that is less than the percentage return of other Victims will participate in each distribution in such amounts as to raise their percentage returns closer to such other Victims until the Victims have an equal percentage return on their respective Investments.

## SECTION 3.

## DEFINITIONS AND CONSTRUCTION OF TERMS

For purposes of the Plan and this Disclosure Statement, the following terms shall have the meanings specified in this Section 3. A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. Wherever from the context it appears appropriate, each term stated shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter, regardless of how stated. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan or this Disclosure Statement (as the case may be) as a whole and not to any particular Section, sub-Section or clause contained in the Plan or this Disclosure Statement (as the case may be). The rules of construction contained in Section 102 of the Bankruptcy Code shall also apply to the terms of the Plan and this Disclosure Statement. The headings in the Plan and this Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

"Active Policy" shall mean a Policy held at any time by a Policyholder that is still in force and/or has not been terminated, and any Policy on which a death benefit has previously been paid or is due and payable as of the Effective Date.

"Administrative Expense Claim" shall mean a Claim that is allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including: (a) fees and expenses of Professionals allowed pursuant to an Order of the Bankruptcy Court; and (b) all fees and charges assessed against the Consolidated Estate pursuant to 28 U.S.C. § 1930.

"Administrative Expense Claim Bar Date" shall have the meaning attributed to this phrase in Section 5.2(c) of the Plan.

"Affiliates" shall have the meaning attributed to it in Section 101(2) of the Bankruptcy Code.

"Allowed . . . Claim" shall mean:

(a)     A Claim that is listed in the Schedules but is not listed in the Schedules as liquidated, disputed or contingent, as well as a Claim as to which a timely proof of Claim has been filed by the applicable Bar Date, including any and all amended claims filed in relation thereto, and either (i) no objection to such Claim, or no application to estimate, equitably subordinate or otherwise limit recovery for such Claim, has been made on or before any applicable deadline, or (ii) if an objection to such Claim, or an application to estimate, equitably subordinate or otherwise limit recovery for such Claim has been interposed, the extent to which such Claim has been Allowed (whether in whole or in part) by a Final Order, either as a result of suit or by settlement agreement; provided, that for each Victim Claim, the amount of such Allowed Victim Claim shall be no greater than the Victim Net Claim Amount for such Victim Claim;

(b)     a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code, to the extent allowed under Section 502(h) of the Bankruptcy Code;

(c)     a Claim allowed pursuant to a Final Order in the amount so ordered; or

(d)     any Claim expressly allowed under the Plan or pursuant to the Confirmation Order.

"Avoidance Actions" shall mean Causes of Action arising or held by the Consolidated Estate under Chapter 5 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

"Bankruptcy Case" shall mean collectively the above-captioned substantively consolidated Chapter 11 case pending in the Bankruptcy Court, including the Chapter 11 case of Dee Allen Randall, filed under Bankruptcy Case No. 10-37546, as well as the substantively consolidated Chapter 11 cases of Horizon Auto Funding, LLC, filed under

Bankruptcy Case No. 11-34826, Independent Commercial Lending, LLC, filed under Bankruptcy Case No. 11-34830, Horizon Financial Center I, LLC, filed under Bankruptcy Case No. 11-34831, Horizon Mortgage and Investment Inc., filed under Case No. 11-34833, and Horizon Financial & Insurance Group Inc., filed under Bankruptcy Case No. 11-34834.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of the United States District Court for the District of Utah specified pursuant to 28 U.S.C. § 151.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

"Bar Date" shall mean: (i) April 26, 2011 with respect to a Claim against Randall other than a Claim of a Governmental Unit against Randall, whether filed on the Randall Claim Docket or on any of the Corporate Debtors Claim Dockets; (ii) June 20, 2011 with respect to a Claim of a Governmental Unit against Randall, whether filed on the Randall Claim Docket or on any of the Corporate Debtors Claim Dockets; (iii) March 12, 2012 with respect to a Claim against any of the Corporate Debtors other than a Claim of a Governmental Entity against any of the Corporate Debtors, whether filed on the Randall Claim Docket or any of the Corporate Debtors Claim Dockets; and (iv) April 9, 2012 with respect to a Claim of a Governmental Unit against any of the Corporate Debtors, whether filed on the Randall Claim Docket or on any of the Corporate Debtors Claim Dockets.  For the sake of clarity, "Bar Date" does not include the Contract Rejection Bar Date, the Administrative Expense Claim Bar Date, or the Professional Administrative Expense Claim Bar Date, which are separately defined herein.

"Beneficial Interest Calculation" shall mean the formula to be used to calculate each Private Actions Trust Beneficiary's interest in the Private Actions Trust for distribution purposes as set forth in Section 2.8 of the Private Actions Trust Agreement. The Private Actions Trust Agreement is attached as Exhibit A to the Plan, which is **Exhibit 1** to this Disclosure Statement.

"Boyce Trust" means The Boyce Family Living Trust, under the Trust Agreement originally dated September 9, 1999, and its trustee, David B. Boyce.  The Boyce Trust was an Investor.

"Business Day" shall mean any day other than a Saturday, Sunday, or legal holiday recognized in the State of Utah.

"Boyingtons" means Carl Boyington and Janice Boyington, who were Investors.

"Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

"Causes of Action" shall mean any actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown or asserted or unasserted, in law, equity or otherwise, including any and all Avoidance Actions.

"Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Class" shall mean those classes designated in Articles II and III of the Plan.

"Collateral" shall mean any property or interest in property of the Consolidated Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

"Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

"Confirmation Hearing" shall mean ⸺,October 28, 2013, or any date to which the Bankruptcy Court continues said Confirmation Hearing on the record without the need for further notice.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

"Consolidated Estate" shall mean the consolidated estate of the Debtors created in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code on the Randall Petition Date and on the Corporate Debtors Petition Date, including but not limited to: (i) as created as a result of the Consolidation Order; and (ii) the property that is retained by the Trustee under the Plan as of, and after the Effective Date.

"Consolidation Order" shall mean the Order Substantively Consolidating the Separate Estates of Dee Allen Randall, Horizon Auto Funding, LLC, Independent Commercial Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage and Investment Inc. and Horizon Financial & Insurance Group Inc., entered by the Bankruptcy Court on January 30, 2012 [Docket No. 449].

"Contingent or Unliquidated Claim" shall mean any Claim for which a proof of Claim has been filed with the Bankruptcy Court but which was not filed in a sum certain, or which has not occurred and is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed.

"Contract Rejection Claim Bar Date" shall have the meaning attributed to it in Section 8.2 of the Plan.

"Corporate Debtors" shall mean any, each and all of Horizon Auto Funding, LLC, Independent Commercial Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage, and Horizon Financial.

"Corporate Debtors Claim Dockets" shall mean the dockets showing proofs of claims filed in the Bankruptcy Case under Case No. 11-34826 for Horizon Auto Funding, LLC,  Case No. 11-34830 for Independent Commercial Lending, LLC, Case No. 11-34831 for Horizon Financial Center I, LLC,  Case No. 11-34833 for Horizon Mortgage, and Case No. 11-34834 for Horizon Financial.

"Corporate Debtors Petition Date" shall mean October 12, 2011.

"Creditor" shall mean any Person who: (a) holds a Claim against the Consolidated Estates that arose prior to the Randall Petition Date with respect to a Claim against Randall or that arose prior to the Corporate Debtors Petition Date with respect to a Claim against any of the Corporate Debtors; (b) holds a Claim against the Consolidated Estate, which arose after the Randall Petition Date, other than an Administrative Expense Claim of the type specified in Bankruptcy Code Section 503(b); or (c) holds a Claim against the Consolidated Estate of the kinds specified in Bankruptcy Code Sections 502(g), 502(h) or 502(j).

"Debtors" shall mean any, each and all of Randall and the Corporate Debtors.

"Debtors' Agent" shall mean a Person, including an Insurance Agent, that acted as an agent, representative, independent contractor, officer, director, manager, or employee of any of the Debtors prior to the Corporate Debtors Petition Date, excluding the Debtors, the Trustee and any Professionals.

"Deficiency Claim" shall mean that portion of any Allowed Claim held by a Creditor of a Secured Claim which exceeds the value of the assets securing such Allowed Claim.

"Disallowed . . . Claim" shall mean:

(a)     a Claim that is listed in the Schedules as unliquidated, disputed or contingent for which no proof of Claim has been filed prior to the Bar Date;

(b)     a Claim disallowed ~~allowed~~ under Section 502(d) of the Bankruptcy Code;

15

        (c)      a Claim asserted in an amount greater than an amount fixed pursuant to a Final Order or pursuant to a settlement agreement entered into with the Trustee; or

        (d)      for any Victim Claim, any amount that is greater than the Victim Net Claim Amount for such Victim Claim, even if the amount for such Victim Claim asserted in the corresponding Victim Proof of Claim is larger than the Victim Net Claim Amount for such Victim Claim.

"<u>Disclosure Statement</u>" shall mean this Disclosure Statement for the Plan, including all Exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

"<u>Disclosure Statement Exhibit</u>" shall mean the Exhibits attached to this Disclosure Statement which are incorporated into this Disclosure Statement and the Plan by reference.

"<u>Disputed . . . Claim</u>" shall mean:

        (a)      a claim that is listed in the Schedules as unliquidated, disputed or contingent;

        (b)      if a proof of Claim relating to a Claim has been filed, a Claim as to which a timely objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Trustee in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order;

        (c)      Claims for which a proof of Claim has not been filed prior to any applicable Bar Date; or

        (d)      a Claim which is a Contingent or Unliquidated Claim.

"<u>Disputed Claims Reserve</u>" shall have the meaning set forth in Section 7.4(a) of the Plan.

"<u>Distribution Record Date</u>" shall mean the Confirmation Date.

"<u>Effective Date</u>" shall mean the date which is 30 days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; <u>provided</u>, <u>however</u>, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have not been satisfied or waived, then the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

"<u>Estate Litigation Claims</u>" shall mean any of the Debtors' or the Consolidated Estate's Causes of Action.

"<u>Equity Interest</u>" shall mean any equity interest in any of the Corporate Debtors, regardless of form, arising under any contract, agreement, and/or under any applicable law.

"<u>Face Amount</u>" shall mean:  (i) when used with respect to a Claim, (a) if no proof of Claim has been filed, the amount of the Claim set forth in the Schedules, or (b) if a proof of Claim has been filed, the amount asserted in the proof of Claim; (ii) when used with respect to an Estate Litigation Claim, the amount set forth in any complaint or other formal or informal demand; and (iii) when used with respect to an asset or liability of the Consolidated Estate other than an Estate Litigation claim, (a) the most recent recorded amount on the Consolidated Estate's books and records, or (b) if no amount is recorded on the Consolidated Estate's books and records, then the fair market value or fair liability amount as determined by the Trustee.

"<u>Facilitators</u>" shall mean Union Central and others who assisted, facilitated, or perpetuated the operations of the Ponzi Scheme by the Randall Enterprise.

"<u>Final Decree</u>" shall mean a Final Order of the Court closing the Bankruptcy Case.

"<u>Final Order</u>" shall mean an order or judgment which has not been reversed, stayed, modified or amended and, as to which (i) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (ii) if appeal, review, reargument or certiorari of the order has been sought, the order has been affirmed or the request for review, reargument or certiorari has been denied and the time to seek a further appeal, review, reargument or certiorari has expired, and as a result of which such order shall have become final and nonappealable in accordance with applicable law; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

"<u>First Lienholders</u>" shall mean collectively the holders of the Secured Claims in Class 1(A), Class 2(A), Class 3(A), Class 4(A), Class 6(A), Class 7(A), Class 8(A), Class 9(A), Class 9(B), Class 10(A), Class 11(A), Class 11(B), Class 11(C), Class 11(D), Class 12(A), Class 13(A), and Class 14(A) under the Plan.

"<u>Fort Lane Property</u>" shall mean collectively the three parcels of real property located at approximately 768 Fort Lane, 790 Fort Lane, and 812 Fort Lane in Layton, Utah, that on the Corporate Debtors Petition Date were owned by Horizon Mortgage (100% interest in the 768 Fort Lane Parcel and the 790 Fort Lane Parcel), Deborah Jean Herbert (an undivided 40% interest in the 812 Fort Lane Parcel), and Horizon Mortgage (an undivided 60% interest in the 812 Fort Lane Parcel).

17

"Governmental Unit" shall have the meaning attributed to it in Section 101(27) of the Bankruptcy Code, and shall include the Utah Division of Securities.

"Gross Contingency Fee" shall mean in connection with the Estate Litigation Claims being pursued against Facilitators on a contingency fee basis by the Reid Collins Law Firm and the Ray Quinney Law Firm, the gross consideration recovered by the Consolidated Estate in connection with the assertion of such Estate Litigation Claims, rather than the net consideration recovered after the expenses incurred by the Consolidated Estate in connection with such Estate Litigation Claims are paid.

"Hatch Trust" shall mean The Jack David Hatch Revocable Trust dated March 1, 2005, and its trustee, Jack David Hatch.  The Hatch Trust was an Investor.

"Horizon Financial" shall mean Horizon Financial & Insurance Group Inc.

"Horizon Mortgage" shall mean Horizon Mortgage and Investment Inc., dba Maple Apartments, also dba Independent Financial & Investment, also dba Independent Property Management.

"Initial Distribution Date" shall mean any date that the Trustee chooses, in the Trustee's sole discretion, prior to the entry of the Final Decree.

"Insurance Agents" shall mean all Persons who acted as insurance agents for Horizon Financial or Randall who were otherwise affiliated with the insurance business of the Debtors and Union Central.

"Investment" shall mean Cash and all other funds deposited by a Person with any of the Debtors for the purpose of obtaining a return on such funds.

"Investor" shall mean a Person who holds a Note, or who otherwise asserts a Claim against the Consolidated Estate arising out of an Investment with Randall or with any of the Corporate Debtors.

"IRS" shall mean the Internal Revenue Service, an agency of the United States.

"IRS Priority Tax Claim" shall mean collectively all of the Priority Tax Claims filed against any of the Debtors by the IRS on behalf of the United States.

"Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.  A Lien that has been avoided in accordance with Section 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall be preserved for the benefit of the Consolidated Estate pursuant to Section 551 of the Bankruptcy Code.

"Liquidation Amount" shall mean all Cash of the Consolidated Estate remaining after: (i) Payment in Full of all Allowed Administrative Claims, all Allowed Priority Tax Claims, and all Allowed Secured Claims in Classes 1-14; (ii) Payment in Full of all fees owing to the Clerk of the Bankruptcy Court, and fees owing to the United States Trustee; (iii) Payment in Full of all post-Confirmation Date fees and expenses, including such fees

and expenses incurred or to be incurred by Professionals employed by the Trustee through the closing of this Bankruptcy Case and entry of a Final Decree (to the extent not included in the Operating Reserve); and (iv) funding of the Operating Reserve, from time to time.

"McGuire Trust" shall mean The Kristina McGuire Living Trust, under the Trust Agreement originally dated April 11, 2001, and its trustee, Kristina McGuire a/k/a Kristina Hyer. The McGuire Trust was an Investor.

"Metamorphosis" shall mean Metamorphosis Investments, L.C., the record title owner to an undivided 1.5% interest in the 1505 N. 1200 W. Property.

"Non-Investor Trade Creditor Unsecured Claim" shall mean a Claim that is not a Secured Claim, not a Claim that is entitled to priority of payment under Section 507 of the Bankruptcy Code, and not a Victim Claim. The holders of Non-Investor Trade Creditor Unsecured Claims are Creditors who provided goods and services or financing to the Debtors and were not Investors. A list of the Creditors that a preliminary review of the Debtors' books and records reflect are holders of Non-Investor Trade Creditor Unsecured Claims for less than $50,000.00 is attached as Exhibit B to the Plan (which is **Exhibit 1** to this Disclosure Statement). The amounts set forth in Exhibit B to the Plan are merely those stated in either the Statements and Schedules or in proofs of Claim filed by the holders of Non-Investor Trade Creditor Unsecured Claims, and the Trustee reserves the right to contest the validity or amounts of the Non-Investor Trade Creditor Unsecured Claims set forth on Exhibit B to the Plan. The Non-Investor Trade Creditor Unsecured Claims that are Allowed in an amount of $50,000 or less shall be classified in Class 16(A) under the Plan. The Non-Investor Trade Creditor Unsecured Claims that are Allowed in an amount greater than $50,000 shall be classified in Class 16(B) under the Plan.

"Note" shall mean one or more promissory notes issued by any of the Debtors to a Person in exchange for such Person making an Investment.

"Operating Reserve" shall have the meaning ascribed to such term in Section 7.4(b) of the Plan.

"Payment in Full" shall mean payment of the full Allowed amount of any Allowed Claim, whether by distribution under the Plan or otherwise.

"Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, trustee, unincorporated association or organization, Governmental Unit or political subdivision thereof.

"Plan" shall mean the Trustee's Liquidating Plan of Reorganization, including the Exhibits, supplements, appendices and schedules to the Plan or to this Disclosure Statement, in their present form or as the same may be altered, amended or modified from time to time. A copy of the Trustee's Plan is attached to this Disclosure Statement as **Exhibit 1** and incorporated herein.

"Policy" shall mean an insurance policy or other insurance product that was issued by Union Central and: (i) produced by one of the Debtors and/or by a Debtors' Agent; or (ii) on which one of the Debtors and/or a Debtors' Agent received a commission from Union Central.

"Policyholder" shall mean a Person that: (i) as of the Corporate Debtors Petition Date, was the holder of a Claim that would qualify as a Class 17 Allowed Victim Claim; (ii) at any time, has been the owner, payor, or holder of a Policy; and (iii) if applicable, the successor(s) or assignee(s) of such Person.

"Ponzi Scheme" shall mean the financial scheme perpetrated by Randall, which had the characteristics of a Ponzi scheme, and was perpetrated through the Randall Enterprise with the assistance and facilitation of the Facilitators, as described more fully herein.

"Priority Tax Claims" shall mean any Claim of a Governmental Unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"Priority Unsecured Claims" shall mean any Claim entitled to priority under Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims and Administrative Expense Claims.

"Private Actions Trust" shall mean the trust established on the Effective Date pursuant to Section 6.9 of the Plan.

"Private Actions Trust Agreement" shall mean the Randall Victims Private Actions Trust Agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan.  A copy of the Private Actions Trust Agreement is attached as Exhibit A to the Plan (a copy of the Plan is attached as **Exhibit 1** to this Disclosure Statement).

"Private Actions Trust Election" means the irrevocable election of a Victim to assign his or her Victim Causes of Action to the Private Actions Trust, such election being evidenced (i) on the Victim's Ballot for his or her Class 17 Allowed Victim Claim, or (ii) in a writing filed with the Private Actions Trustee on or before the date that is sixty (60) calendar days after the Effective Date;  provided, that the Private Actions Trustee, in his or her sole discretion, may choose to allow a Victim to make a Private Actions Trust Election after this deadline.

"Private Actions Trust Participating Creditors" and "Private Actions Trust Beneficiaries" mean those Victims who have made Private Actions Trust Elections and have thereby assigned their Victim Causes of Action to the Private Action Trust.

"Private Actions Trustee" means the trustee of the Private Actions Trust and any subsequent trustee of the Private Actions Trust.  The Trustee will be the initial trustee of the Private Actions Trust.

"Professionals" shall mean (i) the Trustee, or (ii) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330, 331 and 503 of the Bankruptcy Code.

"Professional Administrative Expense Claim Bar Date" shall have the meaning attributed to this phrase in Section 5.2(d)(ii) of the Plan.

"Randall" shall mean Dee Allen Randall, an individual.

"Randall Bankruptcy Case" shall mean the Chapter 11 bankruptcy case commenced by Randall on the Randall Petition Date under Bankruptcy Case No. 10-37546.

"Randall Claim Docket" shall mean the docket showing proofs of Claim filed in the Bankruptcy Case under Case No. 10-37546.

"Randall Enterprise" shall mean Randall, the Corporate Debtors, all subsidiaries of the Debtors, all Affiliates of the Debtors (including Strategic Commercial Lending, LLC and Fruit Heights Construction, LLC), and/or any entity in which Randall or any of the Corporate Debtors held an equity interest.

"Randall Petition Date" shall mean December 20, 2010.

"Ray Quinney Law Firm" shall mean the law firm of Ray Quinney & Nebeker P.C., one of the Professionals of the Consolidated Estate, which was approved by the Bankruptcy Court on March 26, 2012 pursuant to the Order entered as Docket 573 to represent the Trustee and the Consolidated Estate on a contingency fee basis as local counsel to the Reid Collins Law Firm in connection with the Estate Litigation Claims against Facilitators that the Reid Collins Law Firm will also be handling on a contingency fee basis. The Ray Quinney Law Firm also represents the Trustee and the Consolidated Estate, on an hourly basis, as general litigation and bankruptcy counsel on matters not related to the Estate Litigation Claims against Facilitators.

"Reid Collins Law Firm" shall mean the law firm of Reid Collins & Tsai, LLP, which was approved by the Bankruptcy Court on March 26, 2012 pursuant to the Order entered as Docket 574 to act as special litigation counsel for the Trustee and the Consolidated Estate on a contingency fee basis in connection with the Estate Litigation Claims against Facilitators.

"Restitution" shall mean any Cash payments to be made by Randall or by the Insurance Agents or by any other Persons for the benefit of Victims as ordered by any state or federal court or as required by any Governmental Unit, including those required by any Governmental Unit in connection with any settlements by such Governmental Unit with the parties required to make the Restitution payments.

"Rising Tide Distribution Method" shall mean the method of distribution to be applied by the Trustee for the distribution of Victim Funds to holders of Allowed Victim

Claims, and holders of Class 16(B) Allowed Unsecured Claims (if any). The Rising Tide
Distribution Method shall govern all Victim Claims under the Plan, even if the amount
asserted for any Victim Claim in its corresponding Victim Proof of Claim or in the
Schedules or otherwise exceeds the Victim Net Claim Amount for such Victim Claim.
Under the Rising Tide Distribution Method, Investors who are not Winning Investors are
allowed to retain the total Withdrawals they have previously received (whether such
Withdrawals are prepetition Withdrawals or are funds received by such Investors from
the proceeds of the Trustee's post-petition sale of properties or from post-petition
settlements with the Trustee), but their total Withdrawals are subtracted from the amount
of their Investment to determine their Victim Net Claim Amount as well as their initial
recovery percentage (rather than their net loss) for distribution purposes.  Under the
Rising Tide Distribution Method, the Investors who previously received Withdrawals or
prior distributions that resulted in a percentage return of their Investment that is less than
the percentage return of other Investors will participate in each distribution in such
amounts as to raise their percentage returns closer to such other Investors until all of the
Investors have an equal percentage return on their Investment.  An example of three
hypothetical Investors will illustrate the application of the Rising Tide Distribution
Method.  Investor A invested the Investment amount of $150,000, and received
Withdrawals of $60,000.  Investor A's initial recovery percentage is calculated at 40%
($60,000 divided by $150,000 = 40%).  Investor B invested the Investment amount of
$150,000, and received Withdrawals of $30,000.  Investor B's initial recovery percentage
is calculated at 20% ($30,000 divided by $150,000 = 20%).  Investor C invested the
Investment amount of $150,000, but received no Withdrawals.  Investor C's initial
recovery percentage is calculated at 0%.  If the Trustee has Victim Funds of $60,000 for
his initial distribution of Victim Funds, under the Rising Tide Distribution Method,
Investor B will receive $15,000 of the Victim Funds, Investor C will receive $45,000 of
the Victim Funds, and Investor A will receive none of the initial distribution of $60,000
of Victim Funds.  Investor A's recovery percentage is still considered to be 40% (from
Investor A's prior Withdrawals), Investor B's recovery percentage will have increased to
30% (consisting of Investor B's prior Withdrawals of $30,000 plus $15,000 from the
initial distribution of Victim Funds, for a total of $45,000 [$45,000 divided by $150,000
= 30%]), and Investor C's recovery percentage will also have increased to 30% ($45,000
divided by $150,000 = 30%).  The result of the Rising Tide Distribution Method is to
raise the recovery percentages of Investor B and Investor C as close to the recovery
percentage of Investor A as possible, with the Trustee applying a consistent formula to
calculate the Victim Net Claim Amounts for all Victim Claims as well as the initial
distribution of Victim Funds and all subsequent distributions of Victim Funds, giving
distribution preference to those holders of Allowed Victim Claims who received no
Withdrawals or small Withdrawals (i.e., little or no return of their Investment) over other
holders of Allowed Victim Claims who received larger Withdrawals (i.e., larger
distributions of their Investment), either prior to the Petition Date or through post-petition
payments on their Allowed Victim Claims.  Investor A will participate in subsequent
distributions of Victim Funds only at such time as the recovery percentages of Investor B
and Investor C have reached 40%, the same initial recovery percentage for Investor A.
At such time that the recovery percentages for Investor A, Investor B and Investor C have
become equalized through distributions of Victim Funds, then each of Investor A,

Investor B and Investor C will share prorata in all subsequent distributions of Victim Funds.   -For a holder of a Class 16(B) Allowed Unsecured Claim under the Plan (if any), the Rising Tide Distribution Method will be applied as follows: With respect to the transaction (such as a lending transaction or a single contract for goods or services) that gives rise to such Class 16(B) Allowed Unsecured Claim, such holder will be allowed to retain the total payments such holder has previously received arising out of such transaction (whether such payments are prepetition payments or are payments received by such holder from the foreclosure or other disposition of such holder's original Collateral or from a postpetition settlement with the Trustee), but such holder's total payments will be subtracted from the amount that was originally owed to such holder to determine such holder's initial recovery percentage (rather than such holder's net loss) for distribution purposes, and the Rising Tide Distribution Method will then be applied to such Class 16(B) Allowed Unsecured Claim in the same manner that it will be applied to Allowed Victim Claims. The Rising Tide Distribution Method shall govern all Class 16(B) Allowed Unsecured Claims under this Plan.

"Rule 3018(a) Motion" shall have the meaning outlined in Section 5.54 of this Disclosure Statement.

"Sandy Office Building Property" means the real property located at approximately 9890 South 300 West in Sandy, Utah, that on the Corporate Debtors Petition Date was owned by Horizon Financial.

"Schedules" shall mean the various statements and schedules of assets and liabilities filed by the Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules have been or may be supplemented or amended from time to time.

"Scheme" shall mean the financial scheme perpetrated by Randall, which had the characteristics of a Ponzi scheme, and was perpetrated through the Randall Enterprise with the assistance and facilitation of the Facilitators, as described more fully herein.

"Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

"Small Payment Reserve" shall have the meaning outlined in Section 7.5(c) of the Plan.

"Sunset Property" means collectively the three parcels of real property located at approximately 124 West 800 North, 116 West 800 North, and 78 West 800 North in Sunset, Utah, that on the Randall Petition Date were owned by Horizon Mortgage (an undivided 50% interest in the 124 West 800 North Parcel and an undivided 50% interest in the 116 West 800 North Parcel), Danita Hooper (an undivided 50% interest in the 124 West 800 North Parcel and an undivided 50% interest in the 116 West 800 North Parcel), and Randall (100% of the interests in the 78 West 800 North Parcel).

23

"<u>Terminated Policy</u>" shall mean a Policy held at any time by a Policyholder that has been terminated and/or is no longer in force, excluding a Policy on which a death benefit has previously been paid or is due and payable as of the Effective Date.

"<u>Thompsons</u>" shall mean Leland Thompson and Phyllis Thompson, who were Investors.

"<u>Trustee</u>" shall mean Gil A. Miller in his capacity as Chapter 11 Trustee of the Debtors, in his capacity as liquidating trustee under the Plan, and/or in his capacity as the initial trustee of the Private Actions Trust.

"<u>Union Central</u>" shall mean each, any or all of the following: Union Central Life Insurance Company, Ameritas Life Insurance Company, Ameritas Mutual Holding Company, and all Affiliates, officers, directors, agents, attorneys and employees of the foregoing companies.

"<u>United States</u>" shall mean the United States of America.

"<u>Victim Causes of Action</u>" shall mean Causes of Action of a Victim against Union Central, Debtors' Agents, or any other Facilitator that, prior to the Randall Petition Date, acted as an attorney, accountant, auditor, financial advisor for Debtors; such Causes of Action shall include those arising out of: (i) the offering, solicitation, promotion, servicing, or repayment of a Policy or an Investment by Union Central, Debtors or any Debtors' Agent; (ii) the issuance, repayment, cancellation, extension, conversion, exchange, or modification of Notes by the Union Central, Debtors or any Debtors' Agent; (iii) the provision of investment or financial advice or services by Union Central, Debtors or any Debtors' Agent; (iv) other actions of any Debtors' Agent; and (v) any Terminated Policy; provided, however, "Victim Causes of Action" shall not include any right or obligation of any Policyholder under any Active Policy.

"<u>Victim</u>" shall mean an Investor who is not a Winning Investor and who has not received Withdrawals in excess of such Victim's Investment, either from Withdrawals prior to the Randall Petition Date or the Corporate Debtors Petition Date, or from Withdrawals received from the Consolidated Estate after the Randall Petition Date or the Corporate Debtors Petition Date but prior to the Effective Date.

"<u>Victim Claim</u>" shall mean the unsecured non-priority Claim of a Victim, including any Deficiency Claim.  The amount of a Victim Claim is limited to the Victim Net Claim Amount for that Victim.

"<u>Victim Funds</u>" shall mean Restitution, if any, plus all Cash of the Consolidated Estate, less Cash necessary to fund and/or pay: (i) costs of administration of the Consolidated Estate, including any funds necessary to fund settlement agreements unrelated to Victim Claims; (ii) Allowed Administrative Expenses Claims; (iii) Allowed Priority Tax Claims; (iv) Allowed Secured Claims; (v) Allowed Priority Unsecured Claims; (vi) Allowed Non-Investor Trade Creditor Unsecured Claims; (vii) the Disputed Claim Reserve; (viii) the Operating Reserve; and (ix) any Small Claim Reserve.

"Victim Net Claim Amount" shall mean, for the Victim Claim of any particular Victim, the difference between the Victim's total Investment and all Withdrawals received by the Victim.

"Victim Proof of Claim" shall mean a proof of Claim filed by a Victim in the Bankruptcy Case and docketed on either the Randall Claim Docket or any of the Corporate Debtors Claim Dockets.  Notwithstanding the amount of a Victim Claim asserted in any corresponding Victim Proof of Claim, the amount of an Allowed Claim for any Victim Claim shall not exceed the Victim Net Claim Amount for such Victim Claim.

"Voting Deadline" shall mean the deadline outlined in Section 9.1 of this Disclosure Statement for a Creditor to vote on the Plan (if such Creditor is entitled to vote on the Plan).

"Winning Investor" shall mean an Investor who made an Investment with Randall or any of the Corporate Debtors and who received Withdrawals greater than the amount of the Investment prior to the Effective Date.

"Withdrawals" shall mean the total amount of funds received by an Investor from or attributable to Randall or from or attributable to any of the Corporate Debtors as a result of such Investor's Investment, regardless of whether such Withdrawals were characterized as a repayment or return of the Investment or as an interest payment or as a payment of a late fee or as a payment of a commission or any other characterization. Withdrawals shall include not only the funds received by an Investor prior to the Randall Petition Date or the Corporate Debtors Petition Date, but also any additional funds received by an Investor from the Consolidated Estate as a result of the Trustee's sale of any assets (whether assets of the Consolidated Estate or other assets) or from the Trustee's settlement with an Investor with respect to a Secured Claim asserted by an Investor against any of the assets of the Consolidated Estate.

"87 N. Adamswood Property" means the real property located at approximately 87 North Adamswood in Layton, Utah, that on the Corporate Debtors Petition Date was owned by Horizon Mortgage (an undivided 39% interest) and Debbie Noorda, Trustee of the 2905 RRR Land Title Trust (an undivided 61% interest).

"715-721 N. 400 W. Property" means collectively the real properties located at approximately 715 North 400 West and 721 North 400 West in Kaysville, Utah, that on the Corporate Debtors Petition Date were owned by Horizon Mortgage (an undivided 58% interest), Jadrien Marble (an undivided 30% interest), and LeGrande Hafen and LuJuanna Hafen (an undivided 12% interest).

"811 S. Main Property" means the real property located at approximately 811 South Main in Layton, Utah, that on the Randall Petition Date was owned by Randall (a 71.9% undivided interest), Conrad O. Taysom (an undivided 12% interest), Steven D. Zimmerman (an undivided 9% interest), and Jack David Hatch, Trustee of the Jack David Hatch Revocable Trust (an undivided 7.1% interest).

"990 N. Rainbow Drive Property" means the real property located at approximately 990 North Rainbow Drive in Layton, Utah, that on the Randall Petition Date was owned by Randall.

"1072 S. Lloyd Property" means collectively the two parcels of real property located at approximately 1072 South Lloyd in Fruit Heights, Utah, that on the Randall Petition Date were owned by Randall ("Parcel 1") and Horizon Financial ("Parcel 2").

"1427 W. 1650 N. Property" means collectively the real properties located at approximately 1427 West 1650 North in Layton, Utah, that on the Randall Petition Date were owned by Horizon Mortgage (Units 101-104, 701-704, 801-804, and 1101-1104) and Randall (Units 901-904).

"1505 N. 1200 W. Property" means the real property located at approximately 1505 North 1200 West in Layton, Utah, that on the Randall Petition Date was owned by Randall (a 98.5% undivided interest) and Metamorphosis (record title to a 1.5% undivided interest).

"1634 N. Angel St. Property" means the real property located at approximately 1634 North Angel Street in Layton, Utah, that on the Randall Petition Date was owned by Randall.

"2905 RRR Trust" means the 2905 RRR Land Title Trust and its trustee, Debbie Noorda, which was an Investor.


# SECTION 4.

# INTRODUCTION


The Trustee provides the following brief overview of the Debtors and the Bankruptcy Case to facilitate an understanding of this Disclosure Statement and the Plan. The Trustee was appointed by the Bankruptcy Court as the Chapter 11 Trustee for Randall's Bankruptcy Case on December 10, 2010. Since that time, the Trustee has been supervising the liquidation of the remaining assets from the Randall Enterprise Scheme. The Randall Enterprise Scheme was orchestrated by a single controlling individual, Randall, who used his control over the Corporate Debtors to perpetuate the fraudulent Scheme while presenting to his Victims and to the general public an air of legitimacy.

The Randall Enterprise was promoted to the public as an integrated real estate investment and life insurance business. Randall began investing in real estate projects in Utah, primarily apartment complexes, in the late 1990's. In February of 2000, Randall was appointed a General Agent of Union Central Life Insurance Company, and he and his subagents began soliciting and selling Union Central life insurance products to his Victims. Many of the Victims of the Randall Enterprise were neighbors, acquaintances through Randall's church, or other personal acquaintances of Randall, giving the Randall

Enterprise the appearance of a typical "affinity" fraudulent scheme. During the course of the Randall Enterprise, Randall and his subagents sold approximately 12,300 life insurance policies that were underwritten by Union Central.

Many of the Union Central policies that Randall promoted to his Victims were very expensive whole life policies requiring large premiums that most Victims could not generally afford. Randall convinced his Victims to "invest" in his real property empire (often from their life savings or self-directed retirement funds), promising very high returns (typically 12%-15% annually) on their Investments that could be used to pay the life insurance premiums. Randall documented the Investments with Notes and prospectuses, which gave the Randall Enterprise a veneer of respectability and legitimacy. However, instead of segregating the investment funds of the Victims and using them (as represented to the Victims) to purchase or improve real estate (and usually specific real estate projects) or for other projects (the funding of auto loans through Horizon Auto, for example), the Randall Enterprise instead commingled funds received from the Investors and then used investment funds of newer Victims to pay the promised "returns" to earlier Victims. Furthermore, although Randall represented to his Victims that they were investing with a particular Corporate Debtor (Horizon Auto, for example), Randall generally commingled funds received and then simply used funds to pay obligations of the Corporate Debtors - including "interest" obligations to existing Investors – that were most pressing.

From the late 1990's through the date of the Trustee's appointment, Randall operated the Randall Enterprise with the classic characteristics of a Ponzi scheme. In total, Randall, through the operations of the Randall Enterprise, raised more than $72 million from defrauded Victims. As part of the Scheme operated through the Randall Enterprise, Randall, either personally or through one of several agents, raised Cash from Victims, with such Cash constituting the amount of the Investment of each Victim. Typically, in exchange for Cash invested, a Note was issued to the Victim that provided for high rates of return, ranging from approximately 12% to 15%.

The Randall Enterprise raised at least $72.0 million from Victims through the issuance of and/or renewal of the Notes. The Randall Enterprise used this Cash to purchase, among other things, real and personal property and to pay existing Victims payments which in some cases exceeded the amount of their Investment. The Randall Enterprise also used this Cash to fund automobile loans.

The Corporate Debtors never made a profit with which to pay returns to the Victims. Since at least the late 1990's, while the operations of the Randall Enterprise were continuing, increasing amounts of new Victim Cash were used to pay earlier Victims and support the business losses of the Corporate Debtors. The Corporate Debtors were insolvent, and their insolvency increased over time as they took in new Victim funds and continued to experience losses from the poor management of their real estate assets.

On December 20, 2010, after experiencing extreme financial pressures and litigation from disgruntled Victims, Randall filed a personal Chapter 11 bankruptcy petition with the Bankruptcy Court under Bankruptcy Case No. 10-37546.  As a debtor in possession, Randall continued to control the Corporate Debtors.  The Trustee's subsequent investigation resulted in the conclusion that the Randall Enterprise appears to have been operated as one economic unit through significant commingling, disregard for corporate formalities and other consolidated entity conduct, as discussed below.  While acting as debtor in possession for his personal Chapter 11 case, Randall continued to raise Cash from new Victims through the Corporate Debtors that were not yet in bankruptcy.  For example, Randall raised more than $1.3 million through Horizon Auto during this time period, and Randall did not disclose his personal bankruptcy filing to any of these new Victims.  The new money was used to pay existing Victims, including Victims who invested in Corporate Debtors other than Horizon Auto, and support the continuing operating losses of the Randall Enterprise.

The Randall Enterprise finally ran out of new sources of Victim funds several months after Randall's personal bankruptcy filing, and the Corporate Debtors stopped making payments to the existing Victims in July of 2011.  The Investments of most of the Victims remained unpaid when the Randall Enterprise collapsed and bankruptcy cases were filed for the Corporate Debtors in the fall of 2011.

While acting as a debtor in possession of his individual bankruptcy estate, Randall made no real effort to reorganize his personal financial affairs.  After the details of Randall's fraudulent Scheme became apparent during his personal bankruptcy Case, the United States Trustee filed a motion to convert Randall's Chapter 11 case to a Chapter 7 case or, alternatively, to appoint a Chapter 11 trustee.  At the hearing on the United States Trustee's motion on September 28, 2011, Bankruptcy Judge Joel Marker, after hearing testimony, determined:  "[W]hat we do have here is a continuing fraud on the public.  Since he has filed bankruptcy Mr. Randall, by his own testimony, has drawn in to the companies, that again he controls exclusively—including Horizon Auto Funding—has drawn in another $1.3 million from investors, since he filed bankruptcy, without disclosing to them that he has filed bankruptcy.  And then has used the money as he has seen fit, including to pay, according to his testimony, payments to a creditor who obtained a $2 million consent judgment against him…."

In short, Judge Marker at this hearing ruled that there was ample cause for the appointment of the Trustee based upon Randall's fraudulent activities, and Judge Marker ordered the immediate appointment of the Trustee, which occurred in the Randall Case on September 29, 2011.  On October 12, 2011, after the Trustee had taken over control of the operations of the Corporate Debtors, the Trustee caused the Corporate Debtors to also file their own Chapter 11 bankruptcy petitions.

After further investigation into the extensive commingling of cash, assets, and liabilities between Randall and the Corporate Debtors and other evidence of the Debtors' conduct, the Trustee concluded that the Randall Enterprise had operated as a single economic unit.  The Trustee then moved for substantive consolidation of the Debtors,

which was granted by the Bankruptcy Court pursuant to the Consolidation Order on January 27, 2012 [Docket 449], with the bankruptcy cases of the Corporate Debtors being substantively consolidated into the Randall Bankruptcy Case under Bankruptcy Case No. 10-37546.

**Exhibit 2** to this Disclosure Statement is a summary of the evidence gathered by the Trustee and the Trustee's Professionals of the extensive commingling of assets and the consolidated entity conduct of the Debtors that supported the substantive consolidation of the Debtors. The Trustee's investigation confirmed that funds were commingled and transferred between the various Debtors without regard for any formal documentation (such as intercompany promissory notes) or other corporate formalities. Rather, the funds were transferred based solely on the cash-flow needs (including the need to pay existing Victims their "interest" payments) of the various Debtors. In many instances, certain operational expenses were paid by one of the Corporate Debtors, but were not then allocated to the other Corporate Debtors on whose behalf the expenses were paid. Randall controlled he Corporate Debtors and did not observe corporate formalities. The Debtors were operated by the same small group of people headed by Randall. As an example of Randall's control over the Randall Enterprise, Randall did not have a personal bank account, and Randall's personal expenses were paid by Horizon Financial.

Even though Randall's Victims were told they were investing with a particular Corporate Debtor, routinely their Investment Cash was deposited with other Corporate Debtors, and their monthly payments were made by other Corporate Debtors. When Randall filed his personal bankruptcy case, he listed many of the real properties acquired by the Randall Enterprise as personal assets, even though Horizon Mortgage had listed those same properties as its assets on its financial statements and Horizon Mortgage had paid the mortgage payments on those real properties. Horizon Mortgage, which was the Corporate Debtor through which the majority of Victims funds were solicited by the Randall Enterprise, had a cumulative loss of $33,703,232 from 1996 through 2011, experiencing 16 successive years of losses with no positive net income in any of those 16 years. Furthermore, even though an Independent Auditor's Report for Horizon Mortgage was issued as of December 31, 2008, stating that Horizon Mortgage's ability to continue as a going concern was doubtful, Randall continued to operate Horizon Mortgage after that time as part of the Randall Enterprise without disclosing Horizon Mortgage's financial losses to existing Victims or new Victims.

**Exhibit 3** to this Disclosure Statement is the Affidavit of John H. Curtis dated December 12, 2011, which was filed on December 13, 2011, as Docket No. 407 in the Bankruptcy Case. John H. Curtis, who is a CPA and Certified Fraud Examiner, is the Trustee's forensic accountant, and his Affidavit was filed in support of the Trustee's motion for substantive consolidation of the Debtors. The Affidavit of John H. Curtis and attached exhibits provide the back-up support and documentation for the Trustee's evidentiary summary attached as **Exhibit 2**.

Since his appointment, the Trustee has administered and continues to administer the Consolidated Estate in a manner to effectively and efficiently maximize the value of all assets for the benefit of Creditors.  When the Trustee was appointed, there was almost no money in the Consolidated Estate.  The increasing insolvency of the Corporate Debtors had drained their financial resources, and the sources of new Victim funds had dried up.  Notwithstanding the scarcity of funds, the Trustee was able to operate the real properties owned by the Debtors for approximately nine months until all the real properties (and any associated tangible personal property) were either abandoned or sold with Bankruptcy Court approval.  Many of the real properties were "underwater" and had no equity in them, so these properties were abandoned for foreclosure by their senior lienholders.  A list of real properties of the Debtors and their disposition as part of the Bankruptcy Case is attached to this Disclosure Statement as **Exhibit 4-1**.  However, ten of the real properties had some equity, and after these properties were sold with Court approval, there was approximately $2.2 million of net sale proceeds remaining from the sale of these ten properties (plus the sale of unencumbered personal property located at one additional real property site) after payment of the first lienholders (if any) on these properties, but before any payments of net sale proceeds were made to any of the non-bankrupt co-owners of some of these properties.  The eleven properties and the amount of net sale proceeds for each of the eleven properties are included in the information listed on **Exhibit 4-2** to this Disclosure Statement, and are summarized on **Exhibit 11-2** to this Disclosure Statement.

The Trustee is currently holding approximately $2.25 million in Cash.  **See, Exhibit 11-1** to this Disclosure Statement.  The net proceeds from the sale of the eleven real properties (and related personal property), after payment of some settlements related to lienholders and co-owners of some of the real properties, make up approximately $1.9 million of the approximately $2.25 million in Cash currently held by the Consolidated Estate.  The remaining balance of the Cash held by the Consolidated Estate has come from the Trustee's pursuit of avoidance and other Estate Litigation Claims being pursued by the Trustee for the benefit of the defrauded Victims of the Consolidated Estate.  The Trustee has made demand on the fortunate few Randall Enterprise Investors who received more from the Ponzi Scheme fraud than they ever invested, demanding that these Winning Investors return their "excess" distributions or "net winnings" back to the Consolidated Estate.  The Trustee has pursued and is continuing to pursue on behalf of the Consolidated Estate the adversary proceedings outlined in Section 7.3 below to recover these "net winnings" from these Winning Investors who received more than they invested, and to also recover from other Persons who profited from the fraudulent operations of the Randall Enterprise or who received fraudulent transfers.

The Trustee's investigation has revealed that the ultimate source of the Cash that the Trustee is holding on behalf of the Consolidated Estate is the Investment Cash given by the defrauded Victims to the Randall Enterprise.  The real properties that were part of

the Randall Enterprise were held by Horizon Mortgage[2] and were purchased from 1999 to 2008. The Trustee's Professionals have analyzed the sources of Cash used to purchase these real properties. This analysis is attached to this Disclosure Statement as **Exhibit 5**. The real properties were purchased with Cash from Horizon Mortgage as well as bank financing on some of the real properties. When the real properties were sold in 2012, the senior bank financing (if any) on each property was repaid, including unpaid interest, and the net proceeds deposited with the Consolidated Estate (including net proceeds claimed by the co-owners of some of the real properties) were approximately $2.2 million. The Consolidated Estate's share of these net proceeds represents a return of the Cash used by Horizon Mortgage to purchase and maintain the real properties, after losses resulting from the decline in the market values of the real properties.

The analysis in **Exhibit 5** to this Disclosure Statement summarizes cash flow information from the audited financial statements of Horizon Mortgage for the years 1999 and 2002 to 2008 (the Trustee's Professionals have not found the 2001 and 2002 audited financial statements for Horizon Mortgage, but the Randall Enterprise had little real estate acquisition activity during those years). **Exhibit 5** to this Disclosure Statement shows that from 1999 to 2008, Horizon Mortgage had negative Cash flow each year from operations. Cash flow from investing activities was also generally negative, even after separating out the purchases of real property and equipment for the Randall Enterprise. **Exhibit 5** to this Disclosure Statement also shows the amount of Horizon Mortgage Cash used to purchase real property and equipment from 1999 to 2008, which totaled $8,289,059.

Based on the other sources of Cash, **Exhibit 5** to this Disclosure Statement shows the range between the estimated "minimum" amount of Investor Cash used to purchase the real property and equipment of the Randall Enterprise and the estimated "maximum" amount of Investor Cash used for those purchases. That range is between $4.2 million (the minimum amount of Investor Cash used to purchase the real properties) to $8.3 million (the maximum amount of Investor Cash used to purchase the real properties). The minimum calculation, while unlikely (the Trustee's estimate is that more than the minimum amount of Investor Cash was actually used to purchase the real properties), assumes that any other available Cash flow was used first to fund real property purchases before Investor Cash was used.

For example, in 1999, a total of $2,639,252 of real property and equipment was purchased for the Randall Enterprise, and the loan proceeds from Randall Enterprise mortgages during 1999 were $1,600,697 (see **Exhibit 5**, column for 1999 activities). The 1999 operations of the Randall Enterprise were operated at a loss, consuming Cash of

---

[2] Some of the real properties were titled in Randall's name or other Corporate Debtors. However, for accounting purposes, the real properties were generally recorded and accounted for by the Randall Enterprise on the books and records of Horizon Mortgage.

$760,692 in 1999.  In addition, the 1999 investing activities of the Randall Enterprise also were operated at a loss, consuming more Cash equal to $1,049,198 in 1999.  The defrauded Investors invested a net amount of $2,767,217 into the Randall Enterprise in 1999.  If you assume that the 1999 operating losses ($760,692) and the 1999 investing losses ($1,049,198) were funded from other sources, there was still a minimum of $1,038,555 of Investor Cash that was used to purchase the real property and equipment acquired by the Randall Enterprise in 1999 (i.e., with 1999 purchases equal to $2,639,252, and only $1,600,697 in mortgage proceeds in 1999, and the other operations of the Randall Enterprise in 1999 having been operated at a loss, the $1,038,555 difference [$2,639,252 - $1,600,697 = $1,038,555] could only have come from the net proceeds from Investor Cash).   Almost each successive year shows a similar story, and cumulatively, as a minimum amount, $4,222,939 of Investor Cash was used from 1992 through 2008 to purchase the real properties and equipment acquired by the Randall Enterprise.

Alternatively, if you assume that the $1,600,697 in mortgage proceeds in 1999 were used to subsidize the 1999 operating losses and investing losses rather than to acquire new real properties and equipment, then the entire $2,639,252 in 1999 purchases of real properties and equipment for the Randall Enterprise were funded by Investor Cash (i.e., the maximum amount funded in 1999 by Investor Cash for the acquisition of new real properties and equipment was the $2,639,252 in Investor Cash for that year).  Under this alternative methodology, a maximum amount of $8,289,059 in Investor Cash was used from 1999 through 2008 to purchase the real properties and equipment acquired by the Randall Enterprise.

**Exhibit 5** to this Disclosure Statement demonstrates the Randall Enterprise's dependence on the incoming flow of new Investor Cash to maintain the ongoing fraud.  The new Investor Cash almost entirely funded the real property and equipment purchases for the Randall Enterprise as well as operating losses and investing activities.  The net Cash proceeds from the sale of the Randall Enterprises' real properties in 2012 are traceable as the "return" of the Investor Cash used to purchase those real properties.  In fact, the approximately $2 million in net Cash proceeds from the sale of Randall Enterprise real properties is significantly less than the minimum of $4,222,939 of Investor Cash used to fund the purchase of such real properties.

**Exhibit 6** to this Disclosure Statement includes charts that summarize the cash flow of Horizon Mortgage from 2002 to 2008, showing the overwhelming dependence of the Randall Enterprise on new Investor Cash and the use of the same to fund payments to earlier Investors and to cover operating and investing activity losses.  Not only does **Exhibit 6** demonstrate that the Randall Enterprise exhibited the classic characteristics of a Ponzi scheme, but **Exhibit 6** also demonstrates that the funds being held by the Consolidated Estate for future distribution to the defrauded Victims were generated from and are traceable to the funds invested by these same defrauded Victims.

In summary, the results of the Trustee's investigation have demonstrated, at least in the Trustee's view, that the Randall Enterprise had the characteristics of a Ponzi

scheme since the late 1990's, the time period when the Randall Enterprise acquired its real properties.  During that same time period, the operations and the investing activities of the Randall Enterprise were being managed at a loss, and the Cash from the funded amounts of the mortgage loans taken out the Randall Enterprise was not large enough to have paid for the acquired real properties, so the balance of the Cash used to acquire those real properties naturally came from the invested Cash of the defrauded Victims.

As part of his duties in this Bankruptcy Case, and following the Trustee's investigation of the activities of the Debtors as outlined above, the Trustee formulated the proposed Plan attached to this Disclosure Statement as **<u>Exhibit 1</u>**.  The Trustee maintains that the proposed Plan is the most effective means for administering and distributing assets of the Consolidated Estate in a timely fashion for the benefit of all Creditors. Among other things, the Plan provides (a) a means for making the most fair and equitable distribution to Victims of the Cash that the Trustee has obtained to date in administering and liquidating the Consolidated Estate, including Cash obtained as a result of demands or suits against Winning Investors, (b) a method to avoid potential actions by federal or state authorities that could result in a reduced return to Victims as a result of piecemeal marshaling and distribution of assets, (c) efficient and cost-effective administration of the Consolidated Estate after the entry of the Confirmation Order, and (d) creation of a mechanism through the Private Actions Trust for Victims to pursue their Victim Causes of Action against Facilitators for the Facilitators' roles in assisting or perpetuating the Scheme through the Randall Enterprise.

As discussed in greater detail in Section 8 of this Disclosure Statement, the Bankruptcy Case will likely be converted to a case under Chapter 7 if Creditors entitled to vote for the Plan choose not to accept it.  While conversion to Chapter 7 would - like the proposed Plan – provide a process to complete the liquidation of the Consolidated Estate's assets, a conversion may result in a delay of distribution of Cash to holders of Allowed Claims and additional administrative expense.  Conversion also would likely remove any ability of Victims to assign their Victim Causes of Action to the Private Actions Trust, meaning that Victims would need to assert their Victim Causes of Action individually.  The Trustee believes it likely that few, if any, Victims would elect to pursue their Victim Causes of Action individually.  For these reasons, the Trustee urges Creditors to accept the Plan.

## SECTION 5.

## SUMMARY OF PLAN AND TREATMENT OF
## ALLOWED CLAIMS AND INTERESTS

### 5.1    Introduction

This summary of the Plan is qualified in its entirety by reference to the Plan, a copy of which is attached as **Exhibit 1** to this Disclosure Statement.  You are encouraged to read the Plan in its entirety.  In general, the Plan provides for the Trustee's continued liquidation of the property of the Consolidated Estate.  In addition, the Plan provides for the treatment of Claims and Equity Interests, as more fully discussed below, and establishes the Rising Tide Distribution Method for distributions to the holders of Class ~~17~~16(B) Allowed Unsecured Claims (if any) and Class 17 Allowed Victim Claims, as described in the Plan and in this Disclosure Statement.  Finally, the Plan establishes the mechanism for creation of the Private Actions Trust, and for the assignment of Victim Causes of Action to the Private Actions Trust so that these claims can be pursued on an aggregate basis.

### 5.2    Post-Confirmation Administration and the Effective Date

As discussed in further detail in Article VI of the Plan, upon Confirmation of the Plan, the Trustee will retain any and all property of the Consolidated Estate, including but not limited to Claims and Causes of Action, and the Trustee will administer the Consolidated Estate in accordance with the Plan for the benefit of the Consolidated Estate.  Such administration will include completing the orderly liquidation of the property of the Consolidated Estate consistent with the terms of the Plan, making distributions as provided for by the Plan, and organizing and operating the Private Action Trust for the Private Action Trust Beneficiaries.  The Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of and related to the Bankruptcy Case, the assets and liabilities of the Consolidated Estate, and the Plan to the fullest extent permitted by law, as more fully set forth in Article X of the Plan.

If the Court confirms the Plan, and in the absence of any applicable stay, and if all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date, which is the later of: (i) 30 days after the Confirmation Date, or (ii) the day on which all conditions to consummation of the Plan as set forth in Section 9.1 of the Plan have been satisfied or waived.  Notice of the Effective Date of the confirmed Plan will be filed with the Bankruptcy Court and provided to each holder of a Claim.

### 5.3    Treatment of Unclassified Claims and Applicable Claims Bar Dates

The Plan addresses certain unclassified Claims for which treatment is mandated under the Bankruptcy Code.  These types of Claims include Administrative Expense Claims under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, and Priority Tax Claims under Section 507(a)(8) of the Bankruptcy Code.  Unclassified Claims are not considered impaired, and holders of these Claims do not vote on the Plan because they

are automatically entitled to specific treatment as set forth in the Bankruptcy Code.  As such, the Trustee has not placed the following Claims in a Class, and a description and the respective treatment of these unclassified Claims in the Plan as required under the Bankruptcy Code is set forth below.

### 5.3.1    Administrative Expense Claims - General

Administrative Expense Claims are Claims for the costs or expenses of administering the Debtors' Bankruptcy Case and the assets of the Consolidated Estate, including the costs of the Trustee and his Professionals.  Such Claims are allowed under Section 503(b)(3) of the Bankruptcy Code and afforded priority under Section 507 of the Bankruptcy Code.

Other than the Claims of Professionals which are provided for below, the Trustee is not aware of any Administrative Expense Claims.  A summary of incurred but unpaid Administrative Expense Claims of Professionals and estimated Administrative Expense Claims of Professionals through the Effective Date is attached as **Exhibit 7**  to this Disclosure Statement.  Treatment of Allowed Administrative Expense Claims is set forth in Article V of the Plan, and a summary of such treatment is set forth in the chart in Section 5.3.4 below.

### 5.3.2    Deadlines for Filing Certain Administrative Expense Claims

To facilitate a timely and efficient administration of the Consolidated Estate, the Plan requires the holders of certain types of Administrative Expense Claims to be filed by the following deadlines.

### 5.3.2(i)    Administrative Expense Claims Bar Date - Non-Professional Claims

To the extent that Administrative Expense Claims are asserted by Persons other than Professionals, requests for payment of Administrative Expense Claims must be filed and served on the Trustee and the United States Trustee **no later than thirty (30) days after the Effective Date**, which shall be the "Administrative Expense Claim Bar Date." *Any holder of an Administrative Expense Claim to whom the Administrative Expense Claim Bar Date applies who fails to file a request seeking to have its Claim allowed on or before said Bar Date shall be forever barred from seeking the allowance of its Administrative Expense Claim or any other Claim, and the Trustee, the Debtors and the Consolidated Estate shall be discharged of any obligation on such Claim or any other Claim related to the Administrative Expense Claim.*

### 5.3.2(ii)  Professional Administrative Expense Claim Bar Date

All Professionals requesting compensation or reimbursement of expenses under Sections 327, 328, 330, 331 and 503(b) of the Bankruptcy Code for services rendered before the Effective Date shall file with the Court and serve on the Trustee and the United

States Trustee an application for final allowance of compensation and reimbursement of expenses **no later than sixty (60) days after the Effective Date**, which shall be the "Professional Administrative Expense Claim Bar Date." *Any Professional who fails to file a request seeking to have its Claim allowed on or before said Bar Date shall be forever barred from seeking the allowance of its Administrative Expense Claim or any other Claim, and the Trustee, the Debtors and the Consolidated Estate shall be discharged of any obligation on such Claim or any other Claim related to such Professional's Administrative Expense Claim.*

### 5.3.3   Priority Tax Claims

A Priority Tax Claim is that portion of any Claim of a Governmental Unit for unpaid taxes which is entitled to priority under Section 507(a)(8) of the Bankruptcy Code.  Treatment of Allowed Priority Tax Claims, if any, is set forth in Article V of the Plan, and a summary of such treatment is set forth in the chart in Section 5.3.4 below.

**Exhibit 8** to this Disclosure Statement is a copy of Claim No. 7-5 that was filed by the IRS on April 9, 2013 in the Bankruptcy Case.  Claim No. 7-5 asserts the unsecured IRS Priority Tax Claim (on a consolidated basis) against the Consolidated Estate of $933,850.56, and the IRS's additional unsecured general claim (on a consolidated basis) against the Consolidated Estate of $211,622.85.  The IRS asserts that the majority of the IRS's claims are for unpaid payroll taxes that Randall failed to remit to the IRS and associated penalties and interest, which gives rise to the IRS's unsecured priority claim of $933,850.56.  The Trustee has requested that the IRS subordinate the unsecured IRS Priority Tax Claim and the IRS's additional unsecured general claim to the payment of the Class 17 Victim Claims.

The Trustee has estimated the Allowed amount of the Class 16(A) Non-Investor Trade Creditor Unsecured Claims that are currently in amounts of $50,000.00 or less (not including the IRS's unsecured general claim of $211,622.85) will be only approximately $55,000, as itemized in Exhibit B to the Plan (which is **Exhibit 1** to this Disclosure Statement).  The Plan proposes, as a matter of convenience, that the holders of the Class 16(A) Non-Investor Trade Creditor Unsecured Claims in Allowed amounts of $50,000.00 or less be paid 10% of their Claims upon confirmation of the Plan, which would result in a payment on these Claims of approximately $5,500 in total.   A Non-Investor Trade Creditor who has asserted an Unsecured Claim in excess of $50,000.00 can agree with the Trustee to have its Unsecured Claim Allowed in the amount of $50,000.00 or less and thereby become eligible for treatment in Class 16(A).  As stated above, the Trustee has also requested that the IRS subordinate its IRS Priority Tax Claim and its additional unsecured general claim to the payment of the Class 16(A) Non-Investor Trade Creditor Unsecured Claims in Allowed amounts of $50,000.00 or less.

The Trustee's investigation reveals that the Randall Enterprise had various employees that were hired to both manage and operate the real properties and other purported business operations (i.e., overseeing the Horizon Auto loan program, accounting for Victim money and paying Victims).  Since the Randall Enterprise did not

generate sufficient revenue to cover operating expenses, including payroll, it necessarily follows that most of the payroll was funded by Cash raised from Victims.  Because it appears to the Trustee that the source of the payroll for the Randall Enterprise came from the Cash of the defrauded Victims, the Trustee has proposed to the IRS that subordination by the IRS would be an equitable way to return a portion of the Victims' Investment funds back to the Victims.

If the IRS agrees to the Trustee's subordination proposal, the return to the Class 17 Victims from the assets of the Consolidated Estate will be significantly enhanced.  If the IRS does not agree to the Trustee's subordination proposal, and the IRS Claims are Allowed in the amounts and with the priority asserted by the IRS, the return to the Class 17 Victims from the assets of the Consolidated Estate likely will be minimal.

### 5.3.4   Summary of Treatment of Unclassified Claims

The following is a general summary of the treatment of unclassified Claims in the Plan:

| Type of Claim | Treatment | Estimated Distribution Percentage |
|---|---|---|
| **Administrative Expense Claims** (Plan, Art. V, § 5.2) | Except as otherwise agreed to by the Trustee and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the later of: (i) the Effective Date, or (ii) within 5 Business Days of the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. | 100% |
| **Priority Tax Claims** (Plan, Art. V, § 5.3) | At the sole election of the Trustee, the holder of Allowed Priority Tax Claims shall be paid either (i) upon such terms as may be agreed to between the Trustee and such holder of an Allowed Priority Tax Claim, (ii) in full in Cash on the later of the Effective Date or within 5 Business Days of the date that such Allowed Priority Tax Claim becomes and Allowed Priority Tax Claim, or (iii) in deferred Cash payments to be agreed upon by the Trustee and the holder of the Allowed Priority Tax Claim, not to exceed a period of 5 years after the Randall Petition Date.   The Trustee has requested that the IRS agree to different | To the extent any Allowed Priority Tax Claims exist, and barring an agreement from the IRS on subordination, 100% |

37

treatment of the IRS Priority Tax Claim than the options outlined above.  The IRS has agreed that the Trustee may hold the amount of the IRS Priority Tax Claim in reserve until after the IRS has made a final determination on the Trustee's request for subordination by the IRS.  Therefore, no payments on the IRS Priority Tax Claim will be made until after such final determination by the IRS is made and has been communicated to the Trustee, and after the 60 Business Days deadline for any objection by the Trustee to the IRS Priority Tax Claim. Once such final determination by the United States has been made, then the treatment of the IRS Priority Tax Claim shall be as follows:  (i) the IRS Priority Tax Claim shall be treated upon such terms as may be agreed to between the Trustee and the IRS, (ii) the IRS Priority Tax Claim shall be paid in full in Cash within five (5) Business Days of the date that the IRS Priority Tax Claim becomes an Allowed Priority Tax Claim, and if the Trustee does not object to the IRS Priority Tax Claim within the 60 Business Days deadline, the IRS Priority Tax Claim shall be deemed to be an Allowed Priority Tax Claim upon the expiration of such deadline, or (iii) the IRS Priority Tax Claim shall be paid in deferred Cash payments to be agreed upon by the Trustee and the IRS after the IRS Priority Tax Claim becomes an Allowed Priority Tax Claim (consistent with the 60 Business Days deadline for any objection by the Trustee to the IRS Priority Tax Claim), not to exceed a period of five (5) years after the Randall Petition Date.

**5.4      Treatment of Classified Claims and Equity Interests**

The Plan separately classifies different types of Claims and the Equity Interests in accordance with the Bankruptcy Code.  Holders of Claims or Equity Interests in a particular Class may or may not be entitled to vote on the Plan, as discussed in further detail below.

If the Plan is confirmed by the Bankruptcy Court, each holder of a Claim or Equity Interest in a particular Class will receive the same treatment as the other holders of Claims or Equity Interests in that Class, whether or not such holder voted to accept the Plan.  Moreover, upon confirmation, the Plan will be binding on all Creditors and Equity Interest holders, regardless of whether such Creditors or Equity Interest holders voted to accept the Plan.  Such treatment will be in full satisfaction, release and discharge of such holder's respective Claim against and Equity Interest in the Debtors, except as otherwise provided in the Plan.  Inclusion in a Class, however, does not preclude holders of Allowed Claims in that Class from agreeing to, or accepting less favorable treatment by settlement or otherwise.

### 5.4.1    Classes 1 – 14:  Allowed Secured Claims

Classes 1 through 14 consist of all Allowed Secured Claims on the various real properties of the Consolidated Estate for which there were net sale proceeds after such properties were sold by the Trustee.  Secured Claims are Claims against the Consolidated Estate to the extent of the value of any interest in the property of the Consolidated Estate securing such Claim.

The non-Investor first priority Liens on the Debtors' real properties were paid off in connection with the sales of the Debtors' real properties, as outlined in **Exhibit 4-2** to this Disclosure Statement.  A summary of the additional Secured Claims that have been asserted against the Consolidated Estate, including the Trustee's estimate of the amounts for corresponding Allowed Secured Claims and a description of Disputed Secured Claims, is attached as **Exhibit 9** to this Disclosure Statement.  The Trustee currently estimates that the Allowed Secured Claims for the junior Liens on the Debtors' real properties (including the Allowed Secured Claims for junior Liens that have already been paid by the Trustee pursuant settlement agreements that have been approved by Final Orders of the Bankruptcy Court) will be in the amount of $776,112.03, and the amount of the Disputed Secured Claims is approximately $402,123.69.   The treatment of Allowed Secured Claims under the Plan is set forth in Section 2.1 of the Plan, and a summary of such treatment is set forth in the chart in Section 5.4.6 below.

### 5.4.2    Class 2 - Priority Unsecured Claims

Class 2 consists of all Allowed Priority Unsecured Claims.  With the exception of unclassified Administrative Expense Claims, and the exception of the Priority Tax Claims discussed in Section 5.3 above, Priority Unsecured Claims are Claims against the Consolidated Estate entitled to priority of payment pursuant to Section 507(a) of the Bankruptcy Code.

At this time, it does not appear that any Priority Unsecured Claims are asserted against the Consolidated Estate.  In the event that Priority Unsecured Claims are asserted and become Allowed Claims, the treatment thereof under the Plan is set forth in Section 4.2 of the Plan, and a summary of such treatment is set forth in the chart in Section 5.4.6 below.

### 5.4.3    Class 16 – Non-Investor Trade Creditor Unsecured Claims

Class 16 consists of all Non-Investor Trade Creditor Unsecured Claims.  Such Claims are Claims against the Consolidated Estate that are not Secured Claims, Victim Claims or Claims that are entitled to priority of payment under Section 507 of the Bankruptcy Code.  Class 16(A) consists of the Allowed Unsecured Claims of Non-Investor Trade Creditors that are equal to or less than the amount of $50,000.00.  Class 16(B) consists of the Allowed Unsecured Claims of Non-Investor Trade Creditors that are greater than the amount of $50,000.00.

A summary of Non-Investor Trade Creditor Unsecured Claims in amounts equal to or less than the amount of $50,000.00 that have been asserted against the Consolidated Estate is attached as Exhibit B to the Plan (which is **Exhibit 1** to this Disclosure Statement).  The treatment of Allowed Non-Investor Trade Creditor Unsecured Claims, if any, under the Plan is set forth in Section 4.3 of the Plan, and a summary of such treatment is set forth in the chart in Section 5.4.6 below.

### 5.4.4    Class 17 - Victim Claims

Class 17 consists of all Allowed Victim Claims.  Such Claims are unsecured, non-priority Claims of Victims against the Consolidated Estate.  A Victim is an Investor who is not a Winning Investor and who has not received Withdrawals in excess of such Victim's Investment, either from Withdrawals prior to the Randall Petition Date or the Corporate Debtors Petition Date, or from Withdrawals received from the Consolidated Estate after the Randall Petition Date or the Corporate Debtors Petition Date but prior to the Effective Date. [3]

A summary of the total Victim Claims that have been scheduled in the Consolidated Estate's Schedules (a total of $72,060,695) as well as the Trustee's estimate of the total Allowed Victim Claims against the Consolidated Estate (a total of $39,274,000) is attached as **Exhibit 10** to this Disclosure Statement.   The treatment of Allowed Victim Claims under the Plan is set forth in Section 4.4 of the Plan, and a summary of such treatment is set forth in the chart in Section 5.4.6 below.

---

[3] *See* Definitions Section of this Disclosure Statement and the definitions in the Plan (both defining "Victim," "Winning Investor," "Withdrawals," and "Investment").

### 5.4.5    Class 5 - Equity Interests

Class 5 consists of all Equity Interests in the Debtors.  A summary of the treatment of Equity Interests, to the extent that they exist, is set forth in the chart in Section 5.4.6 below.

### 5.4.6    Summary of Treatment of Classified Claims and Equity Interests

The following is a general summary of the treatment of classified Claims and Equity Interests under the Plan:

| Type of Claim | Treatment | Estimated Distribution Percentage | Voting Rights |
|---|---|---|---|
| **Classes 1 – 14: Secured Claims** (Plan, Art. IV, § 4.1) | The First Lien Holders (the holders of the Secured Claims in Classes 1(A), 2(A), 3(A), 4(A), 6(A), 7(A), 8(A), 9(A), 9(B), 10(A), 11(A), 11(B), 11(C), 11(D), 12(A), 13(A), and 14(A)) have been Paid in Full on all of their Claims against the Debtors from the sale proceeds of their respective Collateral.  Such payments to the First Lien Holders are in full satisfaction of their Secured Claims and any other obligations owed by any of the Debtors to the First Lien Holders, and the First Lien Holders shall have no deficiency Claims or any other Claims against the Consolidated Estate.  As to the holders of Secured Claims other than the First Lien Holders, unless the Trustee and the holder of any other Secured Claim agree to different treatment, or unless (with respect to any Secured Claim as to which the Trustee has filed an objection with the Bankruptcy Court) there is a Final Order with respect to the treatment for such Claims, each holder of all other Allowed Secured Claims will receive Cash in an amount equal to | Holders of Allowed Secured Claims will be paid 100% of their Allowed Secured Claims. | The Allowed Secured Claims in these Classes are unimpaired and, therefore, holders of such Allowed Secured Claims are presumed to vote in favor of the Plan. Accordingly, their votes for or against the Plan will not be solicited by the Trustee. To the extent that the unpaid deficiency balance of an asserted Secured Claim is Allowed as an Allowed Victim Claim or as an Allowed Non-Investor Trade |

| Type of Claim | Treatment | Estimated Distribution Percentage | Voting Rights |
|---|---|---|---|
| | such Allowed Secured Claim, including any interest thereon required to be paid pursuant to Section 506(b) of the Bankruptcy Code, on the later of the Initial Distribution Date and five (5) Business Days of the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.  For those Allowed Secured Claims that were secured by Collateral on multiple real properties, the holders of such Allowed Secured Claims shall only receive one satisfaction of their Allowed Secured Claims, and the Trustee shall retain the discretion to determine which proceeds from which real properties secured by such Allowed Secured Claims will be used to satisfy such Allowed Secured Claims in full.  To the extent that the proceeds from the sale of the Collateral securing any asserted Secured Claim are insufficient to pay any portion or all of such asserted Secured Claim, after the priority of such asserted Secured Claim to the sale proceeds has been determined, the unpaid deficiency balance of such asserted Secured Claim shall not be Allowed as a Secured Claim, but such Deficiency Claim shall be Allowed as an Allowed Victim Claim (but only if the holder of such asserted Secured Claim is also a Victim) or otherwise as a Non-Investor Trade Creditor Unsecured Claim, to the extent that the Trustee has not otherwise objected to such Deficiency Claim. | | Creditor Unsecured Claim as outlined in Section 4.1(c) of the Plan, the holder of such Allowed Non-Investor Trade Creditor Unsecured Claim or such Allowed Victim Claim (as the case may be) will be entitled to vote for or against the Plan as part of Class 16(A) or Class 16(B) or as part of Class 17 (as the case may be). |

| Type of Claim | Treatment | Estimated Distribution Percentage | Voting Rights |
|---|---|---|---|
| **Class 15 - Priority Unsecured Claims** (Plan, Art. IV, § 4.2) | Unless the Trustee and the holder of such Claim agree to different treatment, each holder of an Allowed Priority Unsecured Claim, if any, will be paid in full on the later of (i) the Effective Date, or (ii) within 5 Business Days of the date that the holder's Priority Tax Claim is an Allowed Claim. | To the extent any Allowed Priority Unsecured Claims exist and are not subordinated, 100% | Unimpaired - Deemed to accept the Plan and no right to vote.<br><br>Holders of Claims in this Class will not be solicited to vote on the Plan as their respective Claims, if any, are unimpaired and, therefore, they are presumed to vote in favor of the Plan. |
| **Class 16(A) – Non-Investor Trade Creditor Unsecured Claims –That are Allowed in an Amount of $50,000,00 or Less** (Plan, Art. IV, § 4.3) (b)) | Unless the Trustee and the holder of such Claim agree to different treatment, each holder of an Allowed Unsecured Claim of a Non-Investor Trade Creditor Unsecured Claimin an Allowed amount of $50,000.00 or less, if any, will be paid 10% of the Allowed Claim on the later of (i) the Effective Date, or (ii) within 5 Business Days of the date that the holder's Non-Investor Trade Creditor Unsecured Claim is an Allowed Claim, in full satisfaction of such Allowed Claim. | 10% | Impaired - Right to Vote. |
| **Class 16(B) –** | Unless the Trustee and the holder of | 0-5%[4] | Impaired - |

---

[4]    The distribution percentage to Class 16(B) Claims will largely be dependent on whether or not the IRS agrees to subordinate its Claims against the Consolidated Estate.  See Sections 2.8 and 5.33 of this Disclosure Statement for the Trustee's description of the IRS Claims and the Trustee's request that the IRS subordinate its Claims.

| Type of Claim | Treatment | Estimated Distribution Percentage | Voting Rights |
|---|---|---|---|
| **Non-Investor Trade Creditor Unsecured Claims That are Allowed in an Amount Greater Than $50,000.00** (Plan, Art. IV, § 4.3(d)) | such Claim agree to different treatment, each holder of an Allowed Unsecured Claim of a Non-Investor Trade Creditor in an Allowed amount greater than $50,000.00, if any, will be paid from the Victim Funds as follows: (i) on the Initial Distribution Date, such holder will receive a distribution of available Victim Funds (excluding any Victim Funds that are Restitution funds) pursuant to the Rising Tide Distribution Method; and (ii) any subsequent distribution from the Victim Funds (excluding any Victim Funds that are Restitution funds) will be made, when appropriate in the Trustee's sole discretion, using the same Rising Tide Distribution Method. | | Right to Vote. |
| **Class 17 - Victim Claims** (Plan, Art. IV, § 4.4) | Each holder of an Allowed Victim Claim shall be paid from the Victim Funds as follows: (i) on the Initial Distribution Date, such holder will receive a distribution of available Victim Funds pursuant to the Rising Tide Distribution Method; and (ii) any subsequent distribution on account of Allowed Victim Claims will be made, when appropriate in the Trustee's sole discretion, using the same Rising Tide Distribution Method.  In addition, each holder of an Allowed Victim Claim that has made a timely Private Actions Trust Election and thereby assigned his or | 0-5%[5] | Impaired - Right to Vote. |

---

[5]   The distribution percentage to Class 17 Victim Claims will largely be dependent on whether or not the IRS agrees to subordinate its Claims against the Consolidated Estate.  See Sections 2.8 and 5.33 of this Disclosure Statement for the Trustee's description of the IRS Claims and the Trustee's request that the IRS subordinate its Claims.

| Type of Claim | Treatment | Estimated Distribution Percentage | Voting Rights |
|---|---|---|---|
| | her Victim Causes of Action to the Private Actions Trust shall receive outside of the Plan the additional distributions (if any) to which such holder of any Allowed Victim Claim becomes entitled pursuant to the terms of the Private Actions Trust. | | |
| **Class 18 - Equity Interests** (Plan, Art. IV, § 4.5) | Any and all Equity Interests shall be cancelled on the Effective Date, and holders of Equity Interests will neither receive nor retain any property under the Plan. However, to the extent that there is any personal property of Randall listed on the Randall Statements and Schedules that has not been administered as of the Final Decree, such property shall be deemed to be revested in Randall as of the date of the Final Decree. | 0.0% | Deemed to reject Plan – no right to vote.

Accordingly, their votes for or against the Plan will not be solicited by the Trustee. |

Please note that, with the exception of the 0.0% distribution to holders of Equity Interests who will receive no distribution under the Plan, the "Estimated Distribution Percentage" set forth in the table above is merely a forecast of the range of anticipated distributions to holders of Allowed Claims under the Plan. Like any forecast, it is only an estimate based on currently available information. This forecast does not reflect any guaranteed distributions, and actual distributions to Creditors may vary greatly from the forecasts contained in this Disclosure Statement. Distributions to Class 17, for example, could be zero.

### 5.5    Treatment of Victims

**Exhibit 10** to this Disclosure Statement is a summary of the total Victim Claims that have been scheduled in the Consolidated Estate's Schedules (a total of $72,060,695) as well as the Trustee's estimate of the Allowed Victim Claims against the Consolidated Estate (a total of $39,274,000). The vast majority of Claims against the Consolidated Estate are Victim Claims. The Claims of the Victims are the Claims of the Investors who gave Cash to one or more of the Debtors based on promises of high returns, and who have not received Withdrawals in excess of such Victim's Investment, either from Withdrawals received prior to the Randall Petition Date or the Corporate Debtors Petition Date, or from Withdrawals received from the Consolidated Estate prior to the Effective Date. While the Claims of Victims are treated in the Plan, Investors who are Winning

Investors (i.e., Investors who received Withdrawals greater than the amount of their Investment prior to the Effective Date) are not treated as Creditors under the Plan because they do not have an Allowed Claim.  A discussion of the distinction between the treatment of Winning Investors and Investors who are Victims under the Plan is set forth in Sections 5.5.1 and 5.5.2 below.

### 5.5.1   Winning Investors – Not Creditors under the Plan - No Distribution

Not all of the Investors who gave Cash to one or more of the Debtors are Victims who are treated as Creditors under the Plan.  Some of the Investors in the Randall Enterprise ended up being Winning Investors who received Withdrawals prior to the Effective Date in excess of their Investments.  Withdrawals include all Cash or other funds received by an Investor as a result of such Investor's Investment, whether such payments were characterized as a repayment or return of the principal amount of the Investment or an interest payment or a late fee or a commission or any other characterization.  Winning Investors do not have Allowed Claims, and they are not Creditors of the Consolidated Estate, and such Winning Investors will not vote on or receive any distribution under the Plan.  Rather, the Trustee (for the benefit of the Victims) has recovered or is pursuing Claims and Causes of Action to recover the amount of the Cash that many of the Winning Investors received over and above the principal amounts of their respective Investments.  The Trustee's recovery of the "net winnings" from these Winning Investors comprises some of the Cash that will be distributed to Victims under the Plan as Victim Funds.[6]  The Trustee has objected or intends to object to the Claims of Investors who are Winning Investors but who filed proofs of Claim asserting Claims as Victims prior to the Bar Date.  These Winning Investors will not be solicited to vote on the Plan because the Trustee contends that they do not have Claims against the Consolidated Estate, even if they were not paid everything that they claim they were entitled to receive under their contracts with the Debtors.  In the event that these Winning Investors believe that they are entitled to vote for or against the Plan, they must file a Rule 3018(a) Motion by no later than ~~—————————~~ October 1, 2013, and obtain a Court Order estimating the Claim for voting purposes after notice and a hearing.  Any hearing on the Rule 3018(a) Motion must conclude in advance of the Voting Deadline of ~~—————————,~~ October 21, 2013.  Rule 3018(a) Motions that are not timely filed and served will not be considered by the Court.[7]

---

[6] While some Winning Investors did not file proofs of Claim in the Bankruptcy Case, some did.  The Trustee intends to file objections to the proofs of Claim of such Winning Investors.  Such Winning Investors should have no voting rights under the Plan because they are not Creditors of the Consolidated Estate, unless their Claims are estimated by order of the Bankruptcy Court for voting purposes under the Plan pursuant to a Rule 3018(a) Motion filed within the deadline outlined in this Section 5.5.1.  Such Winning Investors will not be entitled to any distribution under the Plan unless their alleged Claims are ultimately determined by the Court to be an Allowed Victim Claim.

[7] *See* the Bankruptcy Court's Order (I) Approving ~~the Trustee's~~ Disclosure Statement ~~and Fixing Time for Filing Acceptances or Rejections of~~ With Respect to the Chapter 11 Trustee's

### 5.5.2    Allowed Victim Claims—*Rising Tide Distribution Method*

As noted, a Victim is an Investor who did not receive, through Withdrawals, a return of the principal amount of his or her Investment, either in whole or in part, prior to the Effective Date or otherwise. Thus, for example, a Victim may be an Investor with an Investment of $100 who received $99 prior to the Petition Date (such Victim would have a Victim Claim of $1), as well as an Investor with the same $100 Investment who received no return prior to the Petition Date (such Victim would have a Victim Claim of $100). No Claim for interest or fees will be recoverable by any Investor as part of such Investor's Allowed Victim Claim (see Section 5.5.4 above).

Under the Plan, all Victims have Claims against the Consolidated Estate. Victims who filed a Victim Proof of Claim in the Bankruptcy Case prior to the Bar Date, whose proof of Claim is an Allowed Claim (whether because the amount asserted in the Victim Proof of Claim, as originally filed or as amended, is consistent with the amount of the Claim based on the Trustee's books and records, or the Claim has been allowed pursuant to an Order of this Court), are holders of Allowed Victim Claims. Holders of Allowed Victim Claims will have the right to vote to accept or reject the Plan, and will have distribution rights in accordance with the Plan, based on the amount of the Allowed Victim Claim.

Recognizing that some Victims had significantly larger losses of their Investments than others, the Plan attempts to equalize distributions to Victims on account of their unpaid Investments by carrying into effect the <u>Rising Tide Distribution Method</u> for the Victim Funds. The Trustee applies a uniform formula, first making distributions to holders of Allowed Victim Claims in preference to those Victims who received little or no return of their Investment so as to equalize the percentage "distributions" of Investments received by all Victims holding Allowed Claims. Thus, each holder of an Allowed Victim Claim will receive a distribution based on the total Victim Funds available, the amount of the Victim Net Claim Amount for such Victim and application of such Victim's initial recovery percentage. The respective initial recovery percentage is calculated the same for each Victim -- dividing the total amount of the Victim's Withdrawals by the Victim's gross amount of his or her Investment. Once the initial recovery percentages are calculated for each Victim holding an Allowed Victim Claim, the Trustee will disburse Victim Funds available for distribution in accordance with the Plan to each holder of an Allowed Victim Claim by applying the same formula to determine the distribution to each holder. By application of this formula, holders of Allowed Victim Claims with a zero or low initial recovery percentage will receive

---

Liquidating Plan of Liquidation Dated ~~May~~April 3, 2013, (II) <u>Establishing Voting Record Holder Date, (III)</u> Approving Solicitation Procedures, ~~Forms~~Form of Ballots, and Manner of Notice, and (~~III~~IV) Fixing the Deadline for Filing Objections to the Confirmation of the ~~Trustee's~~ Plan (entered on ~~_____~~September 9, 2013, and included in the package for the solicitation of votes on the Plan).

distributions on account of their Claims until some point at which their return will be deemed "caught up" to the Withdrawals received by those with higher initial recovery percentages.  A Victim's Withdrawals, if any, that were paid on such Victims Investment will be treated as a "distribution" on par with a distribution made by the Trustee under the Plan (unless agreed otherwise pursuant to a Bankruptcy Court approved settlement agreement).  This "rising tide" allows for compensation of Victims in proportion to their relative loss. The point at which such Victims are considered "caught up" to those Victims who received a greater initial recovery percentage so as to allow for distributions to Victims with higher initial recovery percentages is contingent on numerous factors which cannot be determined at this time, such as the total Victim Funds available for distribution, and the fixing and ultimate total amount of Allowed Victim Claims.

Under the <u>Rising Tide Distribution Method</u>, Victims who received some return (in the form of Withdrawals) of their Investment prior to the Effective Date will receive a smaller distribution, or even no distribution under the Plan, until those Victims who received a smaller or no return (in the form of Withdrawals) of their Investment have been paid at least as much as has been distributed to the other Victims prior to the Effective Date.   It is the Trustee's view that the <u>Rising Tide Distribution Method</u> is the most fair and equitable distribution method for the Victims of the Randall Enterprise Scheme.

### 5.5.3   Allowed Victim Claims—Additional Victim Claims for Investors Who Invested with Strategic Commercial Lending, LLC and Fruit Heights Construction, LLC

As outlined in **Exhibit 10** to this Disclosure Statement, the Trustee's investigation has revealed that the Investments of a small minority of the Victims of the Randall Enterprise were documented as being owed by Strategic Commercial Lending, LLC, and Fruit Heights Construction, LLC, two Affiliates of the Debtors that were also part of the Randall Enterprise, but which are not Debtors.   As reflected in **Exhibit 10** to this Disclosure Statement, the scheduled amounts of these additional Investments for these Victims are $310,285 for Strategic Commercial Lending, LLC, and $223,000 for Fruit Heights Construction, LLC.  The Trustee has elected to treat the Investments of these Victims as Victim Claims against the Consolidated Estate, and the Trustee intends to file (and accept as timely filed Claims) Victim Proofs of Claim on behalf of these Victims against the Consolidated Estate in the following amounts, which are the Trustee's estimates of the Allowed Victim Claims for these Investors:  $248,000 for Victims whose Investments were documented as owed by Strategic Commercial Lending, LLC, and $178,000 for Victims whose Investments were documented as owed by Fruit Heights Construction, LLC.

### 5.5.4   Disputed Victim Claims—Treatment of Portions of Disputed Victim Claims and Voting Rights

The Trustee intends to object to some of the asserted Victim Claims that are disputed by the Trustee; i.e., those Victim Claims where the Victim Proof of Claim filed

by a Victim asserts a Claim amount that is not consistent with the amount of the Claim based on the Trustee's books and records and/or is not consistent with the calculation of Victim Claims established by the Plan.  For such Victims, the Claim Amount for such Victim that is estimated by the Trustee as the appropriate Victim Net Claim Amount will be the amount that such Victim is permitted to vote to accept or reject the Plan, even if the Ballot the Victim receives states a higher or different amount.  The Ballot provided to each of these Victims will state that the Victim is a member of Class 17 and will provide the Trustee's estimate of the correct Victim Net Claim Amount as the amount of such Victim's Class 17 Claim for purposes of voting to accept or reject the Plan.  In the event that any such Victim wishes to assert a Claim for voting purposes in excess of the Trustee's estimate of the Victim Net Claim Amount, such Victim must file a Motion seeking temporary allowance of the increased amount of such Victim's Claim pursuant to a motion made under Federal Rule of Bankruptcy Procedure 3018(a) ("Rule 3018(a) Motion") by no later than ―――――――――,October 1, 2013, and obtain a Court Order estimating the Claim in the increased amount for voting purposes after notice and a hearing.  Any hearing on the Rule 3018(a) Motion must conclude in advance of the Voting Deadline of ―――――――――,October 21, 2013.  Rule 3018(a) Motions that are not timely filed and served will not be considered by the Court.[8]

### 5.5.5   Restitution

There are currently several actions pending against Randall's Insurance Agents in which determinations could be made ordering Randall or any of his Insurance Agents to pay Restitution as a result of any criminal or civil actions pending against any of them.  In the event that any Restitution is ordered in these or any future criminal or civil actions, the Plan accounts for the treatment of Restitution in two alternative ways.

First, if Restitution is assigned to the Consolidated Estate, such Restitution will be included as Victim Funds for distribution to Victims as provided for in the Plan.  In the event that future Restitution exists at the time of the entry of a Final Decree in the Bankruptcy Case, the Trustee shall assign the Restitution back to the relevant Governmental Unit for distribution to Victims outside of the Plan.

Second, if Restitution is ordered and it is not assigned to the Consolidated Estate but rather is distributed to Victims by the relevant Governmental Unit, the Trustee shall treat any such Governmental Unit distribution as a distribution to Victims outside of the Plan, and such distribution shall be taken into account by the Trustee in calculating the distribution made to the holder of an Allowed Victim Claim.

---

[8] *See* Footnote 5.

**5.6**    **Treatment of Executory Contracts and Unexpired Leases and the Deadline to File Claims Related to Rejected Contracts or Leases**

Although the Trustee is not aware of any executory contracts or unexpired leases to which the Debtors are currently a party, any such executory contracts or unexpired leases shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date of the Plan. Any Claims arising from the rejection of an executory contract or unexpired lease must be filed prior to the expiration of the Contract Rejection Claim Bar Date as provided in Section 8.2 of the Plan.

**5.7**    **Preservation of Causes of Action and Defenses**

Except to the extent rights, Claims, Causes of Action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Bankruptcy Case, (a) any and all rights, Claims, Causes of Action, defenses, and counterclaims accruing to or assertable by the Debtors or the Trustee on behalf of the Consolidated Estate, shall remain assets of the Consolidated Estate and may be asserted by the Trustee on behalf of the Consolidated Estate after the Effective Date, and (b) the Trustee does not waive, relinquish or abandon (nor shall he be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Consolidated Estate or that may be asserted by the Consolidated Estate: (i) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Schedules, the Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court, (ii) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to the Trustee, and (iii) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense or counterclaim (A) filed a proof of Claim in the Bankruptcy Case, (B) filed a notice of appearance or any other pleading or notice in the Bankruptcy Case, (C) voted for or against the Plan, or (D) received or retained any consideration under the Plan. Without in any manner limiting the scope of the foregoing, and notwithstanding any otherwise applicable principle of law or equity, including without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, laches or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential right, Claim, Cause of Action, defense, or counterclaim in the Schedules, the Plan, this Disclosure Statement, or any other document filed with the Court, shall in no manner waive, eliminate, modify, release, or alter the Trustee's right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that the Trustee, the Debtors and/or the Consolidated Estate has or may have as of the Confirmation Date. The Trustee may commence, prosecute, defend against, recover on account of, and settle all rights, Claims, Causes of Action, defenses, and counterclaims in his sole discretion in accordance with the best interests, and for the benefit of, the post-Effective Date Consolidated Estate.

**5.8**     **Non-Discharge of Debtors and Injunction**

The Plan provides for an injunction of certain actions and claims against the Debtors.  Holders of Claims, rights, Causes of Action or interests against the Debtors may not pursue (a) property of the Consolidated Estate other than through seeking allowance of its Claim, if any, for distribution in accordance with the Plan; or (b) the Trustee and his agents.

Pursuant to Section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge Claims against any of the Corporate Debtors.  In addition, pursuant to Section 1141(d)(3) of the Bankruptcy Code, Randall will not be discharged under the Plan because (a) the Plan is a liquidating plan, (b) the Debtors will not be engaged in business after consummation of the Plan, and (c) Randall would be denied a discharge under Section 727(a) of the Bankruptcy Code if the Randall Bankruptcy Case were a Chapter 7 case because, pursuant to Section 727(a)(12), Section 522(q)(1) of the Bankruptcy Code may be applicable to Randall.   However, no holder of a Claim may receive any payment from, or seek recourse against any assets that are property of the Consolidated Estate, except for those assets required to be distributed to such holder as expressly provided in the Plan.

As of the Effective Date, all Persons are precluded from asserting against any property of the Consolidated Estate and any assets that are distributed or to be distributed under the Plan, any Claims, rights, Causes of Action, liabilities or interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such claim and regardless of whether such Person has voted to accept the Plan.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all Persons that have held, currently hold or may hold a debt, right, Claim, Cause of Action, or other liability or interest against or in the Debtors that would be discharged upon Confirmation of the Plan on the Effective Date but for the provisions on Section 1141(d)(3) of the Bankruptcy Code, shall be permanently enjoined from taking any of the following actions on account of such debt, right, Claim, Cause of Action, or other liability of interest: (i) commencing or continuing in any manner any action or other proceeding on account of such debt, right, Claim, Cause of Action, or other liability or interest against assets or proceeds thereof that constitute property of the Consolidated Estate and which are to be distributed under the Plan, other than to enforce any right to a distribution with respect to such assets or the proceeds thereof as provided under the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any assets to be distributed to Creditors under the Plan, other than as permitted under subparagraph (i) above; and (iii) creating, perfecting or enforcing any Lien or encumbrance against any assets to be distributed under the Plan, other than as permitted by the Plan, provided that nothing contained herein shall limit the rights of any distributee under the Plan from taking any actions in respect of property distributed or to be distributed to it under the Plan.

**5.9**     **Releases and Limitation of Liability**

Other than Claims and Causes of Action expressly released under the Plan and any Claims and Causes of Action that have already been released as of the Confirmation Date, if any, the Trustee reserves all rights to prosecute after the Confirmation Date any and all Claims and Causes of Action held by the Consolidated Estate.

**5.10**     **Binding Nature of the Plan**

Once confirmed, the Plan is binding on all Creditors and Equity Interest holders, regardless of whether or not holders of Claims or Equity Interests voted for the Plan, and if such parties did vote, regardless of whether they voted for or against the Plan.

# SECTION 6.

## DATE AND TIME OF HEARING ON CONFIRMATION OF THE PLAN

**6.1**     **Confirmation Hearing**

A copy of the Plan is attached as **Exhibit 1** to this Disclosure Statement.  The Bankruptcy Court has scheduled a Confirmation Hearing to consider confirmation of the Plan on ————————,Monday, October 28, 2013, at ————,2:00 p.m. (Mountain Time) in the courtroom of the Honorable Joel T. Marker, United States Courthouse, 350 S. Main Street, Room 341, Salt Lake City, Utah.  The date of the Confirmation Hearing may be continued to such later time as the Bankruptcy Court may announce during the Confirmation Hearing without further written notice.

**6.2**     **Confirmation Objection Deadline**

If you object to confirmation of the Plan, you must file a timely objection to confirmation, whether or not you vote to accept or reject the Plan.  The Bankruptcy Court has ordered that objections, if any, to the confirmation of the Plan must be filed on or before ————————,October 21, 2013, at 4:00 p.m., and served on the Trustee's counsel at the following address:

Michael R. Johnson
Douglas M. Monson
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, UT 84111

Please note that you may vote to accept or reject the Plan (if you are entitled to do so), whether or not you file an objection to confirmation of the Plan.  For information about voting on the Plan, please see Section 9 below.

## SECTION 7.

## THE RANDALL ENTERPRISE AND POST-PETITION
## ADMINISTRATION OF THE CONSOLIDATED ESTATE

### 7.1      The Pre-Petition Randall Enterprise Scheme

The Debtors are all part of the Randall Enterprise. A description of the Randall Enterprise and the Scheme perpetuated by Randall through the operations of the Randall Enterprise is contained in the Introduction in Section 4 above.

### 7.2      The Bankruptcy Case Prior to the Trustee's Appointment

Randall filed his Chapter 11 bankruptcy petition on the Randall Petition Date of December 20, 2010 under Bankruptcy Case No. 10-37546 [Docket 1]. The Randall Bankruptcy Case was originally assigned to Bankruptcy Judge R. Kimball Mosier. The Randall Bankruptcy Case was originally managed and administered by Randall as a debtor-in-possession. An Unsecured Creditors Committee was not appointed in the Randall Bankruptcy Case. Pursuant to notice from the Bankruptcy Court, proofs of Claim for all non-governmental creditors were originally due in the Randall Bankruptcy Case on April 26, 2011, with government proofs of Claim due by June 20, 2011, and the original deadline to oppose Randall's discharge or to file a nondischargeability action against Randall was March 4, 2011 [Docket 11].

The Statements and Schedules in the Randall Bankruptcy Case were filed on January 21, 2011 [Docket 18]. Andy Diaz of 1 Legal Services, P.L.L.C. was approved as Randall's Chapter 11 Debtor's counsel on February 4, 2011 [Docket 24]. Several creditors filed stipulations with Randall to extend the deadline to oppose Randall's discharge, and certain creditors began filing nondischargeability actions against Randall (i.e., Paul Haas, Adversary No. 11-02524, filed on July 13, 2011 [Docket 124]; and Katherine Muller f/k/a Kate Rose and Kelsie Muller, Adversary No. 11-02264, filed on February 28, 2011 [Docket 36]).

A Motion for Relief from Stay was filed by CitiMortgage, Inc. on March 15, 2011 [Docket 48], relating to the real property at 1634 North Angel Street, Unit #B, Layton, Utah 84041. The Bankruptcy Court entered its Order on April 22, 2011 [Docket 83], approving a Stipulation for Randall to make regular monthly payments to CitiMortgage, Inc., on the Angel Street property, Unit #B. A second Motion for Relief from Stay was filed by CitiMortgage, Inc. on April 13, 2011 [Docket 73], relating to the real property at 1634 North Angel Street, Unit #A, Layton, Utah 84041. The Bankruptcy Court entered its Order on May 6, 2011 [Docket 88], granting relief from the automatic stay for 1634 North Angel Street, Unit #A. The Bankruptcy Court entered its Order on May 10, 2011 [Docket 93], extending Randall's exclusivity period to file a Chapter 11 plan of reorganization in the Randall Bankruptcy Case to July 31, 2011. On May 13, 2011, Aurora Loan Services LLC filed a Motion for Relief from Stay [Docket 96], relating to

the real property located at 419 South Golden Circle, Fruit Heights, Utah 84037.  The Bankruptcy Court entered its Order on June 6, 2011 [Docket 108], granting relief from the automatic stay for 419 South Golden Circle, Fruit Heights, Utah 84037.  A third Motion for Relief from Stay was filed by CitiMortgage, Inc. on June 29, 2011 [Docket 120], relating to the real property located at 1634 North Angel Street Unit #C, Layton, Utah 84041.

On August 8, 2011, 2010-2 SFR Venture, LLC filed a Motion for Relief from Stay on Units 167, 168, 178, 179, 180, 181, 183, 184, 187, 188, 189, 194, and 195 of Millcreek Springs Townhomes Amended in Washington County, Utah [Docket147].  The Bankruptcy Court entered its Order on September 7, 2011, granting relief from the automatic stay as requested by 2010-2 SFR Venture, LLC [Docket 186].

The United States Trustee filed a Motion to appoint a Chapter 11 Trustee in the Randall Bankruptcy Case on July 18, 2011 [Docket 132].  U.S. Bank filed a Joinder on August 8, 2011 [Docket 149], joining in the United States Trustee's Motion.  On August 30, 2011, the United States Trustee filed an Agreed Motion to Approve Stipulation to Appoint a Chapter 11 Examiner [Docket 172].  The appointment of a Chapter 11 Examiner was the alternative relief that the United States Trustee had negotiated with Randall's bankruptcy attorney in lieu of the appointment of a Chapter 11 Trustee.  Several Creditors filed objections to the settlement between the United States Trustee and Randall, and instead requested that a Chapter 11 Trustee be appointed for the Randall Bankruptcy Case as originally requested by the United States Trustee.

On September 27, 2011, Judge R. Kimball Mosier recused himself from the Randall Bankruptcy Case, and Judge Joel T. Marker was reassigned to the Randall Bankruptcy Case.  A hearing on the United States Trustee's original Motion and the proposed settlement to appoint a Chapter 11 Examiner was held on September 28, 2011.  After hearing evidence, including evidence that Randall was continuing to solicit Investors through the Corporate Debtors without disclosing the filing of the Randall Bankruptcy Case, Judge Marker found that Randall was perpetrating "a continuing fraud on the public.  Since he has filed bankruptcy Mr. Randall, by his own testimony, has drawn in to the companies, that again he controls exclusively—including Horizon Auto Funding—has drawn in another $1.3 million from investors, since he filed bankruptcy, without disclosing to them that he has filed bankruptcy.  And then has used the money as he has seen fit, including to pay, according to his testimony, payments to a creditor who obtained a $2 million consent judgment against him…."

Judge Marker ruled that there was ample cause for the appointment of a Chapter 11 Trustee based upon Randall's fraudulent activities, and Judge Marker did not agree with the alternative relief of the appointment of a Chapter 11 Examiner.  Judge Marker ordered the immediate appointment of the Trustee, which occurred in the Randall Bankruptcy Case on September 29, 2011 [Docket 241].

### 7.3    The Trustee's Administration of the Consolidated Estate

Upon his appointment by the Bankruptcy Court, the Trustee immediately obtained possession and control of Randall's known assets.  Because Randall was the owner and controlling Person for the Corporate Debtors, the Trustee came into immediate control of the Corporate Debtors as well.  The Trustee retained the law firm of Ray Quinney & Nebeker P.C. as Trustee's counsel as well as the forensic accounting firm of Rocky Mountain Advisory, LLC as his Professionals in the Randall Bankruptcy Case on October 5, 2011, and the Bankruptcy Court approved the appointment of these Professionals on November 1, 2011 [Docket 337 and Docket 339].

The Trustee and his Professionals began an intensive investigation of the activities of the Corporate Debtors as part of the Randall Enterprise in order to determine what should happen with the Corporate Debtors.  On October 12, 2011, through his control of the Corporate Debtors, the Trustee caused the Corporate Debtors to also file their own Chapter 11 bankruptcy petitions.  The Trustee also moved for joint administration of the Randall Bankruptcy Case and the Chapter 11 bankruptcy cases of the Corporate Debtors [Docket 268], which was granted by the Bankruptcy Court on November 1, 2011 [Docket 341], with the jointly administered Cases being administered under the Randall Bankruptcy Case number (Case No. 10-37546).

When the Trustee was appointed, there were virtually no funds in the Randall Estate.  The Trustee recognized that he needed to immediately begin marketing and selling those real properties of the Debtors in which there was still equity (after accounting for the amounts of the Liens of any First Lien Holders).  The Trustee retained Commerce Real Estate Solutions as his real estate broker on November 7, 2011 [Docket 352].  The Trustee also retained the law firm of Fabian & Clendenin as his Special Counsel on November 10, 2011 [Docket 356].  The Bankruptcy Court approved the appointment of Fabian & Clendenin on December 1, 2011 [Docket 387], and approved the appointment of Commerce Real Estate Solutions on December 7, 2011 [Docket 399].

The Trustee quickly determined that there was no equity in 22 condominium units located in Washington County, Utah, and he filed a Stipulated Motion to abandon the Washington County condominium units on November 17, 2011 [Docket 364].  The Trustee also determined that there was no equity in certain condominium units located in Blackfoot, Bingham County, Idaho, and the Trustee filed a Motion to Abandon the Blackfoot, Idaho condominium units on December 15, 2011 [Docket 410].  The Bankruptcy Court entered its Order on January 25, 2012, authorizing the abandonment of the 22 Washington County, Utah condominium units and the Blackfoot, Idaho condominium units [Docket 444].  The Bankruptcy Court authorized the Trustee to reject a lease of the 990 N. Rainbow Drive Property on November 22, 2011 [Docket 369], an action that was taken to prepare that property for marketing and sale.  The Trustee also filed new Statements of Financial Affairs and Schedules in the Randall Bankruptcy Case on December 2, 2011 [Docket 393].

The Trapper Trails Council of the Boy Scouts of America filed a nondischargeability action against Randall and some of the Corporate Debtors on

December 5, 2011 as Adversary No. 11-02755 [Docket 396]. Gennifer Rawlings and
Jody Rawlings filed a nondischargeability action against Randall and the Corporate
Debtors on December 8, 2011 as Adversary No. 11-02757 [Docket 400]. The
Bankruptcy Court entered its Order on December 28, 2011, setting February 29, 2012 as
the last day to oppose the discharge of Randall or to file a nondischargeability action
[Docket 419]. Additional nondischargeability actions were filed on February 29, 2012
by Stanley Smith, Mary Kaye Smith, and Mary Kaye's Family Limited Partnership as
Adversary No. 12-02100 [Docket 504] and by Michael Burnett and Dorothy Burnett as
Adversary No. 12-02102 [Docket 507].

After investigating the extensive commingling of cash, assets, and liabilities
between Randall and the Corporate Debtors and other evidence of the Debtors'
consolidated entity conduct, the Trustee concluded that the Randall Enterprise had
operated as a single economic unit. Accordingly, the Trustee filed a Motion for
Substantive Consolidation of the Debtors on December 13, 2011 [Docket 405]. The
Affidavit of John H. Curtis, the Trustee's forensic accountant, summarizing the
supporting evidence for substantive consolidation of the Debtors, was also filed on
December 13, 2011 [Docket 407] (see **Exhibit 3** to this Disclosure Statement).

The Trustee's Motion for Substantive Consolidation included a request that the
Bankruptcy Court order the "Nunc Pro Tunc" Substantive Consolidation of the Debtors,
with the petition date for all of the Debtors to be deemed to be the same date as the
Randall Petition Date. Various Creditors (Ameritas Life Insurance Corp., Union Central,
the McGuire Trust, the Boyce Trust, Deborah Anne Dorius and American Pension
Services, Inc. as Administrator for The Deborah Anne Dorius Individual Retirement
Account) objected to the Trustee's request for "Nunc Pro Tunc" Substantive
Consolidation of the Debtors, although they did not object to substantive consolidation on
a going forward basis. The Trustee and these Creditors filed a Stipulation on January 23,
2012 [Docket 441], eliminating the Trustee's request for "Nunc Pro Tunc" Substantive
Consolidation. After hearing evidence on January 27, 2012, the Bankruptcy Court
entered its Order substantively consolidating the Randall Bankruptcy Case with the
Chapter 11 bankruptcy cases of the Corporate Debtors, with all of the cases being
substantively consolidated into the Randall Bankruptcy Case under Bankruptcy Case No.
10-37546 [Docket 449]. The Bankruptcy Court ordered that the bankruptcy petition date
for the Corporate Debtors would remain the Corporate Debtors Petition Date of October
12, 2011.

On February 6, 2012, the Bankruptcy Court entered its order approving the
Trustee's sale by auction of the furniture, fixtures and equipment of the Debtors, as well
as a 2005 Toyota Sequoia [Docket 468].

As outlined in more detail in Section 2.5 above, on February 27, 2012, the Trustee
filed his application to employ the Reid Collins Law Firm as Special Litigation Counsel
to the Trustee and the Consolidated Estate with respect to the Estate Litigation Claims
against Facilitators and to approve the contingency fee agreement between the Trustee
and the Reid Collins Law Firm [Docket 498]. The Bankruptcy Court approved the

employment of the Reid Collins Law Firm and approved the contingency fee agreement with the Reid Collins Law Firm by its Order entered on March 26, 2012 [Docket 574]. The Bankruptcy Court also entered its Order on March 26, 2012 [Docket 573], modifying the terms of employment for the Ray Quinney Law Firm as one of the Trustee's Professionals to authorize the Ray Quinney Law Firm to represent the Trustee and the Consolidated Estate and to act as local counsel to the Reid Collins Law Firm in connection with the Estate Litigation Claims against Facilitators being investigated and pursued by the Reid Collins Law Firm.

On July 3, 2012, Creditor FV-1, Inc. filed a Motion for Relief From Stay on real property located at 6850 North 1900 East, in Liberty, Utah 84310 [Docket 751]. The Bankruptcy Court entered its Order on September 12, 2012, granting FV-1, Inc.'s Motion for Relief from Stay [Docket 800].

On September 25, 2012, the Bankruptcy Court approved a settlement between the Trustee and Randall's Chapter 11 bankruptcy counsel, Andy Diaz of 1 Legal Services, P.L.L.C., whereby such counsel was awarded final fees and costs for all services rendered to Randall in the amount of $59,300, and such counsel agreed to accept from the Consolidated Estate the sum of $25,000 in full and final satisfaction of the final award amount and to waive all other claims against the Consolidated Estate.

The Trustee has continued to administer the assets of the Consolidated Estate so as to most effectively and efficiently maximize their value for the benefit of the Creditors, including, among other things, taking the following material actions:

(a)      Examining and analyzing Claims and Causes of action and, when appropriate, commencing Causes of Action against numerous Persons related to the recovery of, *inter alia,* preferential and fraudulent transfers under Sections 544(b), 547(b), 548 and 549 of the Bankruptcy Code and applicable state law, including claims against Winning Investors (*i.e.*, Investors who received Withdrawals greater than their Investment).

(b)      Making demand on numerous Winning Investors and other Persons for recovery of avoidable transfers, commencing and filing numerous adversary proceedings against Winning Investors and other Persons when appropriate because demands were not sent or met, and entering into settlement agreements to resolve numerous pending adversary proceedings. Through settlement of demands and/or adversary proceedings, the Trustee has recovered $580,808.01 for the benefit of Creditors as of May 28, 2013. **See, Exhibit 11-3** to this Disclosure Statement. Settlement negotiations with certain defendants are on-going, and where settlement is not appropriate, the Trustee will continue to pursue the Consolidated Estate's Claims and Causes of Action through litigation.

The following chart summarizes the adversary proceedings that the Trustee has commenced since his appointment seeking to recover money or property for the benefit of the Consolidated Estate:

| | |
|---|---|
| 12-02177 | Miller v. Comax Gyms LLC (closed) |
| 12-02377 | Miller v. Randall |
| 12-02378 | Miller v. Randall (closed) |
| 12-02379 | Miller v. Randall |
| 12-02380 | Miller v. Bank of America, N.A. |
| 12-02381 | Miller v. Aurora Loan Services LLC |
| 12-02382 | Miller v. Bank of America, N.A. fka Countrywide Financial Co |
| 12-02384 | Miller v. American Express Travel Related Services Co., Inc. |
| 12-02385 | Miller v. Union Central Life Insurance Company et al |
| 12-02387 | Miller v. Staples (closed) |
| 12-02388 | Miller v. Haddon et al (closed) |
| 12-02389 | Miller v. Phillips et al |
| 12-02390 | Miller v. Christensen |
| 12-02391 | Miller v. Tibbs et al |
| 12-02392 | Miller v. Ally Bank fka GMAC Bank (closed) |
| 12-02393 | Miller v. Flagstar Bank, FSB (closed) |
| 12-02394 | Miller v. Thayne |
| 12-02395 | Miller v. Call |
| 12-02396 | Miller v. Hymas et al |
| 12-02397 | Miller v. Willden |
| 12-02398 | Miller v. Peterson (closed) |
| 12-02400 | Miller v. Christensen |
| 12-02401 | Miller v. Wilkinson |
| 12-02402 | Miller v. Lang |
| 12-02403 | Miller v. Anderson et al |
| 12-02404 | Miller v. Wilde |
| 12-02405 | Miller v. Minton |
| 12-02406 | Miller v. Warner |
| 12-02407 | Miller v. Green |
| 12-02408 | Miller v. Fortner |
| 12-02409 | Miller v. Clements |
| 12-02410 | Miller v. Christensen |
| 12-02411 | Miller v. Dustin et al |
| 12-02412 | Miller v. Vanderslice |

| | |
|---|---|
| 12-02414 | Miller v. Stansfield |
| 12-02415 | Miller v. Morley |
| 12-02416 | Miller v. Garff |
| 12-02417 | Miller v. Jensen |
| 12-02418 | Miller v. Harris |
| 12-02419 | Miller v. Bell et al |
| 12-02420 | Miller v. Harrison |
| 12-02421 | Miller v. Hansen et al |
| 12-02422 | Miller v. Anglin |
| 12-02423 | Miller v. Clayburn |
| 12-02424 | Miller et al v. Simonsen et al |
| 12-02425 | Miller v. Guest |
| 12-02426 | Miller v. Hammond (closed) |
| 12-02427 | Miller v. Bills et al (closed) |
| 12-02429 | Miller v. Cruz et al |
| 12-02430 | Miller v. Pruden et al (closed) |
| 12-02431 | Miller v. Thorum et al (closed) |
| 12-02432 | Miller v. Powell |
| 12-02433 | Miller v. Smith (closed) |
| 12-02434 | Miller v. Crockett |
| 12-02435 | Miller v. Evans et al |
| 12-02436 | Miller v. McGuire |
| 12-02437 | Miller v. Aagard |
| 12-02438 | Miller v. Parker |
| 12-02439 | Miller v. Day et al |
| 12-02440 | Miller v. Powell |
| 12-02441 | Miller v. Clark et al |
| 12-02442 | Miller v. Cook et al |
| 12-02443 | Miller v. Anderson |
| 12-02444 | Miller v. Stevenson (closed) |
| 12-02445 | Miller v. Andreason |
| 12-02446 | Miller v. Anderton |
| 12-02447 | Miller v. Bird |
| 12-02448 | Miller v. Walker |
| 12-02449 | Miller v. Boyce |

| | |
|---|---|
| 12-02450 | Miller v. Brough et al |
| 12-02451 | Miller v. Randall |
| 12-02452 | Miller v. Thayne |
| 12-02453 | Miller v. Banks |
| 12-02454 | Miller v. Probst et al (closed) |
| 12-02455 | Miller v. Marine |
| 12-02456 | Miller v. Schenfeld |
| 12-02457 | Miller v. Crabtree |
| 12-02458 | Miller v. Clark (closed) |
| 12-02459 | Miller v. Orullian |
| 12-02460 | Miller v. Wilkinson |
| 12-02461 | Miller v. Fullmer et al |
| 12-02462 | Miller v. Thompson et al |
| 12-02463 | Miller v. Satterfield et al |
| 12-02464 | Miller v. Kendell et al |
| 12-02465 | Miller v. Taysom (closed) |
| 12-02466 | Miller v. Noorda (closed) |
| 12-02467 | Miller v. Zimmerman |
| 12-02468 | Miller v. Hatch |
| 12-02469 | Miller v. Hooper (closed) |
| 12-02470 | Miller v. Hyde et al (closed) |
| 12-02471 | Miller v. Beckstrand |
| 12-02472 | Miller v. Sellers (closed) |
| 12-02508 | Miller v. Marine Credit Systems, LLC et al (closed) |
| 13-02023 | Miller v. Union Central Life Insurance Company et al |
| 13-02110 | Miller v. Pitcher et al |
| 13-02111 | Miller v. Clift |
| 13-02112 | Miller v. Brown et al |
| 13-02113 | Miller v. Howe |
| 13-02114 | Miller v. Hooper |
| 13-02115 | Miller v. Call |
| 13-02116 | Miller v. Higinbotham |
| 13-02117 | Miller v. Wilcken et al |
| 13-02120 | Miller v. Hansen |
| 13-02181 | Miller v. Wright |

13-02185 Miller v. Hanson et al

(c)      Engaging in an extensive analysis of Victim Claims as well as all proofs of Claim filed by other Creditors in this case, informing Creditors of potential objections to Claims, negotiating and, when appropriate, entering into settlements related to the allowance or disallowance of such Claims, and obtaining approval of such settlements from the Bankruptcy Court.

(d)      Engaging in settlement negotiations with the Investors and various co-owners who have been asserting Secured Claims against the Consolidated Estate or claims to a portion of the sale proceeds from the sale of the Debtors' real properties.  As a result of his efforts, the Trustee has resolved several of the Secured Claims and co-owner claims asserted against the Consolidated Estate, as follows:

(i)      The Bankruptcy Court's Order approving a settlement with Conrad Taysom was entered on March 14, 2013 [Docket 1044].  Conrad Taysom asserted an undivided 12 % ownership interest in the 811 S. Main Property.  Pursuant to the settlement, Conrad Taysom assigned his undivided 12%  interest in the 811 S. Main Property to the Consolidated Estate, and the Trustee agreed to not pursue other avoidance claims asserted against Conrad Taysom.

(ii)      The Bankruptcy Court's Order approving a settlement with the 2905 RRR Trust and its trustee, Debbie Noorda, was entered on March 14, 2013 [Docket 1045].  The 2905 RRR Trust asserted an undivided 61% ownership interest in the 87 N. Adamswood Property, and also asserted a trust deed Lien against the 811 S. Main Property.  Pursuant to the settlement, the 2905 RRR Trust assigned its undivided 61% ownership interest in the 87 N. Adamswood Property and its trust deed Lien against the 811 S. Main Property to the Consolidated Estate, and the Consolidated Estate paid the 2905 RRR Trust the sum of $20,000.00 from the net proceeds of the 811 S. Main Property, and the 2905 RRR Trust was determined to hold an Allowed Unsecured Claim against the Consolidated Estate of $165,895.66.

(iii)      The Bankruptcy Court's Order approving a settlement with Danita Hooper was entered on May 2, 2013 [Docket 1085].  Danita Hooper asserted an undivided 50% ownership interest in the 124 West 800 North Parcel and the 116 West 800 North Parcel of the Sunset Property.  Pursuant to the settlement, Danita Hooper transferred her undivided 50% ownership interest in the two parcels of the Sunset Property to the Consolidated Estate, the Consolidated Estate paid Danita Hooper the sum of $50,000.00 from the net proceeds of the Sunset Property, and Danita Hooper was determined to hold an Allowed Unsecured Claim against the Consolidated Estate of $1,838,800.29.

(iv)      The Trustee's Motion to approve a settlement with Katherine Muller a/k/a Kate A. Rose was filed by the Trustee with the Bankruptcy Court on

June 7, 2013 [Docket 1123].  Katherine Muller asserted a trust deed Lien against the 990 N. Rainbow Drive Property.  Pursuant to the settlement, but all subject to Bankruptcy Court approval (which is still pending), the Trustee has agreed to pay Katherine Muller the sum of $15,000.00 from the net proceeds of the 990 N. Rainbow Drive Property, the Trustee has agreed that Katherine Muller will hold an Allowed Unsecured Claim against the Consolidated Estate of $485,000.00, and Katherine Muller has agreed to transfer her trust deed Lien against the 990 N. Rainbow Drive Property to the Consolidated Estate.

(v)      The Trustee's Motion to approve a settlement with the McGuire Trust and the Boyce Trust was filed by the Trustee with the Bankruptcy Court on June 7, 2013 [Docket 1122].  The McGuire Trust and the Boyce Trust recorded a judgment Lien with the Davis County, Utah, Recorder against Horizon Mortgage and Horizon Financial, which attached to all of the real property of Horizon Mortgage and Horizon Financial in Davis County, Utah.  Pursuant to the settlement, but all subject to Bankruptcy Court approval (which is still pending), the Trustee has agreed to pay the McGuire Trust and the Boyce Trust the sum of $346,898.58 (but subject to possible reductions) from the net proceeds of the 715-721 N. 400 W. Property ($68,204.70), the Sunset Property ($74,353.10), the 87 N. Adamswood Property ($85,878.56), the Fort Lane Property, Lot 2 ($19,737.90), the Fort Lane Property, Lot 3 ($71,969.66), the 1427 W. 1650 N. Property ($6,754.66), and unencumbered funds of the Consolidated Estate ($20,000.00), the Trustee has agreed that the McGuire Trust and the Boyce Trust will hold an Allowed Unsecured Claims against the Consolidated Estate of $1,104,140.17 (but subject to a possible increase if the amount paid to the McGuire Trust and the Boyce Trust is reduced), and the McGuire Trust and the Boyce Trust have agreed to transfer their judgment Lien to the Consolidated Estate and that their judgment Lien against the 1072 S. Lloyd Property, Parcel 2, is deemed to be avoided pursuant to the Trustee's avoidance powers.

(vi)      The Trustee also estimates that LeGrande Hafen and LuJuanna Hafen will be paid approximately $14,111.31 from the net proceeds of the sale ~~foo~~of the 715-721 N. 400 W. Property in connection with their ownership of an undivided 12% interest in the 715-721 N. 400 W. Property.

(e)      Cooperating with the office of the United States Trustee with regard to the administration of the Consolidated Estate.

(f)      Providing information to, and meeting and cooperating with the Department of Justice and the Utah Attorney General's Office in matters related to criminal and civil enforcement investigations against Randall and his agents.

(g)      Employing the Professionals outlined above to aid the Trustee in effectively administering the Consolidated Estate.

(h)     Marketing, negotiating, and completing the sale of the Debtors' real properties, as more fully outlined in **Exhibit 4-2** to this Disclosure Statement.  The Trustee has recovered net proceeds in the amount of **$2,198,297.97** as of the date of this Disclosure Statement, as shown in **Exhibit 11-2** to this Disclosure Statement.  However, for some of these real properties, the Debtors did not own all of the interests in these properties, and the Trustee obtained the approval of the Bankruptcy Court to also sell the interests of the co-owners of these properties, with the interests of the co-owners (if their ownership interests are ultimately confirmed by the Bankruptcy Court) to attach to the net proceeds.  The asserted interests of these co-owners as well as the asserted interests of various Investors who recorded trust deed Liens against some of these properties are outlined in **Exhibit 9** and **Exhibit 11-2** to this Disclosure Statement.  Accordingly, not all of the net proceeds outlined in **Exhibit 4-2** and **Exhibit 11-2** to this Disclosure Statement will be available for the benefit of the Creditors of the Consolidated Estate.

(i)     Formulating the Plan and drafting this Disclosure Statement.

(j)     Negotiating with the IRS and requesting that the IRS subordinate all of the IRS's Claims against the Consolidated Estate.

Through the Trustee's administration of the Consolidated Estate, assets have been preserved and liquidated in a manner intended to maximize returns for creditors under the Plan.  The summary of liquidated and unliquidated assets that the Trustee currently holds for the benefit of Creditors of the Consolidated Estate is attached as **Exhibit 11** to this Disclosure Statement.

## 7.4     Governmental Investigations Related to the Randall Enterprise

The Trustee administers the Debtors' Consolidated Estate for the benefit of Creditors, including Victims of the Scheme.  The Trustee is not a party to any investigations by any Governmental Unit of the Randall Enterprise Scheme, or Randall personally.  However, the Trustee has cooperated with various Governmental Units in providing information requested by them in the investigation of the Randall Enterprise for possible prosecution of any criminal offenses that may be uncovered as a result of the various Governmental investigations, or any related civil enforcement actions.  A number of civil actions have already been filed against certain Insurance Agents, and a small amount of Restitution has been ordered.  At this time, it is not clear if the various Governmental investigations will result in any further criminal prosecutions or civil enforcement actions, and, perhaps most relevant to Victims and this Bankruptcy Case, whether Randall or any of the Insurance Agents will be required to pay any further Restitution.

## SECTION 8.

## OTHER CONSIDERATIONS

### 8.1    Feasibility of the Plan

The Plan is feasible inasmuch as the Trustee's current Cash on hand is sufficient to consummate the Plan, including by making a distribution to holders of Allowed Victim Claims on the Initial Distribution Date.  Pursuant to the Plan, the Trustee will administer the Consolidated Estate after the Confirmation Date and will continue to liquidate property of the Consolidated Estate for the benefit of the Debtors' Creditors.  Attached as **Exhibit 11** to this Disclosure Statement is a Schedule outlining the current liquidated and unliquidated assets of the Consolidated Estate.

### 8.2    Effect of a Denial of Confirmation of the Plan

The Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the Chapter 11 case; (b) alternative plans of liquidation; or (c) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.  Each scenario is discussed below.

#### 8.2.1   Continuation of the Cases

If the Debtors were to remain in Chapter 11, and the Trustee were to continue in the administration of the Consolidated Estate without the benefit of a plan of liquidation, the Trustee believes that Creditor recoveries may be eroded as a result of, among other things, higher costs of administration.  Furthermore, and significantly, it is likely that Creditors would be delayed in receiving recoveries because the Trustee could not distribute funds without an order confirming a plan, and it would take longer for the Trustee to administer the Consolidated Estate.

#### 8.2.2   Alternative Plans of Liquidation

If the Plan is not confirmed, the Trustee or another party in interest in the Bankruptcy Case could attempt to formulate and propose a different plan or plans.  Such plans might, at least theoretically, involve either a reorganization and continuation of the Debtors' businesses, an orderly liquidation of the Debtors' assets, or a combination thereof.  To date, the Trustee has not received any concrete suggestions for alternate plans, and given the circumstances, it is highly unlikely that a plan of reorganization could be confirmed.  Continuation of the Debtors' businesses is not possible, given that they were operated as part of a Scheme that had the characteristics of a Ponzi scheme, there was no legitimate profitable business that could continue to be operated, and the Debtors' properties have been sold or abandoned.

### 8.2.3   Liquidation under Chapter 7

If the Plan is not confirmed, it is also possible that the Bankruptcy Case could be converted to a case under Chapter 7 of the Bankruptcy Code.  Under this scenario, a Chapter 7 trustee would be appointed or elected to liquidate the assets of the Debtors.  As in Chapter 7, the Trustee's proposed Plan is a liquidation of assets that will provide a return to Creditors according to the priorities established by the Bankruptcy Code.  But, through the Plan, the Trustee proposes the creation and implementation of the Private Actions Trust, which may provide an alternative source of recovery to the Victims who elect to become Private Actions Trust Beneficiaries.  Pursuant to the Plan, the Trustee will also continue to administer and liquidate assets for the benefit of Creditors.  Furthermore, the Plan attempts to capitalize on the negotiated nature of Chapter 11 plans by attempting to resolve potential issues with the IRS on the IRS Priority Tax Claim and the IRS's general unsecured claim and to provide holders of Allowed Claims, including Victims, the most fair and equitable distribution of assets, including by employing the Rising Tide Distribution Method discussed in the Plan and in this Disclosure Statement.  While the Trustee has considered the possibility of a Chapter 7 liquidation of the Consolidated Estate, the Trustee believes that the liquidation contemplated by the Plan will produce a better result for all Creditors.

### 8.2.4   Best Interests Test.

With respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  This requirement often is referred to as the "best interests test."

The starting point in determining whether the Plan meets the best interests test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' assets in a Chapter 7 liquidation case as opposed to the amount of proceeds that will be generated from the liquidation of the Debtors' assets in these consolidated Chapter 11 cases under the confirmed Plan.  The liquidation proceeds in a Chapter 7 liquidation case must then be reduced by the costs of such liquidation, including costs incurred during the consolidated Chapter 11 cases and costs allowed under Chapter 7 of the Bankruptcy Code (such as Professionals' fees and expenses), a Chapter 7 trustee's fees and expenses, and the fees and expenses of Professionals retained by a Chapter 7 trustee.

The potential Chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to Chapter 7.  A conversion to a Chapter 7 case would necessarily result in additional delays to any distribution to the Creditors.  If the United States Trustee appoints someone other than the Trustee to act as the Chapter 7 trustee of the consolidated cases, there would be additional administrative fees and expenses that would be incurred in connection with the

transition to a new Chapter 7 trustee and his or her Professionals, and those additional fees and expenses would reduce the ultimate recovery to the Creditors.  In addition, inefficiencies in the claims resolution process in a Chapter 7 that would likely result from the transition from the Trustee and his Professionals to a Chapter 7 trustee and his or her Professionals would negatively impact the recoveries of Creditors.

The net present value of a hypothetical Chapter 7 liquidation distribution in respect of an impaired Class is then compared to the recovery provided for in the Plan for that Class.  The Trustee notes that a Chapter 7 trustee would not be in a position to pursue Victim Causes of Action through the Private Actions Trust that will be organized under the confirmed Plan.  As set forth in the Plan and this Disclosure Statement, a portion of the recoveries from the Private Actions Trust's pursuit of the Victim Causes of Action (if realized) will be distributed to the Consolidated Estate, so those recoveries to the Consolidated Estate (if realized) would not be available for distribution to the Creditors if the consolidated Chapter 11 cases were converted to a Chapter 7 case.  Because the additional expenses and delays associated with a Chapter 7 liquidation case would reduce the distributions that would be made to the Creditors under the Plan that is proposed for the payment of the Creditors, and because a Chapter 7 trustee would not be in a position to organize and oversee the Private Actions Trust (which provides a potential for a recovery on the Victim Causes of Action that will benefit the Consolidated Estate as well as providing a potential alternative source of recovery for Victims who become Private Actions Trust Beneficiaries), the Trustee believes that Creditors would receive less (and perhaps substantially less) in a Chapter 7 liquidation case than they would receive in Chapter 11 under the treatments proposed for the Creditors in the Plan.  The Trustee believes that the Plan establishes a fair and equitable method for distribution of assets, including by employing the <u>Rising Tide Distribution Method</u> discussed in this Disclosure Statement.  In short, while the Trustee has considered the possibility of a Chapter 7 liquidation of the Consolidated Estate, the Trustee believes that the liquidation contemplated by the Plan will produce a better result for all Creditors.

In any event, the question under the best interests test is whether Creditors will receive at least as much under Chapter 11 as they would under Chapter 7.  The Trustee firmly believes that Creditors will receive at least as much under the Plan as they would under Chapter 7, and therefore that the best interests test is easily satisfied.

### 8.2.5   Cramdown.

The Debtor will seek to confirm the Plan notwithstanding the rejection by any of the Impaired Classes.  To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(i)     <u>Secured Creditors</u>.  Either (i) each impaired Secured Creditor retains its Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments having a present value equal to the amount of its Allowed Secured Claim, (ii) each impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (iii) the property securing the Claim is sold free and clear of Liens with such Liens to attach to the proceeds of the sale and the treatment of such Liens on proceeds is to be as provided in subclause (i) or (ii) above.

(ii)     <u>Unsecured Creditors</u>.  Either (i) each impaired Unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.  (This provision is often referred to as the "absolute priority rule.")

(iii)     <u>Interests</u>.  Either (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the Equity Interest, or (ii) the holder of an interest that is junior to the nonaccepting Class will not receive or retain any property under the Plan.

A Plan does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class.

The Trustee believes that, if required, the Trustee could confirm the Plan under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

### 8.3     <u>Conditions to Confirmation.</u>

Except as expressly waived pursuant to the Plan, the Plan shall be null and void and have no force or effect unless the Court shall have entered the Confirmation Order, which shall be a Final Order and which order shall:

(a)     confirm the Plan without modification except as modified by the Trustee in accordance herewith;

(b)     be in form and substance acceptable to the Trustee;

(c)     declare that the provisions of the Confirmation Order shall not be severable and are mutually dependent;

(d)     declare that the transfer of the Debtor's assets, including the transfer of ownership of any and all real or personal property, tangible or intangible, shall be free from any and all recordation and transfer taxes;

(e)     declare that the Trustee has solicited acceptances of the Plan in good faith and in compliance with the Bankruptcy Code and that the Trustee and each of his affiliates, agents, directors, officers, employees, advisors, members, managers, attorneys and Professionals have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and therefore are not liable for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan; and

(f)     satisfy all of the other conditions to confirmation set forth in the Plan.

## 8.4    <u>Risk Factors</u>

Consummation of the Plan as proposed and described herein is subject to a number of risks.  These risks include, but are not limited to, the following: (a) there is no assurance of success in, and/or recovery from the Claims and Causes of Action that have been or may be commenced by the Trustee; (b) there is no assurance that Restitution will be imposed against Randall or any of his agents and/or that any such Restitution will be assigned to the Consolidated Estate to be distributed to Victims; (c) Claims that the Trustee maintains are Disputed Claims may be Allowed in full; and (d) judgments that the Trustee has obtained may not be collectable in whole or in part.

In addition, there are certain risks inherent in the Chapter 11 process.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if Creditors accept the Plan.  Although the Trustee believes that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Trustee to re-solicit acceptances, which could delay and/or jeopardize Confirmation of the Plan.  The Trustee believes that the solicitation of votes on the Plan will comply with Section 1126(b) of the Bankruptcy Code and that the Bankruptcy Court will confirm the Plan.  The Trustee, however, can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

## 8.5    <u>Tax Consequences</u>

### 8.5.1    Introduction

The following discussion summarizes certain of the important federal income tax consequences of the transactions described herein and in the Plan.  This discussion is for informational purposes only and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice.  Neither the impact on foreign holders of Claims, if any, and on Equity Interests, nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers,

such as financial institutions, broker-dealers, life insurance companies and tax-exempt organizations.  Furthermore, due to the complexity of the transactions contemplated in the Plan and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties.  No opinion of counsel has been obtained, and no ruling has been requested from the IRS on these or any other tax issues. There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### 8.5.2    Tax Consequences to the Debtors and the Consolidated Estate

Generally, the Plan contemplates a compromise of debts against the Debtors.  Any income corresponding to the payment of Claims at a discount should not constitute taxable income to the Debtors or the Consolidated Estate since the debt forgiveness arises in connection with a case under Title 11 of the United States Code.

### 8.5.3    Tax Consequences to Creditors

**In General**.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the claimant receives consideration in more than one tax year, (c) whether the claimant is a resident of the United States, (d) whether all the consideration by the claimant is deemed to be received by that claimant as part of an integrated transaction, (e) whether the claimant reports income using the accrual or cash method of accounting, and (f) whether the

holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for Cash and other property in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset.  For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 8.6    Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 28 percent with respect to payments made pursuant to the Plan unless such holder (a) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (b) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 8.7    Importance of Obtaining Professional Assistance

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

## SECTION 9.

## VOTING PROCEDURES AND REQUIREMENTS

### 9.1     Ballots and Voting Deadline

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement.  A Creditor who is voting must (a) carefully review the ballot and instructions thereon, (b) complete and execute the ballot indicating the Creditor's vote to either accept or reject the Plan, and (c) return the executed ballot to the address below.

Pursuant to an Order of the Bankruptcy Court, in order to be counted for voting purposes, **ballots for the acceptance or rejection of the Plan must be *received* by counsel for the Trustee by 4:00 p.m. Salt Lake City time, on** ~~,~~**Wednesday, October 21,** 2013 (the "Voting Deadline")**,** at the following address:

> Sherry Glendening
> RAY QUINNEY & NEBEKER P.C.
> 36 South State Street, Suite 1400
> Salt Lake City, Utah 84111

*It is important that you vote. Voting on the Plan will affect your rights. Determining the outcome of balloting on the Plan requires a calculation that considers the votes of those creditors who actually voted on the Plan.  Further, if the Plan is confirmed, it is binding on all Creditors and Equity Interest holders, whether or not you voted or whether or not you voted for or against the Plan.  Thus, your rights may be affected even if you do not vote on the Plan. The Trustee, therefore, requests that you vote if you are entitled to do so and that you take steps to ensure that your ballot is received in time to be counted.*

### 9.2     Creditors Entitled to Vote

Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan is entitled to vote separately to accept or reject the Plan.  For voting purposes, holders of Claims shall be entitled to vote on the Plan in the amount as follows: (a) the amount of any Allowed Claim; (b) the amount of Claim reflected on the Ballot for such holder; or (c) for those Creditors who are holders of Disputed Claims or for those holders of Victim Claims who have asserted a Victim Claim in excess of the applicable Victim Net Claim Amount, as the amount estimated and temporarily allowed pursuant to an order of the Bankruptcy Court for purposes of voting on the Plan.

### 9.3     Nonconsensual Confirmation

If any impaired Class entitled to vote does not accept the Plan, or if any impaired Class is deemed to have rejected the Plan, the Trustee reserves the right (a) to confirm the

Plan under Section 1129(b) of the Bankruptcy Code, and/or (b) to amend the Plan to the extent necessary to obtain entry of a Confirmation Order.

### 9.4    Voting Procedures

All voting procedures are described in the Bankruptcy Court's Order (I) Approving ~~the Trustee's~~ Disclosure Statement ~~and Fixing Time for Filing Acceptances or Rejections of~~ With Respect to the Chapter 11 Trustee's Liquidating Plan of Liquidation Dated ~~May~~April 3, 2013, (II) Establishing Voting Record Holder Date, (III) Approving Solicitation Procedures, ~~Forms~~Form of Ballots, and Manner of Notice, and (~~III~~IV) Fixing the Deadline for Filing Objections to the Confirmation of the ~~Trustee's~~ Plan (entered on ~~_____,~~September 9, 2013, and included in the package for the solicitation of votes on the Plan).

### 9.5    Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a Plan by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the Class actually voting to accept or reject the proposed plan of reorganization.

**THE TRUSTEE STRONGLY URGES ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN.**

Dated:  ~~July 2~~September 9, 2013.

**/s/ Gil A. Miller**
**Gil A. Miller**
**Chapter 11 Trustee**

1207529.~~05~~07/rqn/dmm

# Exhibit "B"

Michael R. Johnson, Esq. (A7070)
Douglas M. Monson, Esq. (A2293)
David H. Leigh, Esq. (A9433)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email:  dmonson@rqn.com
Email:  dleigh@rqn.com
*Counsel for Gil A. Miller, Chapter 11 Trustee of the Consolidated Estate*

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**DEE ALLEN RANDALL; HORIZON AUTO FUNDING, LLC; INDEPENDENT COMMERCIAL LENDING, LLC; HORIZON FINANCIAL CENTER I, LLC; HORIZON MORTGAGE AND INVESTMENT INC.; and HORIZON FINANCIAL & INSURANCE GROUP INC.;**<br><br>        Debtors. | Bankruptcy Case No. 10-37546<br><br>(Substantively Consolidated with Case Nos. 11-34826, 11-34830, 11-34831, 11-34833 and 11-34834)<br><br>Chapter 11<br><br>Honorable Joel T. Marker |

**[PROPOSED] CHAPTER 11 TRUSTEE'S LIQUIDATING PLAN OF
REORGANIZATION DATED APRIL 3, 2013**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND CONSTRUCTION OF TERMS ............................................. 1

ARTICLE II CLASSIFICATION OF CLAIMS ......................................................... 14
    2.1     Classified Claims. ................................................................ 14
    2.2     Unclassified Claims. ............................................................ 25

ARTICLE III VOTING ON, ACCEPTANCE, AND REJECTION OF THE PLAN ................. 25
    3.1     Voting Classes and Acceptance of Plan. ........................................ 25
    3.2     Non-Voting Classes. ............................................................ 25
    3.3     Voting Rights of Holders of Disputed Claims. ................................... 26
    3.4     Nonconsensual Confirmation. ................................................... 26

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS ........................................ 26
    4.1     Classes 1 – 14: Secured Claims. ................................................ 26
    4.2     Class 15 - Priority Unsecured Claims. ........................................... 27
    4.3     Class 16 - Non-Investor Trade Creditor Unsecured Claims. ...................... 27
    4.4     Class 17 - Victim Claims. ...................................................... 28
    4.5     Class 18 - Equity Interests. .................................................... 29

ARTICLE V TREATMENT OF UNCLASSIFIED CLAIMS - ALLOWED
          ADMINISTRATIVE EXPENSE CLAIMS AND ALLOWED PRIORITY
          TAX CLAIMS ................................................................. 29
    5.1     Non-Classification. ............................................................ 29
    5.2     Administrative Expense Claims. ................................................ 30
    5.3     Priority Tax Claims. ........................................................... 30

ARTICLE VI IMPLEMENTATION OF THE PLAN ............................................ 31
    6.1     General. ...................................................................... 31
    6.2     Administration of the Consolidated Estate by Trustee. .......................... 32
    6.3     Retention of Property of Consolidated Estate; Estate Assets to Remain in
          Consolidated Estate; No Revesting of Consolidated Estate Assets. ............... 32
    6.4     Liquidation of Property and Distribution of Net Proceeds. ....................... 32
    6.5     Restitution. ................................................................... 32
    6.6     Preservation of Causes of Action and Defenses. ................................ 32
    6.7     No Waiver of Legal Privileges. ................................................. 33
    6.8     Common Interest Agreement Between and Among the Trustee and
          Private Actions Trust Participating Creditors. .................................. 34
    6.9     Private Actions Trust. ......................................................... 34
    6.10    Prosecution and Resolution of Estate Litigation Claims. ........................ 38
    6.11    Non-Discharge of Randall and Corporate Debtors and Injunction. ............... 39

ARTICLE VII CLAIM OBJECTIONS AND DISTRIBUTION OF CONSIDERATION .......... 41
    7.1     Objections to Claims. .......................................................... 41
    7.2     Disputed Claims. .............................................................. 41

i

7.3      Estimation of Claims. ....................................................................................... 41
7.4      Disputed Claims Reserve, Operating Reserve, and Maintenance of Cash. ........ 42
7.5      Method of Distributions Under the Plan. ........................................................... 42
7.6      Unclaimed Funds. .............................................................................................. 43

ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 44
8.1      Executory Contracts and Unexpired Leases. ..................................................... 44
8.2      Rejection Damage Claims And Contract Rejection Claim Bar Date. ................ 44

ARTICLE IX CONDITIONS PRECEDENT TO EFFECTIVE DATE ..................................... 44
9.1      Conditions Precedent to Effectiveness. ............................................................. 44
9.2      Waiver of Conditions. ........................................................................................ 45

ARTICLE X RETENTION OF JURISDICTION ....................................................................... 45

ARTICLE XI MISCELLANEOUS ............................................................................................. 47
11.1     Continuation of Injunctions or Stays Until Effective Date. ............................... 47
11.2     Notice of Effective Date. ................................................................................... 47
11.3     Limitation of Liability. ...................................................................................... 47
11.4     Execution of Documents and Corporate Action. ............................................... 48
11.5     Default of Plan. ................................................................................................. 48
11.6     Setoffs and No Waiver. ...................................................................................... 48
11.7     Amendment or Modification of the Plan. ........................................................... 48
11.8     Revocation or Withdrawal of the Plan. ............................................................. 49
11.9     Severability. ...................................................................................................... 49
11.10    Exhibits. ............................................................................................................ 49
11.11    Binding Effect. .................................................................................................. 50
11.12    Notices. ............................................................................................................. 50
11.13    Governing Law. ................................................................................................. 50
11.14    Post-Confirmation Administration - Fees, Reports, Final Decree. .................... 50
11.15    Headings. ........................................................................................................... 51
11.16    Inconsistency. .................................................................................................... 51

Gil A. Miller, the duly-appointed Chapter 11 Trustee in the above-captioned substantively consolidated bankruptcy case ("Trustee"), hereby proposes the following Chapter 11 Trustee's Liquidating Plan of Reorganization ("Plan") under Section 1121 of the Bankruptcy Code.

On December 20, 2010 (the "Randall Petition Date"), Dee Randall ("Randall") commenced Case No. 10-37546 (the "Randall Case") by filing a voluntary petition for relief under Chapter 11 of the title 11 of the United States Code with the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court").  The Trustee was appointed by the Bankruptcy Court as the Chapter 11 Trustee in the Randall Case on September 29, 2011.  On October 12, 2011 (the "Corporate Debtors Petition Date"), the Trustee, in his capacity as the Chapter 11 trustee in the Randall Case, caused the following bankruptcy petitions to be filed by the following entities owned by Randall (collectively, the "Corporate Debtors") under Chapter 11 of Title 11 of the United States Code:  (A) In re Horizon Auto Funding, LLC, Case No. 11-34826; (B) In re Independent Commercial Lending, LLC, Case No. 11-34830; (C) In re Horizon Financial Center I, LLC, Case No. 11-34831; (D) In re Horizon Mortgage and Investment Inc. ("Horizon Mortgage"), Case No. 11-34833; and (E) In re Horizon Financial & Insurance Group Inc. ("Horizon Financial"), Case No. 11-34834.  On January 27, 2012, the Bankruptcy Court entered its order substantively consolidating the separate bankruptcy estates of Randall and each of the Corporate Debtors (collectively the "Debtors"), with all cases being consolidated with and into the Randall Case, but effective only as of the date of the Bankruptcy Court's consolidation order.

Sent to you in the same envelope as this document is the Disclosure Statement that has been approved by the Bankruptcy Court and that is provided to help you understand the Plan.  All holders of Claims are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.  The Disclosure Statement for the Plan contains a summary of the Plan and discusses the Debtors' history, assets and liabilities to the extent known to the Trustee.  Reading the summary of the Plan contained in the Disclosure Statement, however, is not a substitute for reading the Plan.  As the provisions of the Plan control, all holders of Claims are encouraged to carefully read the Plan.  No solicitation materials, other than the Disclosure Statement, the Disclosure Statement Exhibits, the Exhibits attached to this Plan, and the related materials transmitted with the Disclosure Statement or Plan, have been approved by the Bankruptcy Court for use in soliciting acceptances or rejections to the Plan.

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

For purposes of this Plan, the following terms shall have the meanings specified in this Article I.  A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  Wherever from the context it appears appropriate, each term stated shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter, regardless of how stated.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Section, sub-Section or clause contained in the Plan.  The rules of

construction contained in Section 102 of the Bankruptcy Code shall apply to the terms of this Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

"Active Policy" shall mean a Policy held at any time by a Policyholder that is still in force and/or has not been terminated, and any Policy on which a death benefit has previously been paid or is due and payable as of the Effective Date.

"Administrative Expense Claim" shall mean a Claim that is allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including: (a) fees and expenses of Professionals allowed pursuant to an Order of the Bankruptcy Court; and (b) all fees and charges assessed against the Consolidated Estate pursuant to 28 U.S.C. § 1930.

"Administrative Expense Claim Bar Date" shall have the meaning attributed to this phrase in Section 5.2(c) of the Plan.

"Affiliates" shall have the meaning attributed to it in Section 101(2) of the Bankruptcy Code.

"Allowed . . . Claim" shall mean:

(a)     A Claim that is listed in the Schedules but is not listed in the Schedules as liquidated, disputed or contingent, as well as a Claim as to which a timely proof of Claim has been filed by the applicable Bar Date, including any and all amended claims filed in relation thereto, and either (i) no objection to such Claim, or no application to estimate, equitably subordinate or otherwise limit recovery for such Claim, has been made on or before any applicable deadline, or (ii) if an objection to such Claim, or an application to estimate, equitably subordinate or otherwise limit recovery for such Claim has been interposed, the extent to which such Claim has been Allowed (whether in whole or in part) by a Final Order, either as a result of suit or by settlement agreement; provided, that for each Victim Claim, the amount of such Allowed Victim Claim shall be no greater than the Victim Net Claim Amount for such Victim Claim;

(b)     a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code, to the extent allowed under Section 502(h) of the Bankruptcy Code;

(c)     a Claim allowed pursuant to a Final Order in the amount so ordered; or

(d)     any Claim expressly allowed under this Plan or pursuant to the Confirmation Order.

"Avoidance Actions" shall mean Causes of Action arising or held by the Consolidated Estate under Chapter 5 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

2

"<u>Bankruptcy Case</u>" shall mean collectively the above-captioned substantively consolidated Chapter 11 case pending in the Bankruptcy Court, including the substantively consolidated Chapter 11 cases of Horizon Auto Funding, LLC, filed under Bankruptcy Case No. 11-34826, Independent Commercial Lending, LLC, filed under Bankruptcy Case No. 11-34830, Horizon Financial Center I, LLC, filed under Bankruptcy Case No. 11-34831, Horizon Mortgage and Investment Inc., filed under Case No. 11-34833, and Horizon Financial & Insurance Group Inc., filed under Bankruptcy Case No. 11-34834.

"<u>Bankruptcy Code</u>" shall mean Title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of the United States District Court for the District of Utah specified pursuant to 28 U.S.C. § 151.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

"<u>Bar Date</u>" shall mean: (i) April 26, 2011 with respect to a Claim against Randall other than a Claim of a Governmental Unit against Randall, whether filed on the Randall Claim Docket or on any of the Corporate Debtors Claim Dockets; (ii) June 20, 2011 with respect to a Claim of a Governmental Unit against Randall, whether filed on the Randall Claim Docket or on any of the Corporate Debtors Claim Dockets; (iii) March 12, 2012 with respect to a Claim against any of the Corporate Debtors other than a Claim of a Governmental Entity against any of the Corporate Debtors, whether filed on the Randall Claim Docket or any of the Corporate Debtors Claim Dockets; and (iv) April 9, 2012 with respect to a Claim of a Governmental Unit against any of the Corporate Debtors, whether filed on the Randall Claim Docket or on any of the Corporate Debtors Claim Dockets. For the sake of clarity, "Bar Date" does not include the Contract Rejection Bar Date, the Administrative Expense Claim Bar Date, or the Professional Administrative Expense Claim Bar Date, which are separately defined herein.

"<u>Beneficial Interest Calculation</u>" shall mean the formula to be used to calculate each Private Actions Trust Beneficiary's interest in the Private Actions Trust for distribution purposes as set forth in Section 2.8 of the Private Actions Trust.

"<u>Boyce Trust</u>" means The Boyce Family Living Trust, under the Trust Agreement originally dated September 9, 1999, and its trustee, David B. Boyce. The Boyce Trust was an Investor.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, or legal holiday recognized in the State of Utah.

"<u>Boyingtons</u>" means Carl Boyington and Janice Boyington, who were Investors.

3

"Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

"Causes of Action" shall mean, any actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown or asserted or unasserted, in law, equity or otherwise, including any and all Avoidance Actions.

"Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Class" shall mean those classes designated in Articles II and III of this Plan.

"Collateral" shall mean any property or interest in property of the Consolidated Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

"Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

"Confirmation Hearing" shall mean ~~——————~~,October 28, 2013, or any date to which the Bankruptcy Court continues said Confirmation Hearing on the record without the need for further notice.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

"Consolidated Estate" shall mean the consolidated estate of all of the Debtors created in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code on the Randall Petition Date and on the Corporate Debtors Petition Date, including but not limited to: (i) as created as a result of the Consolidation Order; and (ii) the property that is retained by the Trustee under the Plan as of, and after the Effective Date.

"Consolidation Order" shall mean the Order Substantively Consolidating the Separate Estates of Dee Allen Randall, Horizon Auto Funding, LLC, Independent Commercial Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage and Investment Inc. and Horizon Financial & Insurance Group Inc., entered by the Bankruptcy Court on January 30, 2012 [Docket No. 449].

4

"Contingent or Unliquidated Claim" shall mean any Claim for which a proof of Claim has been filed with the Bankruptcy Court but which was not filed in a sum certain, or which has not occurred and is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed.

"Contract Rejection Claim Bar Date" shall have the meaning attributed to it in Section 8.2 of the Plan.

"Corporate Debtors" shall mean Horizon Auto Funding, LLC, Independent Commercial Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage, and Horizon Financial.

"Corporate Debtors Claim Dockets" shall mean the dockets showing proofs of claims filed in the Bankruptcy Case under Case No. 11-34826 for Horizon Auto Funding, LLC, Case No. 11-34830 for Independent Commercial Lending, LLC, Case No. 11-34831 for Horizon Financial Center I, LLC,  Case No. 11-34833 for Horizon Mortgage, and Case No. 11-34834 for Horizon Financial.

"Corporate Debtors Petition Date" shall mean October 12, 2011.

"Creditor" shall mean any Person who: (a) holds a Claim against the Consolidated Estates that arose prior to the Randall Petition Date with respect to a Claim against Randall or that arose prior to the Corporate Debtors Petition Date with respect to a Claim against any of the Corporate Debtors; (b) holds a Claim against the Consolidated Estate, which arose after the Randall Petition Date, other than an Administrative Expense Claim of the type specified in Bankruptcy Code Section 503(b); or (c) holds a Claim against the Consolidated Estate of the kinds specified in Bankruptcy Code Sections 502(g), 502(h) or 502(j).

"Debtors" shall mean any, each and all of Randall and the Corporate Debtors.

"Debtors' Agent" shall mean a Person, including an Insurance Agent, that acted as an agent, representative, independent contractor, officer, director, manager, or employee of any of the Debtors prior to the Corporate Debtors Petition Date, excluding the Debtors, the Trustee and any Professionals.

"Deficiency Claim" shall mean that portion of any Allowed Claim held by a Creditor of a Secured Claim which exceeds the value of the assets securing such Allowed Claim.

"Disallowed . . . Claim" shall mean:

      (a)     a Claim that is listed in the Schedules as unliquidated, disputed or contingent for which no proof of Claim has been filed prior to the Bar Date;

      (b)     a Claim disallowed allowed under Section 502(d) of the Bankruptcy Code;

      (c)     a Claim asserted in an amount greater than an amount fixed pursuant to a Final Order or pursuant to a settlement agreement entered into with the Trustee; or

      (d)     for any Victim Claim, any amount that is greater than the Victim Net Claim Amount for such Victim Claim, even if the amount for such Victim Claim asserted in the

corresponding Victim Proof of Claim is larger than the Victim Net Claim Amount for such Victim Claim.

"Disclosure Statement" shall mean the disclosure statement relating to the Plan, including all Exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

"Disclosure Statement Exhibit" shall mean the Exhibits attached to the Disclosure Statement which are incorporated into the Disclosure Statement and this Plan by reference.

"Disputed . . . Claim" shall mean:

(a)    a claim that is listed in the Schedules as unliquidated, disputed or contingent;

(b)    if a proof of Claim relating to a Claim has been filed, a Claim as to which a timely objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Trustee in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order;

(c)    Claims for which a proof of Claim has not been filed prior to any applicable Bar Date; or

(d)    a Claim which is a Contingent or Unliquidated Claim.

"Disputed Claims Reserve" shall have the meaning set forth in Section 7.4(a) hereof.

"Distribution Record Date" shall mean the Confirmation Date.

"Effective Date" shall mean the date which is 30 days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have not been satisfied or waived, then the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

"Estate Litigation Claims" shall mean any of the Debtors' or the Consolidated Estate's Causes of Action.

"Equity Interest" shall mean any equity interest in any of the Corporate Debtors, regardless of form, arising under any contract, agreement, and/or under any applicable law.

"Face Amount" shall mean:  (i) when used with respect to a Claim, (a) if no Proof of Claim has been filed, the amount of the Claim set forth in the Schedules, or (b) if a Proof of Claim has been filed, the amount asserted in the Proof of Claim; (ii) when used with respect to an Estate Litigation Claim, the amount set forth in any complaint or other formal or informal

6

demand; and (iii) when used with respect to an asset or liability of the Consolidated Estate other than an Estate Litigation claim, (a) the most recent recorded amount on the Consolidated Estate's books and records, or (b) if no amount is recorded on the Consolidated Estate's books and records, then the fair market value or fair liability amount as determined by the Trustee.

"Final Decree" shall mean a Final Order of the Court closing the Bankruptcy Case.

"Final Order" shall mean an order or judgment which has not been reversed, stayed, modified or amended and, as to which (i) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (ii) if appeal, review, reargument or certiorari of the order has been sought, the order has been affirmed or the request for review, reargument or certiorari has been denied and the time to seek a further appeal, review, reargument or certiorari has expired, and as a result of which such order shall have become final and nonappealable in accordance with applicable law; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Fort Lane Property" shall mean collectively the three parcels of real property located at approximately 768 Fort Lane, 790 Fort Lane, and 812 Fort Lane in Layton, Utah, that on the Corporate Debtors Petition Date were owned by Horizon Mortgage (100% interest in the 768 Fort Lane Parcel and the 790 Fort Lane Parcel), Deborah Jean Herbert (an undivided 40% interest in the 812 Fort Lane Parcel), and Horizon Mortgage (an undivided 60% interest in the 812 Fort Lane Parcel).

"Governmental Unit" shall have the meaning attributed to it in Section 101(27) of the Bankruptcy Code, and shall include the Utah Division of Securities.

"Hatch Trust" shall mean The Jack David Hatch Revocable Trust dated March 1, 2005, and its trustee, Jack David Hatch.  The Hatch Trust was an Investor.

"Horizon Financial" shall mean Horizon Financial & Insurance Group Inc.

"Horizon Mortgage" shall mean Horizon Mortgage and Investment Inc., dba Maple Apartments, also dba Independent Financial & Investment, also dba Independent Property Management.

"Initial Distribution Date" shall mean any date that the Trustee chooses, in the Trustee's sole discretion, prior to the entry of the Final Decree.

"Insurance Agents" shall mean all Persons who acted as insurance agents for Horizon Financial or Randall who were otherwise affiliated with the insurance business of the Debtors and Union Central.

"Investment" shall mean Cash and all other funds deposited by a Person with any of the Debtors for the purpose of obtaining a return on such funds.

7

"<u>Investor</u>" shall mean a Person who holds a Note, or who otherwise asserts a Claim against the Consolidated Estate arising out of an Investment with Randall or with any of the Corporate Debtors.

"<u>IRS</u>" shall mean the Internal Revenue Service, an agency of the United States.

"<u>IRS Priority Tax Claim</u>" shall mean collectively all of the Priority Tax Claims filed against any of the Debtors by the IRS on behalf of the United States.

"<u>Lien</u>" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.  A lien that has been avoided in accordance with Section 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall be preserved for the benefit of the Consolidated Estate pursuant to Section 551 of the Bankruptcy Code.

"<u>Liquidation Amount</u>" shall mean all Cash of the Consolidated Estate remaining after: (i) Payment in Full of all Allowed Administrative Claims, all Allowed Priority Tax Claims, and all Allowed Secured Claims in Classes 1-14; (ii) Payment in Full of all fees owing to the Clerk of the Bankruptcy Court, and fees owing to the United States Trustee; (iii) Payment in Full of all post-Confirmation Date fees and expenses, including such fees and expenses incurred or to be incurred by Professionals employed by the Trustee through the closing of this Bankruptcy Case and entry of a Final Decree (to the extent not included in the Operating Reserve); and (iv) funding of the Operating Reserve, from time to time.

"<u>McGuire Trust</u>" shall mean The Kristina McGuire Living Trust, under the Trust Agreement originally dated April 11, 2001, and its trustee, Kristina McGuire a/k/a Kristina Hyer. The McGuire Trust was an Investor.

"<u>Metamorphosis</u>" shall mean Metamorphosis Investments, L.C., the record title owner to an undivided 1.5% interest in the 1505 N. 1200 W. Property.

"<u>Non-Investor Trade Creditor Unsecured Claim</u>" shall mean a Claim that is not a Secured Claim, not a Claim that is entitled to priority of payment under Section 507 of the Bankruptcy Code, and not a Victim Claim.  The holders of Non-Investor Trade Creditor Unsecured Claims are Creditors who provided goods and services <u>or financing</u> to the Debtors and were not Investors.  A list of the Creditors that a preliminary review of the Debtors' books and records reflect are holders of Non-Investor Trade Creditor Unsecured Claims <u>for less than $50,000.00</u> is attached hereto as Exhibit B.  The amounts set forth in Exhibit B are merely those stated in either the Statements and Schedules or in proofs of claim filed by the holders of Non-Investor Trade Creditor Unsecured Claims, and the Trustee reserves the right to contest the validity or amounts of the Non-Investor Trade Creditor Unsecured Claims set forth on Exhibit B.  <u>The Non-Investor Trade Creditor Unsecured Claims that are Allowed in an amount of $50,000.00 or less shall be classified in Class 16(A) under this Plan.  The Non-Investor Trade Creditor Unsecured Claims that are Allowed in an amount greater than $50,000.00 shall be classified in Class 16(B) under this Plan.</u>

8

"Note" shall mean one or more promissory notes issued by any of the Debtors to a Person in exchange for such Person making an Investment.

"Operating Reserve" shall have the meaning ascribed to such term in Section 7.4(b) of this Plan.

"Payment in Full" shall mean payment of the full Allowed amount of any Allowed Claim, whether by distribution under this Plan or otherwise.

"Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, trustee, unincorporated association or organization, Governmental Unit or political subdivision thereof.

"Plan" shall mean this Liquidating Plan of Reorganization, including the Disclosure Statement Exhibits and any Exhibits, supplements, appendices and schedules hereto, in their present form or as the same may be altered, amended or modified from time to time.

"Policy" shall mean an insurance policy or other insurance product that was issued by Union Central and: (i) produced by one of the Debtors and/or by a Debtors' Agent; or (ii) on which one of the Debtors and/or a Debtors' Agent received a commission from Union Central.

"Policyholder" shall mean a Person that: (i) as of the Corporate Debtors Petition Date, was the holder of a Claim that would qualify as a Class 17 Allowed Victim Claim; (ii) at any time, has been the owner, payor, or holder of a Policy; and (iii) if applicable, the successor(s) or assignee(s) of such Person.

"Priority Tax Claims" shall mean any Claim of a Governmental Unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"Priority Unsecured Claims" shall mean any Claim entitled to priority under Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims and Administrative Expense Claims.

"Private Actions Trust" shall mean the trust established on the Effective Date pursuant to Section 6.9 of this Plan.

"Private Actions Trust Agreement" shall mean the Randall Victims Private Actions Trust Agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan.  A copy of the Private Actions Trust Agreement is attached hereto as Exhibit A to this Plan.

"Private Actions Trust Election" means the irrevocable election of a Victim to assign his or her Victim Causes of Action to the Private Actions Trust, such election being evidenced (i) on the Victim's Ballot for his or her Class 17 Allowed Victim Claim, or (ii) in a writing filed with the Private Actions Trustee on or before the date that is sixty (60) calendar days after the Effective Date;  provided, that the Private Actions Trustee, in his or her sole discretion, may choose to allow a Victim to make a Private Actions Trust Election after this deadline.

9

"Private Actions Trust Participating Creditors" and "Private Actions Trust Beneficiaries" mean those Victims who have made Private Actions Trust Elections and have thereby assigned their Victim Causes of Action to the Private Action Trust.

"Private Actions Trustee" means the trustee of the Private Actions Trust and any subsequent trustee of the Private Actions Trust.  The Trustee will be the initial trustee of the Private Actions Trust.

"Professionals" shall mean (i) the Trustee, or (ii) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330, 331 and 503 of the Bankruptcy Code.

"Professional Administrative Expense Claim Bar Date" shall have the meaning attributed to this phrase in Section 5.2(d)(ii) of the Plan.

"Randall" shall mean Dee Allen Randall, an individual.

"Randall Claim Docket" shall mean the docket showing proofs of Claim filed in the Bankruptcy Case under Case No. 10-37546.

"Randall Enterprise" shall mean Randall, the Corporate Debtors, all subsidiaries of the Debtors, all Affiliates of the Debtors, and/or any entity in which Randall or any of the Corporate Debtors held an equity interest.

"Randall Petition Date" shall mean December 20, 2010.

"Restitution" shall mean any Cash payments to be made by Randall or by the Insurance Agents or by any other Persons for the benefit of Victims as ordered by any state or federal court or as required by any Governmental Unit, including those required by any Governmental Unit in connection with any settlements by such Governmental Unit with the parties required to make the Restitution payments.

"Rising Tide Distribution Method" shall mean the method of distribution to be applied by the Trustee for the distribution of Victim Funds to holders of Allowed Victim Claims and holders of Class 16(B) Allowed Unsecured Claims (if any).  The Rising Tide Distribution Method shall govern all Victim Claims under this Plan, even if the amount asserted for any Victim Claim in its corresponding Victim Proof of Claim or in the Schedules or otherwise exceeds the Victim Net Claim Amount for such Victim Claim.  Under the Rising Tide Distribution Method, Investors who are not Winning Investors are allowed to retain the total Withdrawals they have previously received (whether such Withdrawals are prepetition Withdrawals or are funds received by such Investors from the proceeds of the Trustee's postpetition sale of properties or from postpetition settlements with the Trustee), but their total Withdrawals are subtracted from the amount of their Investment to determine their Victim Net Claim Amount as well as their initial recovery percentage (rather than their net loss) for distribution purposes.  Under the Rising Tide Distribution Method, the Investors who previously received Withdrawals or prior distributions that resulted in a percentage return of their

10

Investment that is less than the percentage return of other Investors will participate in each distribution in such amounts as to raise their percentage returns closer to such other Investors until all of the Investors have an equal percentage return on their Investment. An example of three hypothetical Investors will illustrate the application of the Rising Tide Distribution Method. Investor A invested the Investment amount of $150,000, and received Withdrawals of $60,000. Investor A's initial recovery percentage is calculated at 40% ($60,000 divided by $150,000 = 40%). Investor B invested the Investment amount of $150,000, and received Withdrawals of $30,000. Investor B's initial recovery percentage is calculated at 20% ($30,000 divided by $150,000 = 20%). Investor C invested the Investment amount of $150,000, but received no Withdrawals. Investor C's initial recovery percentage is calculated at 0%. If the Trustee has Victim Funds of $60,000 for his initial distribution of Victim Funds, under the Rising Tide Distribution Method, Investor B will receive $15,000 of the Victim Funds, Investor C will receive $45,000 of the Victim Funds, and Investor A will receive none of the initial distribution of $60,000 of Victim Funds. Investor A's recovery percentage is still considered to be 40% (from Investor A's prior Withdrawals), Investor B's recovery percentage will have increased to 30% (consisting of Investor B's prior Withdrawals of $30,000 plus $15,000 from the initial distribution of Victim Funds, for a total of $45,000 [$45,000 divided by $150,000 = 30%]), and Investor C's recovery percentage will also have increased to 30% ($45,000 divided by $150,000 = 30%). The result of the Rising Tide Distribution Method is to raise the recovery percentages of Investor B and Investor C as close to the recovery percentage of Investor A as possible, with the Trustee applying a consistent formula to calculate the Victim Net Claim Amounts for all Victim Claims as well as the initial distribution of Victim Funds and all subsequent distributions of Victim Funds, giving distribution preference to those holders of Allowed Victim Claims who received no Withdrawals or small Withdrawals (i.e., little or no return of their Investment) over other holders of Allowed Victim Claims who received larger Withdrawals (i.e., larger distributions of their Investment), either prior to the Petition Date or through postpetition payments on their Allowed Victim Claims. Investor A will participate in subsequent distributions of Victim Funds only at such time as the recovery percentages of Investor B and Investor C have reached 40%, the same initial recovery percentage for Investor A. At such time that the recovery percentages for Investor A, Investor B and Investor C have become equalized through distributions of Victim Funds, then each of Investor A, Investor B and Investor C will share prorata in all subsequent distributions of Victim Funds. For a holder of a Class 16(B) Allowed Unsecured Claim (if any), the Rising Tide Distribution Method will be applied as follows: With respect to the transaction (such as a lending transaction or a single contract for goods or services) that gives rise to such Class 16(B) Allowed Unsecured Claim, such holder will be allowed to retain the total payments such holder has previously received arising out of such transaction (whether such payments are prepetition payments or are payments received by such holder from the foreclosure or other disposition of such holder's original Collateral or from a postpetition settlement with the Trustee), but such holder's total payments will be subtracted from the amount that was originally owed to such holder to determine such holder's initial recovery percentage (rather than such holder's net loss) for distribution purposes, and the Rising Tide Distribution Method will then be applied to such Class 16(B) Allowed Unsecured Claim in the same manner that it will be applied to Allowed Victim Claims. The Rising Tide Distribution Method shall govern all Class 16(B) Allowed Unsecured Claims under this Plan.

"Sandy Office Building Property" means the real property located at approximately 9890 South 300 West in Sandy, Utah, that on the Corporate Debtors Petition Date was owned by Horizon Financial.

"Schedules" shall mean the various statements and schedules of assets and liabilities filed by the Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules have been or may be supplemented or amended from time to time.

"Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

"Small Payment Reserve" shall have the meaning outlined in Section 7.5(c) of the Plan.

"Sunset Property" means collectively the three parcels of real property located at approximately 124 West 800 North, 116 West 800 North, and 78 West 800 North in Sunset, Utah, that on the Randall Petition Date were owned by Horizon Mortgage (an undivided 50% interest in the 124 West 800 North Parcel and an undivided 50% interest in the 116 West 800 North Parcel), Danita Hooper (an undivided 50% interest in the 124 West 800 North Parcel and an undivided 50% interest in the 116 West 800 North Parcel), and Randall (100% of the interests in the 78 West 800 North Parcel).

"Terminated Policy" shall mean a Policy held at any time by a Policyholder that has been terminated and/or is no longer in force, excluding a Policy on which a death benefit has previously been paid or is due and payable as of the Effective Date.

"Thompsons" shall mean Leland Thompson and Phyllis Thompson, who were Investors.

"Trustee" shall mean Gil A. Miller in his capacity as Chapter 11 Trustee of the Debtors, in his capacity as liquidating trustee under this Plan, and/or in his capacity as trustee of the Private Actions Trust.

"Union Central" shall mean any or all of the following: Union Central Life Insurance Company, Ameritas Life Insurance Company, Ameritas Mutual Holding Company, and all Affiliates, officers, directors, agents, attorneys and employees of the foregoing companies.

"United States" shall mean the United States of America.

"Victim Causes of Action" shall mean Causes of Action of a Victim against Union Central, Debtors' Agents, or any Person that, prior to the Randall Petition Date, acted as an attorney, accountant, auditor, financial advisor for Debtors; such Causes of Action shall include those arising out of: (i) the offering, solicitation, promotion, servicing, or repayment of a Policy or an Investment by Union Central, Debtors or any Debtors' Agent; (ii) the issuance, repayment, cancellation, extension, conversion, exchange, or modification of Notes by the Union Central, Debtors or any Debtors' Agent; (iii) the provision of investment or financial advice or services by Union Central, Debtors or any Debtors' Agent; (iv) other actions of any Debtors Agent; and

12

(v) any Terminated Policy; provided, however, "Victim Causes of Action" shall not include any right or obligation of any Policyholder under any Active Policy.

"Victim" shall mean an Investor who is not a Winning Investor and who has not received Withdrawals in excess of such Victim's Investment, either from Withdrawals prior to the Randall Petition Date or the Corporate Debtors Petition Date, or from Withdrawals received from the Consolidated Estate after the Randall Petition Date or the Corporate Debtors Petition Date but prior to the Effective Date.

"Victim Claim" shall mean the unsecured non-priority Claim of a Victim, including any Deficiency Claim.  The amount of a Victim Claim is limited to the Victim Net Claim Amount for that Victim.

"Victim Funds" shall mean Restitution, if any, plus all Cash of the Consolidated Estate, less Cash necessary to fund and/or pay: (i) costs of administration of the Consolidated Estate, including any funds necessary to fund settlement agreements unrelated to Victim Claims; (ii) Allowed Administrative Expenses Claims; (iii) Allowed Priority Tax Claims; (iv) Allowed Secured Claims; (v) Allowed Priority Unsecured Claims; (vi) Allowed Non-Investor Trade Creditor Unsecured Claims: classified in Class 16(A); (vii) the Disputed Claim Reserve; (viii) the Operating Reserve; and (ix) any Small Claim Reserve.

"Victim Net Claim Amount" shall mean, for the Victim Claim of any particular Victim, the difference between the Victim's total Investment and all Withdrawals received by the Victim.

"Victim Proof of Claim" shall mean a proof of Claim filed by a Victim in the Bankruptcy Case and docketed on either the Randall Claim Docket or any of the Corporate Debtors Claim Dockets.  Notwithstanding the amount of a Victim Claim asserted in any corresponding Victim Proof of Claim, the amount of an Allowed Claim for any Victim Claim shall not exceed the Victim Net Claim Amount for such Victim Claim.

"Winning Investor" shall mean an Investor who made an Investment with Randall or any of the Corporate Debtors and who received Withdrawals greater than the amount of the Investment prior to the Effective Date.

"Withdrawals" shall mean the total amount of funds received by an Investor from or attributable to Randall or from or attributable to any of the Corporate Debtors as a result of such Investor's Investment, regardless of whether such Withdrawals were characterized as a repayment or return of the Investment or as an interest payment or as a payment of a late fee or as a payment of a commission or any other characterization. Withdrawals shall include not only the funds received by an Investor prior to the Randall Petition Date or the Corporate Debtors Petition Date, but also any additional funds received by an Investor from the Consolidated Estate as a result of the Trustee's sale of any assets (whether assets of the Consolidated Estate or other assets) or from the Trustee's settlement with an Investor with respect to a Secured Claim asserted by an Investor against any of the assets of the Consolidated Estate.

"87 N. Adamswood Property" means the real property located at approximately 87 North Adamswood in Layton, Utah, that on the Corporate Debtors Petition Date was owned by Horizon Mortgage (an undivided 39% interest) and Debbie Noorda, Trustee of the 2905 RRR Land Title Trust (an undivided 61% interest).

"715-721 N. 400 W. Property" means collectively the real properties located at approximately 715 North 400 West and 721 North 400 West in Kaysville, Utah, that on the Corporate Debtors Petition Date were owned by Horizon Mortgage (an undivided 58% interest), Jadrien Marble (an undivided 30% interest), and LeGrande Hafen and LuJuanna Hafen (an undivided 12% interest).

"811 S. Main Property" means the real property located at approximately 811 South Main in Layton, Utah, that on the Randall Petition Date was owned by Randall (a 71.9% undivided interest), Conrad O. Taysom (an undivided 12% interest), Steven D. Zimmerman (an undivided 9% interest), and Jack David Hatch, Trustee of the Jack David Hatch Revocable Trust (an undivided 7.1% interest).

"990 N. Rainbow Drive Property" means the real property located at approximately 990 North Rainbow Drive in Layton, Utah, that on the Randall Petition Date was owned by Randall.

"1072 S. Lloyd Property" means collectively the two parcels of real property located at approximately 1072 South Lloyd in Fruit Heights, Utah, that on the Randall Petition Date were owned by Randall ("Parcel 1") and Horizon Financial ("Parcel 2").

"1427 W. 1650 N. Property" means collectively the real properties located at approximately 1427 West 1650 North in Layton, Utah, that on the Randall Petition Date were owned by Horizon Mortgage (Units 101-104, 701-704, 801-804, and 1101-1104) and Randall (Units 901-904).

"1505 N. 1200 W. Property" means the real property located at approximately 1505 North 1200 West in Layton, Utah, that on the Randall Petition Date was owned by Randall (a 98.5% undivided interest) and Metamorphosis (record title to a 1.5% undivided interest).

"1634 N. Angel St. Property" means the real property located at approximately 1634 North Angel Street in Layton, Utah, that on the Randall Petition Date was owed by Randall.

"2905 RRR Trust" means the 2905 RRR Land Title Trust and its trustee, Debbie Noorda, which was an Investor.

## ARTICLE II

## CLASSIFICATION OF CLAIMS

### 2.1    Classified Claims.

14

As a result of the Consolidation Order, the Debtors and their respective bankruptcy estates have been substantively consolidated. Thus, any and all Allowed Claims, to the extent claimed against any one of the Debtors, are deemed to be made against the Consolidated Estate, and the Plan does not provide for separate classification of Claims against any one Debtor, to the extent such Claims exist, and all Claims of one Debtor against another Debtor, to the extent such Claims exist, have been disregarded. Rather, all holders of Allowed Claims are to be paid from the assets of the Consolidated Estate as provided for in this Plan.

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the Plan must classify, with certain exceptions discussed below, all Claims, and such classification is for all purposes relating to the Plan, including voting on, confirmation of, and distributions pursuant to the Plan. A Claim is classified in a particular Class only to the extent that: (a) the Claim falls with the description of that Class; and (b) unless otherwise noted, it has not already been paid, released or otherwise satisfied before the Effective Date. In this case, Claims other than certain unclassified Claims discussed below, are classified as follows:

Classes 1 through 14 - <u>Secured Claims</u>. Classes 1 through 14 consist of all Allowed Secured Claims, as follows:

1.    **Class 1** consists of all Allowed Secured Claims on the 1505 N. 1200 W. Property.

a.    Class 1(A) consists of the Allowed Secured Claim of US Bank or its successors or assigns (including AMRO/Regency Savings Bank) as the first priority Lien on the 1505 N. 1200 W. Property.

b.    Class 1(B) consists of the Allowed Secured Claim of the State of Utah on its 9/9/09 Tax Warrant against Randall in the amount of no more than $26,764.68 as the second priority Lien on the 1505 N. 1200 W. Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.    Class 1(C) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on the 1505 N. 1200 W. Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

d.    Class 1(D) consists of the Allowed Secured Claim of the State of Utah on its 7/12/10 Tax Warrant against Randall in the amount of no more than $44,124.43 as the fourth priority Lien on the 1505 N. 1200 W. Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

e.    Class 1(E) consists of the Allowed Secured Claim of Washington Federal Savings on its 8/30/10 Judgment Lien against Randall in the amount of no more than $78,600.59

as the fifth priority Lien on the 1505 N. 1200 W. Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

2.     **Class 2** consists of all Allowed Secured Claims on Randall's 71.9% undivided interest in the 811 S. Main Property.

a.     Class 2(A) consists of the Allowed Secured Claim of LaSalle Bank/Imperial Capital Bank as the first priority Lien on the 811 S. Main Property.

b.     Class 2(B) consists of the Allowed Secured Claim of the 2905 RRR Trust as the second priority Lien on Randall's undivided 71.9% interest in the 811 S. Main Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.     Class 2(C) consists of the Allowed Secured Claim of the Hatch Trust as the third priority Lien on Randall's undivided 71.9% interest in the 811 S. Main Property, to the extent that such Judgment Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

d.     Class 2(D) consists of the Allowed Secured Claim of the State of Utah on its 9/9/09 Tax Warrant against Randall in the amount of no more than $26,764.68 as the fourth priority Lien on Randall's undivided 71.9% interest in the 811 S. Main Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

e.     Class 2(E) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the fifth priority Lien on Randall's undivided 71.9% interest in the 811 S. Main Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

f.     Class 2(F) consists of the Allowed Secured Claim of the State of Utah on its 7/12/10 Tax Warrant against Randall in the amount of no more than $44,124.43 as the sixth priority Lien on an undivided 71.9% interest in the 811 S. Main Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

g.     Class 2(G) consists of the Allowed Secured Claim of Washington Federal Savings on its 8/30/10  Judgment Lien against Randall in the amount of no more than $78,600.59 as the seventh priority Lien on Randall's undivided 71.9% interest in the 811 S. Main Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim

or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

3.     **Class 3** consists of all Allowed Secured Claims on Horizon Mortgage's 39% undivided interest in the 87 N. Adamswood Property.

a.     Class 3(A) consists of the Allowed Secured Claim of US Bank National Association or its successors and assigns (including ABN AMRO/ Regency Savings Bank) as the first priority Lien on the 87 N. Adamswood Property.

b.     Class 3(B) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the second priority Lien on Horizon Mortgage's 39% interest in the 87 N. Adamswood Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.     Class 3(C) consists of the Allowed Secured Claim of the McGuire Trust and the Boyce Trust on their 3/24/11 Judgment Lien in the amount of no more than $2,715,731.95 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on Horizon Mortgage's 39% interest in the 87 N. Adamswood Property, to the extent that such Judgment Lien is Allowed in whole or in part. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

4.     **Class 4** consists of all Allowed Secured Claims on Randall's interest in the 990 N. Rainbow Drive Property.

a.     Class 4(A) consists of the Allowed Secured Claim of Washington Federal Savings as the first priority Lien on the 990 N. Rainbow Drive Property.

b.     Class 4(B) consists of the Allowed Secured Claim of the State of Utah on its 9/9/09 Tax Warrant against Randall in the amount of no more than $26,764.68 as the second priority Lien on the 990 N. Rainbow Drive Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.     Class 4(C) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on the 990 N. Rainbow Drive Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

d.     Class 4(D) consists of the Allowed Secured Claim of Kate A. Rose on her 6/9/10 Trust Deed Lien in the amount of no more than $500,000 as the fourth priority Lien on the 990 N. Rainbow Drive Property, to the extent that such Trust Deed Lien is Allowed in whole

17

or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

   e.  Class 4(E) consists of the Allowed Secured Claim of the State of Utah on its 7/12/10 Tax Warrant against Randall in the amount of no more than $44,124.43 as the fifth priority Lien on the 990 N. Rainbow Drive Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

   f.  Class 4(F) consists of the Allowed Secured Claim of Washington Federal Savings on its 8/30/10 Judgment Lien against Randall in the amount of no more than $78,600.59 as the sixth priority Lien on the 990 N. Rainbow Drive Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

  5.  **Class 5** consists of all Allowed Secured Claims on Randall's interest in Parcel 1 of the 1072 S. Lloyd Property and/or on Horizon Financial's interest in Parcel 2 of the 1072 S. Lloyd Property.

   a.  Class 5(A) consists of the Allowed Secured Claim of the Thompsons and the Boyingtons on their 7/23/08 Trust Deed Lien in the amount of no more than $250,000 as the first priority Lien on Parcel 1 of the 1072 S. Lloyd Property, to the extent that such Trust Deed Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

   b.  Class 5(B) consists of the Allowed Secured Claim of the Satterfield Family Trust on its 8/18/08 Trust Deed Lien in the amount of no more than $200,000 as the second priority Lien on Parcel 1 of the 1072 S. Lloyd Property, to the extent that such Trust Deed Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

   c.  Class 5(C) consists of the Allowed Secured Claim of the Kendall Family Trust on its 8/18/08 Trust Deed Lien in the amount of no more than $100,000 as the third priority Lien on Parcel 1 of the 1072 S. Lloyd Property, to the extent that such Trust Deed Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

   d.  Class 5(D) consists of the Allowed Secured Claim of the State of Utah on its 9/9/09 Tax Warrant against Randall in the amount of no more than $26,764.68 as the fourth priority Lien on Parcel 1 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

e.      Class 5(E) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the fifth priority Lien on Parcel 1 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

f.      Class 5(F) consists of the Allowed Secured Claim of the State of Utah on its 7/12/10 Tax Warrant against Randall in the amount of no more than $44,124.43 as the sixth priority Lien on Parcel 1 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

g.      Class 5(G) consists of the Allowed Secured Claim of Washington Federal Savings on its 8/30/10 Judgment Lien against Randall in the amount of no more than $78,600.59 as the seventh priority Lien on Parcel 1 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

h.      Class 5(H) consists of the Allowed Secured Claim of the United States of America on its 3/4/08 Federal Tax Lien against Horizon Financial in the amount of no more than $4,071.29 as the first priority Lien on Parcel 2 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

i.      Class 5(I) consists of the Allowed Secured Claim of RJT Excavating, Inc. on its 12/17/08 mechanic's Lien in the amount of no more than $24,136.57 as the second priority Lien on Parcel 2 of the 1072 S. Lloyd Property, to the extent that such mechanic's Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

j.      Class 5(J) consists of the Allowed Secured Claim of the State of Utah on its 8/3/09 Tax Warrants against Horizon Financial in the amount of no more than $12,650.07 as the third priority Lien on Parcel 2 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

k.      Class 5(K) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the fourth priority Lien on Parcel 2 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

19

l.     Class 5(L) consists of the Allowed Secured Claim of the State of Utah on its 6/7/10 Tax Warrants against Horizon Financial in the amount of no more than $29,318.83 as the fifth priority Lien on Parcel 2 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

m.     Class 5(M) consists of the Allowed Secured Claim of the Thompsons and the Boyingtons on their 2/16/11 Trust Deed Lien in the amount of no more than $250,000 as the sixth priority Lien on Parcel 2 of the 1072 S. Lloyd Property, to the extent that such Trust Deed Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

n.     Class 5(N) consists of the Allowed Secured Claim of the State of Utah on its 6/6/11 Tax Warrant against Horizon Financial in the amount of no more than $11,529.19 as the seventh priority Lien on Parcel 2 of the 1072 S. Lloyd Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

6.     **Class 6** consists of all Allowed Secured Claims on Horizon Mortgage's 50% undivided interest in the two parcels of the Sunset Property at the addresses of 124 West 800 North and 116 West 800 North, Sunset, Utah.

a.     Class 6(A) consists of the Allowed Secured Claim of Washington Federal Savings as the first priority Lien on all of the Sunset Property.

b.     Class 6(B) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the second priority Lien on Horizon Mortgage's undivided 50% interest in these two parcels.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.     Class 6(C) consists of the Allowed Secured Claim of the McGuire Trust and the Boyce Trust on their 3/24/11 Judgment Lien in the amount of no more than $2,715,731.95 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on Horizon Mortgage's undivided 50% interest in these two parcels, to the extent that such Judgment Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

7.     **Class 7** consists of all Allowed Secured Claims on Randall's interest in the third parcel of the Sunset Property at the addresses of 78 West 800 North, Sunset, Utah.

a.     Class 7(A) consists of the Allowed Secured Claim of Washington Federal Savings as the first priority Lien on all of the Sunset Property.

20

b.      Class 7(B) consists of the Allowed Secured Claim of the State of Utah on its 9/9/09 Tax Warrant against Randall in the amount of no more than $26,764.68 as the second priority Lien on the third parcel of the Sunset Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.      Class 7(C) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on the third parcel of the Sunset Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

d.      Class 7(D) consists of the Allowed Secured Claim of the State of Utah on its 7/12/10 Tax Warrant against Randall in the amount of no more than $44,124.43 as the fourth priority Lien on the third parcel of the Sunset Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

e.      Class 7(E) consists of the Allowed Secured Claim of Washington Federal Savings on its 8/30/10 Judgment Lien against Randall in the amount of no more than $78,600.59 as the fifth priority Lien on the third parcel of the Sunset Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

8.      **Class 8** consists of all Allowed Secured Claims on Horizon Mortgage's 58% undivided interest in the 715 – 721 N. 400 W. Property.

a.      Class 8(A) consists of the Allowed Secured Claim of New York Mellon or its successors or assigns (including Homecomings Financial Network / JP Morgan Chase) as the first priority Lien on the 715 – 721 N. 400 W. Property.

b.      Class 8(B) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the second priority Lien on Horizon Mortgage's undivided 58% interest in the 715 – 721 N. 400 W. Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.       Class 8(C) consists of the Allowed Secured Claim of the McGuire Trust and the Boyce Trust on their 3/24/11 Judgment Lien in the amount of no more than $2,715,731.95 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on Horizon Mortgage's undivided 58% interest in the 715 – 721 N. 400 W. Property, to the extent that such Judgment Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

21

9.      **Class 9** consists of all Allowed Secured Claims on Horizon Mortgage's interests in Lot 2 (768 Fort Lane) and Lot 3 (790 Fort Lane) of the Fort Lane Property.

a.      Class 9(A) consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. or its predecessors or successors or assigns (including Green Point Mortgage Funding / Wachovia Bank) as the first priority Lien on Lot 2 of the Fort Lane Property, and does not include the additional recorded junior priority Liens in favor of Green Point Mortgage Funding on Lot 2 and Lot 3 to secure home equity lines of credit, the Debtors' records not reflecting any amounts owed on such home equity lines of credit for Lot 2 and Lot 3 from Green Point Mortgage Funding.

b.      Class 9(B) consists of the Allowed Secured Claim of BAC Home Loan Servicing LP or its predecessors or successors or assigns (including Green Point Mortgage Funding / HSBC Bank, Trustee for the Holders of Deutsche Mortgage Securities Loan Trust) as the first priority Lien on Lot 3 of the Fort Lane Property.

c.      Class 9(C) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the second priority Lien on Lot 2 and Lot 3 of the Fort Lane Property.   The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

d.      Class 9(D) consists of the Allowed Secured Claim of the McGuire Trust and the Boyce Trust on their 3/24/11 Judgment Lien in the amount of no more than $2,715,731.95 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on Lot 2 and Lot 3 of the Fort Lane Property, to the extent that such Judgment Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

10.     **Class 10** consists of all Allowed Secured Claims on Horizon Mortgage's 60% undivided interest in Lot 4 (812 Fort Lane) of the Fort Lane Property.

a.      Class 10(A) consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. or its predecessors or successors or assigns (including Green Point Mortgage Funding / Wachovia Bank) as the first priority Lien on Lot 4 of the Fort Lane Property.

b.      Class 10(B) consists of the Allowed Secured Claim of Deborah Jean Herbert and Randy Herbert on their 12/27/04 Trust Deed Lien securing their Trust Deed Note dated December 9, 2004, as the second priority Lien on Horizon Mortgage's 60% undivided interest in Lot 4 of the Fort Lane Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

c.      Class 10(C) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on Horizon Mortgage's 60% undivided interest in Lot 4 of the Fort Lane Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

d.      Class 10(D) consists of the Allowed Secured Claim of the McGuire Trust and the Boyce Trust on their 3/24/11 Judgment Lien in the amount of no more than $2,715,731.95 against Randall, Horizon Mortgage and Horizon Financial as the fourth priority Lien on Horizon Mortgage's 60% undivided interest in Lot 4 of the Fort Lane Property, to the extent that such Judgment Lien is Allowed in whole or in part.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

11.    **Class 11** consists of all Allowed Secured Claims on Horizon Mortgage's interest in Units 101-104, 701-704, 801-804, and 1101-1104 of the 1427 W. 1650 N. Property.

a.      Class 11(A) consists of the Allowed Secured Claim of United Financial Mortgage as the first priority Lien on Units 101-104 of the 1427 W. 1650 N. Property.

b.      Class 11(B) consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. or its successors or predecessors or assigns (including Green Point Mortgage Funding / Wachovia Bank) as the first priority Lien on Units 701-704 of the 1427 W. 1650 N. Property.

c.      Class 11(C) consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. or its successors or predecessors or assigns (including Green Point Mortgage Funding / Wachovia Bank) as the first priority Lien on Units 801-804 of the 1427 W. 1650 N. Property.

d.      Class 11(D) consists of the Allowed Secured Claim of America's Wholesale Lender / Bank of America as the first priority Lien on Units 1101-1104 of the 1427 W. 1650 N. Property.

e.      Class 11(E) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the second priority Lien on Units 101-104, 701-704, 801-804, and 1101-1104 of the 1427 W. 1650 N. Property.  The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

f.      Class 11(F) consists of the Allowed Secured Claim of the McGuire Trust and the Boyce Trust on their 3/24/11 Judgment Lien in the amount of no more than $2,715,731.95 against Randall, Horizon Mortgage and Horizon Financial as the third priority Lien on Units 101-104, 701-704, 801-804, and 1101-1104 of the 1427 W. 1650 N. Property, to the extent that such Judgment Lien is Allowed in whole or in part.  The amount of the Claim of

23

this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

12.      **Class 12** consists of all Allowed Secured Claims on Randall's interest in Units 901-904 of the 1427 W. 1650 N. Property.

a.      Class 12(A) consists of the Allowed Secured Claim of Green Point Mortgage Funding / HSBC Bank USA as the first priority Lien on Units 901-904 of the 1427 W. 1650 N. Property.

b.      Class 12(B) consists of the Allowed Secured Claim of the FDIC as Receiver for America West Bank on its 2/22/10 Judgment Lien in the amount of no more than $13,683.56 against Randall, Horizon Mortgage and Horizon Financial as the second priority Lien on Units 901-904 of the 1427 W. 1650 N. Property. The amount of the Claim of this Creditor and whether such Creditor's Claim is a Secured Claim or an Unsecured Claim will be determined in accordance with the provisions of Section 4.1(c) below.

13.      **Class 13** consists of all Allowed Secured Claims on Randall's interest in the 1634 N. Angel St. Property.

a.      Class 13(A) consists of the Allowed Secured Claim of Citimortgage, Inc., as the first priority Lien on the 1634 N. Angel St. Property.

14.      **Class 14** consists of all Allowed Secured Claims on Horizon Financial's interest in the Sandy Office Building Property.

a.      Class 14(A) consists of the Allowed Secured Claim of Barnes Banking Company as the first priority Lien on the Sandy Office Building Property.

15.      **Class 15** - Priority Unsecured Claims. Class 15 consists of all Allowed Priority Unsecured Claims, if any.

16.      **Class 16** consists of all Allowed Unsecured Claims of the Non-Investor Trade Creditor Unsecured Claims. Creditors.

a.      Class 16(A) consists of all the Allowed Unsecured Claims of Non-Investor Trade Creditor Unsecured ClaimsCreditors that are equal to or less than the amount of $50,000.00.

b.      Class 16(B) consists of the Allowed Unsecured Claims of Non-Investor Trade Creditors that are greater than the amount of $50,000.00.

17.      **Class 17** - Victim Claims. Class 17 consists of all Allowed Victim Claims.

18.      **Class 18** - Equity Interests. Class 18 consists of all Equity Interests in the Debtors.

24

Treatment of each of these Classes of Claims under the Plan is set forth in Article IV below.

**2.2     Unclassified Claims.**

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not placed into Classes that are entitled to vote to accept or reject this Plan; instead, such Claims are "unclassified," and the holders of such Claims do not vote on the Plan because they are entitled to specific treatment under the Bankruptcy Code.  As such, the Trustee has not placed these Claims in a Class.  The respective treatment of these Claims under the Plan is set forth in Article V below.


# ARTICLE III

# VOTING ON, ACCEPTANCE, AND REJECTION OF THE PLAN

**3.1     Voting Classes and Acceptance of Plan.**

Each holder of an Allowed Claim in Classes 16(A), 16(B) and 17 of the Plan is entitled to vote to accept or reject the Plan as a member of an impaired Class which will retain or receive property under the Plan.  A Person holding an Allowed Claim in more than one Class is entitled to vote in each Class.  Persons who are holders of Allowed Claims in voting Classes 16(A), 16(B) and 17 should vote on a duly executed and delivered ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.  Unless otherwise ordered by the Bankruptcy Court, the amount of the Allowed Claim for which any holder of a Victim Claim in Class 17 is entitled to vote to accept or reject the Plan is limited to the Victim Net Claim Amount for such Victim Claim.  Each holder of an Allowed Claim in Classes 1 through 15 who has not previously been paid in full or settled with the Trustee is entitled to vote to accept or reject the Plan as a member of an impaired Class which will retain or receive property under the Plan.

**3.2     Non-Voting Classes.**

Each holder of an Allowed Claim in Classes 1 through 15 who has previously been paid in full or has settled with the Trustee pursuant to a settlement that has been approved by the Bankruptcy Court by a Final Order is not impaired under the Plan and, therefore, under Section 1126(f) of the Bankruptcy Code, such holders of Allowed Claims in these Classes are deemed to accept the Plan.  Accordingly, the Trustee will not solicit votes on the Plan from the holders of Allowed Claims in Classes 1 through 15 who have previously been paid in full or have settled with the Trustee pursuant to a settlement that has been approved by the Bankruptcy Court by a Final Order.

Holders of Equity Interests, if any, in Class 18 are not entitled to receive or retain any property under the Plan and, therefore, under Section 1126(g) of the Bankruptcy Code, holders

25

of Equity Interests in Class 18 are deemed to have rejected the Plan. Accordingly, the Trustee will not solicit votes on the Plan from the holders of Equity Interests in this Class.

### 3.3    Voting Rights of Holders of Disputed Claims.

Pursuant to Bankruptcy Rule 3018(a), a Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is Disputed, unless the Court enters an order temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a). Such disallowance for voting purposes is without prejudice to the holder's right to seek to have its Disputed Claim be determined to be an Allowed Claim for purposes of distribution under the Plan.

### 3.4    Nonconsensual Confirmation.

If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Section 1126(c) or (d) of the Bankruptcy Code, as applicable, or if any impaired Class is deemed to have rejected the Plan, the Trustee reserves the right (a) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, (b) to amend the Plan in accordance with Section 11.7 hereof, to the extent necessary to obtain entry of a Confirmation Order, and/or (c) to convert the Chapter 11 Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.


## ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS

### 4.1    Classes 1 – 14: Secured Claims.

(a)    Classification:  Classes 1 through 14 consist of all Allowed Secured Claims.

(b)    Treatment of First Lien Holders:  The holders of the Secured Claims in Class 1(A), Class 2(A), Class 3(A), Class 4(A), Class 6(A), Class 7(A), Class 8(A), Class 9(A), Class 9(B), Class 10(A), Class 11(A), Class 11(B), Class 11(C), Class 11(D), Class 12(A), Class 13(A), and Class 14(A) (collectively the "First Lien Holders") have been Paid in Full on all of their Claims against the Debtors from the sale proceeds that they received pursuant to Bankruptcy Court Final Orders from the sales of their respective Collateral. Such payments to the First Lien Holders shall be in full satisfaction of their Secured Claims and in full satisfaction of any indebtedness and any other obligations owed by any of the Debtors to the First Lien Holders, and the First Lien Holders shall have no deficiency Claims or any other Claims (whether Secured Claims or Unsecured Claims or otherwise) against the Consolidated Estate.

(c)    Treatment of Other Secured Claims Under Classes 1 through 14.  Unless the Trustee and the holder of any other Secured Claim agree to different treatment, or unless (with respect to any Secured Claim as to which the Trustee has filed an objection with the

26

Bankruptcy  Court) the Bankruptcy Court has entered a Final Order with respect to the treatment to be afforded to any or all other holders of any other Allowed Secured Claims with respect to their Claims or their Collateral, each holder of all other Allowed Secured Claims other than the Secured Claims of the First Lien Holders will receive Cash in an amount equal to such Allowed Secured Claim, including any interest thereon required to be paid pursuant to Section 506(b) of the Bankruptcy Code, on the later of the Initial Distribution Date and five (5) Business Days of the date such Secured Claim becomes an Allowed Secured Claim, in full and complete satisfaction thereof on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.  For those Allowed Secured Claims that were secured by Collateral on multiple real properties, the holders of such Allowed Secured Claims shall only receive one satisfaction of their Allowed Secured Claims, and the Trustee shall retain the discretion to determine which proceeds from which real properties secured by such Allowed Secured Claims will be used to satisfy such Allowed Secured Claims in full.  To the extent that the proceeds from the sale of the Collateral securing any asserted Secured Claim are insufficient to pay any portion or all of such asserted Secured Claim, after the priority of such asserted Secured Claim to the sale proceeds has been determined, either by agreement with the Trustee or by the Bankruptcy Court, the unpaid deficiency balance of such asserted Secured Claim shall not be Allowed as a Secured Claim, but shall be Allowed as an Allowed Victim Claim (but only if the holder of such asserted Secured Claim is also a Victim) or otherwise as a Non-Investor Trade Creditor Unsecured Claim, to the extent that the Trustee has not otherwise objected to such Claim.

(d)    Voting:  The Allowed Secured Claims in these Classes are unimpaired and, therefore, holders of such Allowed Secured Claims are presumed to vote in favor of the Plan.  Accordingly, their votes for or against the Plan will not be solicited by the Trustee.  To the extent that the unpaid deficiency balance of an asserted Secured Claim is Allowed as an Allowed Victim Claim or as an Allowed Non-Investor Trade Creditor Unsecured Claim as outlined in Section 4.1(c) above, such Allowed Non-Investor Trade Creditor Unsecured Claim or such Allowed Victim Claim (as the case may be) will be entitled to vote for or against the Plan as part of Class 16(A) or Class 16(B) or as part of Class 17 (as the case may be).

### 4.2    Class 15 - Priority Unsecured Claims.

(a)    Classification:  Class 15 consists of all Allowed Priority Unsecured Claims.

(b)    Treatment:  Unless the Trustee and the holder of such Claim agree to different treatment, each holder of an Allowed Priority Unsecured Claim, if any, will be paid in full on the later of (i) the Effective Date, or (ii) within five (5) Business Days of the date that the holder's Priority Unsecured Claim is an Allowed Claim.

(c)    Voting:  Claims in this Class are unimpaired and, therefore, holders of such Claims are presumed to vote in favor of the Plan.  Accordingly, their vote for or against the Plan will not be solicited by the Trustee.

### 4.3    Class 16 - Non-Investor Trade Creditor Unsecured Claims.

27

(a)    Classification: for Class 16(A):  Class 16(A) consists of all Allowed Unsecured Claims of Non-Investor Trade Creditors that are equal to or less than the amount of $50,000.00.  A Non-Investor Trade Creditor Unsecured Claims.who has asserted an Unsecured Claim in excess of $50,000.00 can agree with the Trustee to have its Unsecured Claim Allowed in the amount of $50,000.00 or less and thereby become eligible for treatment in Class 16(A).

(b)    Treatment: for Class 16(A):  Unless the Trustee and the holder of such Claim agree to different treatment, each holder of an Allowed Unsecured Claim of a Non-Investor Trade Creditor Unsecured Claimthat is equal to or less than the amount of $50,000.00, if any, will be paid Ten Percent (10.0%) of the Allowed Claim on the later of (i) the Effective Date, or (ii) within five (5) Business Days of the date that the holder's Non-Investor Trade Creditor Unsecured Claim is an Allowed Claim, in full satisfaction of such Allowed Claim.

(c)    Classification for Class 16(B):  Class 16(B) consists of all Allowed Unsecured Claims of Non-Investor Trade Creditors that are greater than the amount of $50,000.00.

(d)    Treatment for Class 16(B):  Unless the Trustee and the holder of such Claim agree to different treatment, each holder of an Allowed Unsecured Claim of a Non-Investor Trade Creditor that is greater than the amount of $50,000.00, if any, shall be paid from the Victim Funds (but excluding any Restitution funds that are part of the Victim Funds) as follows:  (i) on the Initial Distribution Date, such holder will receive a distribution of available Victim Funds pursuant to the Rising Tide Distribution Method at the same time as and consistent with the Trustee's distribution of available Victim Funds to the holders of Allowed Victim Claims in Class 17; and (ii) any subsequent distribution will be made from the Victim Funds (but excluding any Restitution funds that are part of the Victim Funds), when appropriate in the Trustee's sole discretion, using the same Rising Tide Distribution Method, such subsequent distribution to be made at the same time as and consistent with the Trustee's subsequent distribution of Victim Funds to the holders of Allowed Victim Claims in Class 17.

(c)(e)    Voting:  Claims in this Class 16(A) and in Class 16(B) are impaired and, therefore, holders of such Claims will be solicited by the Trustee to vote for the Plan.

**4.4    Class 17 - Victim Claims.**

(a)    Classification:  Class 17 consists of all Allowed Victim Claims.

(b)    Treatment: Each holder of an Allowed Victim Claim shall be paid from the Victim Funds as follows:  (i) on the Initial Distribution Date, such holder will receive a distribution of available Victim Funds pursuant to the Rising Tide Distribution Method; and (ii) any subsequent distribution on account of Allowed Victim Claims will be made, when appropriate in the Trustee's sole discretion, using the same Rising Tide Distribution Method.  In addition, each holder of an Allowed Victim Claim that has made a timely Private Actions Trust Election and thereby assigned his or her Victim Causes of Action to the Private Actions Trust shall receive outside of the Plan the additional distributions (if any) to which such holder of any Allowed Victim Claim becomes entitled pursuant to the terms of the Private Actions Trust.

28

(c)     Effect of Restitution: In the event that Restitution is ordered, the following alternative scenarios will apply that will affect the treatment of Allowed Victim Claims as set forth herein:

(i)     In the event that Restitution is assigned to the Consolidated Estate or otherwise turned over to the Consolidated Estate by a Governmental Unit, such Restitution will be Victim Funds for distribution under the Rising Tide Distribution Method to Victims holding Allowed Victim Claims as provided for in the Plan.  In the event that future Restitution payments are still to be made at the time of the entry of a Final Decree in the Bankruptcy Case, the Trustee shall assign such future Restitution payments back to the relevant Governmental Unit for distribution to Victims outside of the Plan, and the Trustee shall recommend that the relevant Governmental Unit distribute such Restitution pursuant to the Rising Tide Distribution Method, consistent with the terms of this Plan.

(ii)     In the event that Restitution is not assigned to the Consolidated Estate or otherwise turned over to the Consolidated Estate, but rather is distributed to Victims by the relevant Governmental Unit, the Trustee shall treat any such Governmental Unit distribution as a distribution to the Victim outside of the Plan, and such distribution shall be considered by the Trustee to have been applied pursuant to the Rising Tide Distribution Method for purposes of calculating any additional distributions to be made to the holder of the Allowed Victim Claim.

(d)     Voting:  Claims in this Class are impaired and, therefore, holders of such Claims will be solicited by the Trustee to vote for the Plan.

**4.5     Class 18 - Equity Interests.**

(a)     Classification:  Class 18 consists of any and all Equity Interests.

(b)     Treatment:  Any and all Equity Interests shall be cancelled on the Effective Date, and holders of Equity Interests will neither receive nor retain any property under the Plan.  However, to the extent that there is any personal property of Randall listed on the Randall Statements and Schedules that has not been administered as of the Final Decree, such property shall be deemed to be revested in Randall as of the date of the Final Decree.

(c)     Voting: Equity Interests are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan.  Accordingly, the Trustee will not solicit votes on the Plan from the holders of Equity Interests.

**ARTICLE V**

**TREATMENT OF UNCLASSIFIED CLAIMS - ALLOWED ADMINISTRATIVE
EXPENSE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS**

**5.1     Non-Classification.**

As discussed in Section 2.2 above, under Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  The holders of all such Claims do not vote on the Plan and are instead treated separately in accordance with applicable law as set forth in this Article V.

**5.2**     **Administrative Expense Claims.**

(a)     _General_.  Except as otherwise agreed to by the Trustee and the holder of an Allowed Administrative Expense Claim, and except as specifically provided for in subsections (c) and (d) below, each such holder shall be paid in full in Cash on the later of: (i) the Effective Date, or (ii) within five (5) Business Days of the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

(b)     _U.S. Trustee's Fees_.  The United States Trustee's quarterly fees shall be paid in full without prior approval pursuant to 28 U.S.C. § 1930 on or before the Effective Date. Any dispute related to the amount of the fees shall be resolved by the Court at the Confirmation Hearing.

(c)     _Administrative Expense Bar Date and Procedures_.  Other than the Claims of Professionals which are provided for below, the Trustee is not aware of any Administrative Expense Claims other than the Claims that are listed in any Exhibit to the Disclosure Statement. But, to the extent Administrative Expense Claims are alleged by Persons other than Professionals, requests for payment of such Claims must be filed and served on the Trustee and the United States Trustee no later than thirty (30) days after the Effective Date, which shall be the "Administrative Expense Claim Bar Date."  Any holder of an Administrative Expense Claim to which the Administrative Expense Claim Bar Date applies who fails to file a request seeking to have its Claim allowed on or before said Bar Date shall be forever barred from seeking the allowance of its Administrative Expense Claim or any other Claim, and the Trustee, the Debtors and the Consolidated Estate shall be discharged of any obligation on such Claim or any other Claim related to the Administrative Expense Claim.

(d)     _Professionals—Bar Dates and Procedures_.  All Professionals requesting compensation or reimbursement of expenses under Sections 327, 328, 330, 331 and 503(b) of the Bankruptcy Code for services rendered before the Effective Date shall file and serve on the Trustee and the United States Trustee an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, which shall be the "Professional Administrative Expense Claim Bar Date."  Any Professional to which this Professional Administrative Expense Claim Bar Date applies who fails to file a request to have its Claim allowed on or before said Bar Date shall be forever barred from seeking the allowance of its Administrative Expense Claim or any other Claim, and the Trustee, the Debtors and the Consolidated Estate shall be discharged of any obligation on such Claim or any other Claim related to such Professional's Administrative Expense Claim.

**5.3**     **Priority Tax Claims.**

30

At the sole election of the Trustee, the holder of an Allowed Priority Tax Claim other than the IRS Priority Tax Claim shall be paid either (i) upon such terms as may be agreed to between the Trustee and such holder of an Allowed Priority Tax Claim, (ii) in full in Cash on the later of the Effective Date or within five (5) Business Days of the date that such Allowed Priority Tax Claim becomes an Allowed Priority Tax Claim, or (iii) in deferred Cash payments to be agreed upon by the Trustee and the holder of the Allowed Priority Tax Claim, not to exceed a period of five (5) years after the Randall Petition Date.  The Trustee has requested that the United States, the holder of the IRS Priority Tax Claim, agree to different treatment of the IRS Priority Tax Claim than the options outlined above.  Notwithstanding the provisions above that apply to an Allowed Priority Tax Claim other than the IRS Priority Tax Claim, the IRS, on behalf of the United States, has agreed that the Trustee may hold the amount of the IRS Priority Tax Claim in reserve until after the United States has made a final determination on the Trustee's request that the United States agree to different treatment of the IRS Priority Tax Claim. Therefore, no payments on the IRS Priority Tax Claim will be made until after such final determination by the United States is made and has been communicated to the Trustee, and the deadline for any objection by the Trustee to the IRS Priority Tax Claim as outlined below has expired. Once such final determination by the United States has been made, then the treatment of the IRS Priority Tax Claim shall be as follows:  (i) the IRS Priority Tax Claim shall be treated upon such terms as may be agreed to between the Trustee and the IRS, (ii) the IRS Priority Tax Claim shall be paid in full in Cash within five (5) Business Days of the date that the IRS Priority Tax Claim becomes an Allowed Priority Tax Claim, and the Trustee shall have sixty (60) Business Days from the date that the final determination by the United States has been made and communicated to the Trustee to object to the IRS Priority Tax Claim, and if the Trustee does not object to the IRS Priority Tax Claim by such deadline, the IRS Priority Tax Claim shall be deemed to be an Allowed Priority Tax Claim upon the expiration of such deadline, or (iii) the IRS Priority Tax Claim shall be paid in deferred Cash payments to be agreed upon by the Trustee and the IRS after the IRS Priority Tax Claim becomes an Allowed Priority Tax Claim (consistent with the deadline for any objection by the Trustee to the IRS Priority Tax Claim as outlined above), not to exceed a period of five (5) years after the Randall Petition Date.

## ARTICLE VI

## IMPLEMENTATION OF THE PLAN

### 6.1    General.

The Plan will be implemented and consummated through means contemplated by Section 1123(a)(5)(A), and (D), and Section 1123(b) of the Bankruptcy Code, including:

(a)    Retention of property of the Consolidated Estate for liquidation;

(b)    Where appropriate, the sale of property of the Consolidated Estate, and the distribution of net sale proceeds among the holders of Allowed Claims as provided for herein;

(c)    Where appropriate, the distribution of all or any part of the property of the Consolidated Estate among those having an interest in such property;

31

(d)      Compromising certain Claims; and

(e)      Retention and enforcement by the Trustee, post-confirmation, of any and all Claims and Causes of Action, including any and all Chapter 5 Claims.

**6.2**      **Administration of the Consolidated Estate by Trustee.**

The Trustee shall be appointed as the representative of the estate and shall administer the Consolidated Estate after confirmation of the Plan, including but not limited to by holding all rights, powers, and duties of a trustee under Chapter 11 of the Bankruptcy Code, as well as those rights, powers and duties afforded by this Plan and the Confirmation Order.  Unless expressly stated otherwise herein, the Trustee is the representative of the Consolidated Estate for all purposes after the entry of the Confirmation Order.

**6.3**      **Retention of Property of Consolidated Estate; Estate Assets to Remain in Consolidated Estate; No Revesting of Consolidated Estate Assets.**

At all relevant times, including after entry of the Confirmation Order and the occurrence of the Effective Date, the Trustee shall retain property of the Consolidated Estate including the retention of all Claims and Causes of Action, including as set forth in Section 6.6 below. Notwithstanding Section 1141(b) of the Bankruptcy Code, except as otherwise provided for in this Plan, property of the Estate, including Estate Litigation Claims, shall not revest in the Debtors but shall remain property of the Consolidated Estate subject to the jurisdiction of the Bankruptcy Court, under the exclusive control of the Trustee, until distributed to holders of Allowed Claims in accordance with the provisions of this Plan and the Confirmation Order.

**6.4**      **Liquidation of Property and Distribution of Net Proceeds.**

At all times relevant, including after the entry of the Confirmation Order and the occurrence of the Effective Date, the Trustee shall continue his orderly liquidation of property of the Consolidated Estate consistent with the terms of the Plan.  The Trustee shall continue to reduce all property of the Consolidated Estate to Cash, and distribute such Cash pursuant to the provisions of this Plan.  The Trustee shall use such Cash, less costs of administration, to pay the holders of Allowed Claims as provided for in the Plan and Confirmation Order until such Cash is exhausted.  In addition, the net proceeds from the sale of the 1505 N. 1200 W. Property that are attributable to the 1.5% undivided interest in the 1505 N. 1200 W. Property owned by Metamorphosis shall be distributed by the Trustee to the Consolidated Estate, free and clear of any interest or claim to such proceeds by Metamorphosis, and no distribution will be made to Metamorphosis by the Trustee with respect to the 1505 N. 1200 W. Property.

**6.5**      **Restitution.**

In the event that Restitution is ordered, the alternative scenarios set forth in Section 4.4(c) above will apply to the Restitution funds.

**6.6**      **Preservation of Causes of Action and Defenses.**

32

Except to the extent rights, Claims, Causes of Action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved by the Bankruptcy Court during the Bankruptcy Case, (a) any and all rights, Claims, Causes of Action, defenses, and counterclaims accruing to or assertable by the Debtors or the Trustee on behalf of the Consolidated Estate, shall remain assets of the Consolidated Estate and may be asserted by the Trustee on behalf of the Consolidated Estate, and as the representative of the Consolidated Estate, after the Effective Date, and (b) the Trustee does not waive, relinquish or abandon (nor shall he be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Consolidated Estate or is assertable by the Consolidated Estate: (i) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Schedules, the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (ii) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to the Trustee, and (iii) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense or counterclaim filed a proof of Claim in the Bankruptcy Case, filed a notice of appearance or any other pleading or notice in the Bankruptcy Case, voted for or against the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, laches or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential right, Claim, Cause of Action, defense, or counterclaim, in the Schedules, the Plan, the Disclosure Statement, or any other document filed with the Court shall in no manner waive, eliminate, modify, release, or alter the Trustee's right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that the Trustee, the Debtors and/or the Consolidated Estate has or may have as of the Confirmation Date.  The Trustee may commence, prosecute, defend against, recover on account of, and settle all rights, Claims, Causes of Action, defenses, and counterclaims in his sole discretion in accordance with the best interests, and for the benefit of, the post-Effective Date Consolidated Estate.  Confirmation of this Plan will have no impact upon, and will not render *res judicata* any: (i) Estate Litigation Claim, (ii) any defenses any of the Debtors may have (including rights of setoff) in any action brought against any of the Debtors; or (iii) any party's right to object to any Claim against the Consolidated Estate, subject to any limitation expressly set forth in this Plan.  A partial listing of Estate Litigation Claims already asserted by the Trustee as well as potential parties against whom the Trustee may assert additional Estate Litigation Claims is attached as Exhibit C to this Plan.  This list is not comprehensive.  **In voting on this Plan, Creditors should not rely on the fact that they are not listed on Exhibit C of this Plan in voting to accept this Plan.  Estate Litigation Claims may be brought against parties not listed on Exhibit C, and those Estate Litigation Claims are expressly preserved under this Plan and may still be brought.**

### 6.7     No Waiver of Legal Privileges.

Confirmation of this Plan will not waive the attorney/client, work product or other legal privileges of any of the Debtors or the Trustee or the Consolidated Estate, including any such privileges that belong to the Trustee as the Private Actions Trustee.

33

**6.8**    **Common Interest Agreement Between and Among the Trustee and Private Actions Trust Participating Creditors.**

From and after the Confirmation Date, (i) the Trustee may share his own information or information of any of the Debtors or the Consolidated Estate with any of the Private Actions Trust Participating Creditors, and (ii) any Private Actions Trust Participating Creditor may share his or her or its own information with the Trustee, and the shared information will be considered shared pursuant to a common interest agreement, and the sharing of information will not constitute a waiver of any attorney/client privilege, work product privilege, or other similar privilege recognized by applicable law.

**6.9**    **Private Actions Trust.**

(a)    *Establishment*.  On the Effective Date, the Private Actions Trust will be established pursuant to the terms of the Private Actions Trust Agreement to pursue the Victim Causes of Action and to receive, hold, liquidate, and distribute the proceeds of recoveries on the Victim Causes of Action on the terms set forth in the Private Actions Trust Agreement.

(b)    *Eligibility to Participate in Private Actions Trust*.  Notwithstanding anything to the contrary in the Private Actions Trust Agreement or in this Plan, only Creditors who held Claims as of the Corporate Debtors Petition Date that would otherwise be Class 17 Allowed Victim Claims (or their successor(s) or assignee(s), if applicable) may assign their Victim Causes of Action to the Private Actions Trust and thereby be entitled to participate in any distributions from or other rights appurtenant to the Private Actions Trust.

(c)    *Election to Assign Victim Causes of Action to the Private Actions Trust*.  A Creditor who held a Claim as of the Corporate Debtors Petition Date that would otherwise be a Class 17 Allowed Victim Claim (or such Creditor's successor(s) or assignee(s), if applicable) may assign his or her Victim Causes of Action to the Private Actions Trust by making a Private Actions Trust Election and thereby become a Private Actions Trust Participating Creditor.

(d)    *The Private Actions Trustee*.  Notwithstanding anything to the contrary in the Private Actions Trust Agreement or in this Plan, (i) the initial trustee of the Private Actions Trust will be the Trustee, and (ii) any successor trustee of the Private Actions Trust shall be appointed pursuant to the terms of the Private Actions Trust Agreement.

(e)    *Participation in Private Actions Trust by Secondary Purchasers of Claims of Policyholders against the Debtor*.  Subject to the deadlines outlined in Section 7.5(e) of this Plan and applicable law, any Person that purchases or otherwise takes an assignment of a Class 17 Allowed Victim Claim prior to the Effective Date may participate in the Private Actions Trust and qualify as a Private Actions Trust Participating Creditor, but only if such assignee makes a Private Actions Trust Election.

(f)    *No Requirement for Bankruptcy Court Approval*.  From and after the Effective Date, the Trustee may prosecute, waive, decline to pursue or otherwise resolve Victim Causes of Action in the Private Actions Trust without the approval or consent of the Bankruptcy

34

Court or any of the Private Actions Trust Participating Creditors; provided, that the Trustee shall not consummate any settlement or compromise or release of the Victim Causes of Action in the Private Actions Trust without the prior approval of the Bankruptcy Court and after notice and an opportunity for a hearing having been given to the Private Actions Trust Participating Creditors.

(g)     Loans to Private Actions Trust from Consolidated Estate.  As contemplated by Sections 1.6 and 3.8(p) of the Private Actions Trust Agreement, the Trustee may elect to make one or more loans from the Consolidated Estate to the Private Actions Trust. All such loans in excess of $25,000 will be made only after receiving approval from the Bankruptcy Court after notice and an opportunity for a hearing.  Notice of a proposed loan and an opportunity for a hearing shall be given to only the United States Trustee and those Creditors who have filed with the Bankruptcy Court after the date of this Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date.  As outlined in Section 5.1 of the Private Actions Trust Agreement, any distributions from the Private Actions Trust will first be made to repay any loans or other funding obtained pursuant to Sections 1.6 or 3.8(p) of the Private Actions Trust Agreement.

(h)     Distributions from the Private Actions Trust.  The distribution from the Private Actions Trust (or the aggregate of all distributions from the Private Actions Trust if there is more than one distribution from the Private Actions Trust) shall be made in accordance with Section 5.1 of the Private Actions Trust Agreement as follows:

First, to repay the loans and/or other funding (including any fees, costs, or interest incurred in connection therewith) described in Sections 1.6 or 3.8(p) of the Private Actions Trust Agreement.

Second, to the Consolidated Estate in accordance with the following conditions and corresponding applicable amounts and/or percentages:

(i)  Thirty Percent (30%) for distributable amounts equal to or less than One Million Dollars ($1,000,000), plus

(ii) Twenty Percent (20%) for distributable amounts greater than One Million Dollars ($1,000,000) but equal to or less than Ten Million Dollars ($10,000,000), plus

(iii) Ten Percent (10%) for distributable amounts greater than Ten Million Dollars ($10,000,000).

Third, to the Private Actions Trust Beneficiaries on a prorata basis based upon the respective percentages attributable to each Private Actions Trust Beneficiary for distribution purposes in accordance with the Beneficial Interest Calculation formula and other provisions

35

outlined in Section 2.8 of the Private Actions Trust Agreement.[1]

    **Fourth**, if all of the Private Actions Trust Beneficiaries have received the total amounts of their respective Victim Net Claim Amounts, then any remaining funds shall be distributed to the Consolidated Estate.

    (i)  <u>Trustee's Evaluation of Victim Causes of Action and Estate Litigation Claims and Determination of the Appropriate Distribution Methodology</u>.  Based upon the information currently available, the Trustee has made a preliminary evaluation of the Victim Causes of Action and the Estate Litigation Claims against Union Central, Debtors' Agents, and any Person that, prior to the Randall Petition Date, acted as an attorney, accountant, auditor, or financial advisor for Debtors.  Based upon this preliminary evaluation, the Trustee believes that the Victim Causes of Action collectively have a greater value than the Estate Litigation Claims against the same parties.  The Trustee based the distribution methodology for the Private Actions Trust proposed in Section 2.8 of the Private Actions Trust Agreement, as outlined in Section 6.9(h) above of this Plan, pursuant to his preliminary evaluation as outlined above, but the Trustee has also determined that the Consolidated Estate should receive the distribution percentages from the Private Actions Trust outlined in Section 2.8 of the Private Actions Trust Agreement and in Section 6.9(h) of this Plan above for the following reasons:

      (A)  The Consolidated Estate has incurred all of the initial setup expenses

---

[1] **The Beneficial Interest Calculation formula from Section 2.8 of the Private Actions Trust Agreement is the following:**

    **Each Private Actions Trust Beneficiary's interest for Private Actions Trust distribution purposes will be calculated by the Private Actions Trustee as the percentage resulting from the following Beneficial Interest Calculation:**

    **<u>Step 1</u>: divide (i) the sum of such Private Action Trust Beneficiary's Victim Net Claim Amount and all premiums (if any) paid on such Private Action Trust Beneficiary's Terminated Policy or Terminated Policies, by (ii) the sum of all of the Victim Net Claim Amounts for all of the Private Action Trust Beneficiaries and all premiums (if any) paid on all Terminated Policies of all of the Private Action Trust Beneficiaries; and**

    **<u>Step 2</u>: multiply the resulting fraction by 100.**

Section 2.8 of the Private Actions Trust Agreement also describes the circumstances under which the Private Actions Trustee may correct and adjust the percentage interests of the Private Actions Trust Beneficiaries upon receipt of more accurate information to make the correct Beneficial Interest Calculations for all Private Actions Trust Beneficiaries.

for creating the Private Actions Trust Agreement, which is the mechanism the Trustee will be using to investigate and potentially pursue the Victim Causes of Action.

(B)  The Chapter 11 structure provides a more workable mechanism for gathering together the Victims as a group to disclose to the Victims their opportunity to participate in the Private Actions Trust, and also facilitates the assignment by the participating Victims of their Victim Causes of Action to a common representative (i.e., the Private Actions Trustee) for the investigation and potential pursuit of the Victim Causes of Action.  The Victim Causes of Action should be more valuable when pursued as a group of multiple assigned Victims of Action, rather than each Victim locating his or her own individual attorney to pursue individual Victim Causes of Action.

(C)  The Chapter 11 process, which has extensive reporting requirements and requires the formulation and confirmation of a plan of reorganization and accompanying disclosure statement, is much more expensive than a Chapter 7 case.  The Trustee elected to keep this Bankruptcy Case in Chapter 11, rather than converting the Bankruptcy Case to a Chapter 7 case, in order to pursue the creation of the Private Actions Trust for the investigation and potential pursuit of the Victim Causes of Action.  The Consolidated Estate should be compensated for these additional expenses that the Consolidated Estate has incurred by keeping this Bankruptcy Case in Chapter 11.

(D)  The defendants of any Victim Causes of Action pursued by the Private Actions Trust will undoubtedly prefer to negotiate the final resolution of all Victim Causes of Action and Estate Litigation Claims against such defendants, and the Consolidated Estate is entitled to be compensated for the enhanced settlement value that arises in connection with the simultaneous pursuit of Victim Causes of Action and Estate Litigation Claims against the same defendants.

The Trustee has developed the distribution methodology for the Private Actions Trust outlined above based upon his preliminary evaluation and the current information available to the Trustee, which may or may not be consistent with future developments as they unfold. The Victims voting for the Plan acknowledge the foregoing criteria used by the Trustee in order to develop the distribution methodology for the Private Actions Trust and acknowledge and agree that the Trustee has used his reasoned judgment and acted in good faith in developing this distribution methodology.

(j)     _Interpretation_.  If the terms of this Plan conflict with the terms of the Private Actions Trust Agreement on matters arising from or related to the Private Actions Trust, the terms of the Private Actions Trust Agreement will govern.

(k)     **Continued Investigation of Victim Causes of Action.  The Trustee has not fully investigated the Victim Causes of Action in this Bankruptcy Case.  This investigation is ongoing and may occur after confirmation of this Plan.  Creditors and other parties in interest are advised that, notwithstanding that no specific reference is made to particular Victim Causes of Action in this Plan, the Disclosure Statement, or in other documents filed in the Bankruptcy Case, Victim Causes of Action may, at the sole**

37

discretion of the Private Actions Trustee, still be asserted under the terms of the Private Actions Trust Agreement at any time (subject to any applicable statute of limitations and other limitations, if any, set forth in this Plan).

(l)    **Discretion of Trustee**.  The assignment of any Victim Causes of Action to the Private Actions Trust does not obligate the Private Actions Trustee to prosecute or assert such Victim Causes of Action.  The Private Actions Trustee shall have the sole discretion to prosecute, settle, compromise, waive, release, decline to pursue or otherwise resolve any Victim Causes of Action assigned to the Private Actions Trust.

(m)    **Waiver of Conflicts of Interest by the Private Actions Trust Beneficiaries**.  By making a Private Actions Trust Election, a Private Actions Trust Beneficiary acknowledges and agrees that: (i) the Private Actions Trustee shall have the sole discretion to decide whether to pursue any Victim Causes of Action; (ii) conflicts of interest could arise as a result of the Trustee simultaneously acting as the Trustee of the Consolidated Estate and as the Private Actions Trustee; (iii) there is a risk that the Trustee, acting in both capacities, could take actions that may adversely impact the interests of the Consolidated Estate, such Private Actions Trust Beneficiary, and/or the interests of the Private Actions Trust, and that the risks from such potential conflicts of interest have been adequately disclosed to such Private Actions Trust Beneficiary; (iv) the Private Actions Trust Beneficiary has had the opportunity to consult with legal counsel of such Private Actions Trust Beneficiary's choosing with respect to the risks of such potential conflicts of interest; and (v) the Private Actions Trust Beneficiary expressly waives any and all conflicts of interest that may arise as a result of the Trustee simultaneously acting as the Trustee of the Consolidated Estate and as the Private Actions Trustee.

(n)    **Waiver of Conflicts of Interest Between the Private Actions Trustee and the Consolidated Estate**.  All conflicts of interest that may exist between the Private Actions Trustee and the Consolidated Estate are hereby waived.

### 6.10    Prosecution and Resolution of Estate Litigation Claims.

(a)    Trustee's authority to bring, prosecute and settle Estate Litigation Claims.  After confirmation of this Plan, the Trustee shall have the full right and authority to prosecute, settle, compromise, waive, release, decline to pursue or otherwise resolve any Estate Litigation Claims in this Bankruptcy Case in accordance with the terms of this Plan, whether the Estate Litigation Claim was commenced prior to or after the Effective Date.

(b)    Deadline for bringing Estate Litigation Claims.  Nothing in this Plan limits the time by which the Trustee must bring an Estate Litigation Claim.  The deadline for bringing Estate Litigation Claims is any applicable statute of limitations, as such statute of limitations may be altered or amended by the terms of the Bankruptcy Code.  For purposes of determining the applicable statute of limitations, Section 108 of the Bankruptcy Code and all statutory and equitable tolling principles will be applicable to all Estate Litigation Claims, and confirmation of this Plan will not limit any time periods contained therein.

38

(c) _Bankruptcy Court Approval._ From and after the Effective Date, the Trustee may settle or otherwise resolve Estate Litigation Claims without the approval or consent of the Bankruptcy Court where the Face Amount of the Estate Litigation Claim is $100,000 or less. The Bankruptcy Court must approve the settlement of any Estate Litigation Claim where the Face Amount of the Estate Litigation Claim is more than $100,000. Notice of any proposed settlement and an opportunity for a hearing shall be given to only the United States Trustee and those Creditors who have filed with the Bankruptcy Court after the date of this Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date.

**(d)** **Continued investigation of Estate Litigation Claims.** **THE TRUSTEE HAS NOT FULLY INVESTIGATED THE ESTATE LITIGATION CLAIMS IN THIS BANKRUPTCY CASE. THIS INVESTIGATION IS ONGOING AND WILL CONTINUE AFTER CONFIRMATION OF THIS PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE ADVISED THAT, NOTWITHSTANDING THAT NO SPECIFIC REFERENCE IS MADE TO A PARTICULAR ESTATE LITIGATION CLAIM IN THIS PLAN, THE DISCLOSURE STATEMENT, OR IN OTHER DOCUMENTS FILED IN THE BANKRUPTCY CASE, THE TRUSTEE MAY STILL BRING ESTATE LITIGATION CLAIMS AGAINST ANY PARTY AT ANY TIME (SUBJECT TO ANY APPLICABLE STATUTE OF LIMITATIONS). A PARTIAL LISTING OF PARTIES AGAINST WHOM THE TRUSTEE HAS ALREADY ASSERTED ESTATE LITIGATION CLAIMS OR MAY ASSERT ESTATE LITIGATION CLAIMS IN THE FUTURE IS ATTACHED AS EXHIBIT C TO THIS PLAN. THIS LIST IS NOT COMPREHENSIVE. IN VOTING ON THIS PLAN, CREDITORS SHOULD NOT RELY ON THE FACT THAT THEY ARE NOT LISTED ON EXHIBIT C OF THIS PLAN IN VOTING TO ACCEPT THIS PLAN. ESTATE LITIGATION CLAIMS MAY BE BROUGHT AGAINST PARTIES NOT LISTED ON EXHIBIT C AND THOSE ESTATE LITIGATION CLAIMS ARE EXPRESSLY RESERVED UNDER THIS PLAN AND MAY STILL BE BROUGHT.**

**6.11** **Non-Discharge of Randall and Corporate Debtors and Injunction.**

**THIS PLAN PROVIDES FOR AN INJUNCTION OF CERTAIN ACTIONS AND CLAIMS AGAINST THE DEBTORS. ANY HOLDER OF ANY CLAIMS, RIGHTS, CAUSES OF ACTION OR INTERESTS AGAINST THE DEBTORS MAY NOT PURSUE (a) PROPERTY OF THE CONSOLIDATED ESTATE OTHER THAN THROUGH SEEKING ALLOWANCE OF ITS CLAIM, IF ANY, FOR DISTRIBUTION IN ACCORDANCE WITH THIS PLAN; OR (b) THE TRUSTEE AND HIS AGENTS.**

**PURSUANT TO SECTION 1141(d)(3) OF THE BANKRUPTCY CODE, THE CONFIRMATION ORDER SHALL NOT DISCHARGE CLAIMS AGAINST THE CORPORATE DEBTORS. IN ADDITION, PURSUANT TO SECTION 1141(d)(3) OF THE BANKRUPTCY CODE, RANDALL IS NOT DISCHARGED UNDER THE PLAN BECAUSE (A) THE PLAN IS A LIQUIDATING PLAN, (B) THE DEBTORS WILL NOT BE ENGAGED IN BUSINESS AFTER CONSUMMATION OF THE PLAN, AND (C) RANDALL WOULD BE DENIED A DISCHARGE UNDER SECTION 727(a) OF THE**

BANKRUPTCY CODE IF THE BANKRUPTCY CASE WERE A CHAPTER 7 CASE
BECAUSE, PURSUANT TO 727(a)(12), SECTION 522(q)(1) OF THE BANKRUPTCY
CODE MAY BE APPLICABLE TO RANDALL.   HOWEVER, NO HOLDER OF A
CLAIM MAY RECEIVE ANY PAYMENT FROM OR SEEK RECOURSE AGAINST
ANY ASSETS THAT ARE PROPERTY OF THE CONSOLIDATED ESTATE, EXCEPT
FOR THOSE ASSETS REQUIRED TO BE DISTRIBUTED TO SUCH HOLDER AS
EXPRESSLY PROVIDED FOR IN THE PLAN.

AS OF THE EFFECTIVE DATE, ALL PERSONS ARE PRECLUDED FROM
ASSERTING AGAINST ANY PROPERTY OF THE CONSOLIDATED ESTATE AND
ASSETS THAT ARE DISTRIBUTED OR TO BE DISTRIBUTED UNDER THE PLAN
ANY CLAIMS, RIGHTS, CAUSES OF ACTION, LIABILITIES OR INTERESTS
BASED UPON ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF
ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE,
OTHER THAN AS EXPRESSLY PROVIDED IN THE PLAN OR THE
CONFIRMATION ORDER, REGARDLESS OF THE FILING, LACK OF FILING,
ALLOWANCE OR DISALLOWANCE OF SUCH CLAIM, AND REGARDLESS OF
WHETHER SUCH PERSON HAS VOTED TO ACCEPT THE PLAN.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE
CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS
THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A DEBT, RIGHT, CLAIM,
CAUSE OF ACTION, OR OTHER LIABILITY OR INTEREST AGAINST OR IN THE
CORPORATE DEBTORS THAT WOULD BE DISCHARGED UPON CONFIRMATION
OF THE PLAN ON THE EFFECTIVE DATE BUT FOR THE PROVISIONS OF
SECTION 1141(d)(3) OF THE BANKRUPTCY CODE SHALL BE PERMANENTLY
ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT
OF SUCH DEBT, RIGHT, CLAIM, CAUSE OF ACTION, OR OTHER LIABILITY OR
INTEREST: (i) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION
OR OTHER PROCEEDING ON ACCOUNT OF SUCH DEBT, RIGHT, CLAIM, CAUSE
OF ACTION, OR OTHER LIABILITY OR INTEREST AGAINST ASSETS OR
PROCEEDS THEREOF THAT ARE PROPERTY OF THE CONSOLIDATED ESTATE
AND WHICH ARE TO BE DISTRIBUTED UNDER THE PLAN, OTHER THAN TO
ENFORCE ANY RIGHT TO A DISTRIBUTION WITH RESPECT TO SUCH ASSETS
OR THE PROCEEDS THEREOF AS PROVIDED UNDER THE PLAN; (ii)
ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER
ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST ANY ASSETS TO BE
DISTRIBUTED TO CREDITORS UNDER THE PLAN, OTHER THAN AS
PERMITTED UNDER SUBPARAGRAPH (i) ABOVE; and (iii) CREATING,
PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST ANY
ASSETS TO BE DISTRIBUTED UNDER THE PLAN, OTHER THAN AS PERMITTED
BY THE PLAN, PROVIDED THAT NOTHING CONTAINED HEREIN SHALL LIMIT
THE RIGHTS OF ANY DISTRIBUTEE UNDER THE PLAN FROM TAKING ANY
ACTIONS IN RESPECT OF PROPERTY DISTRIBUTED OR TO BE DISTRIBUTED
TO IT UNDER THE PLAN.

# ARTICLE VII

## CLAIM OBJECTIONS AND DISTRIBUTION OF CONSIDERATION

### 7.1     Objections to Claims.

Unless otherwise extended by an order entered by the Bankruptcy Court, objections to the allowance of Claims shall be filed and served upon the Persons asserting such Claims as follows: (a) for known Priority Tax Claims other than the IRS Priority Tax Claim, Secured Claims, Priority Unsecured Claims, Non-Investor Trade Creditor Unsecured Claims listed on Exhibit B, and Victim Claims, no later than one hundred and twenty (120) days after the Effective Date; (b) for any and all Claims to which the Administrative Claims Bar Date, the Professional Administrative Claims Bar Date or the Contract Rejection Claims Bar Date applies, thirty (30) days after the expiration of the respective Bar Date; (c) for any Claim that is not listed on any Exhibit to the Disclosure Statement or to which the Administrative Claims Bar Date, the Professional Administrative Claims Bar Date or the Contract Rejection Claims Bar Date applies, thirty (30) days after the Trustee is provided notice of such Claim; and (d) for the IRS Priority Tax Claim, within the deadline outlined in Section 5.3 of this Plan.

The Trustee shall (i) be responsible for filing objections to any and all Claims that are Disputed Claims asserted against the Consolidated Estate; (ii) have authority to settle and compromise any objection to a Disputed Claim, if appropriate, without further order of the Bankruptcy Court, provided that the total Cash settlement amount does not exceed $100,000; and (iii) he may assert any and all Claims, rights of action, Causes of Action, counterclaims and defenses held by the Consolidated Estate after the Effective Date as they existed prior to the Effective Date. Distributions made under the Plan to the holder of a Claim shall not be considered to be a waiver or release by the Trustee and the Consolidated Estate of any Claims against the holder of the Claim.

### 7.2     Disputed Claims.

On the Effective Date or thereafter, no distributions shall be made unless a Claim is an Allowed Claim on the Effective Date. Except as may otherwise be agreed with respect to any Disputed Claim, no payment or distribution will thereafter be made with respect to all or any portion of a Disputed Claim until such Claim is an Allowed Claim. Payments and distributions to each holder of a Disputed Claim (to the extent that such Claim, or any portion thereof, ultimately becomes an Allowed Claim) must be made in accordance with the Plan.

### 7.3     Estimation of Claims.

The Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including to establish the amount of the Claim for voting purposes, the amount of the Disputed Cash Reserve, or during any litigation concerning or an objection to such Claim. The Trustee shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim. If the Bankruptcy Court determines the maximum limitation of such Claim, such

41

determination shall not preclude the Trustee from pursuing any additional proceedings to object to any ultimate payment of such Claim.  If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under this Plan.  All such proceedings are cumulative and not exclusive remedies.

**7.4**    **Disputed Claims Reserve, Operating Reserve, and Maintenance of Cash.**

(a)    The Disputed Claims Reserve.  On the Effective Date, the Trustee will establish and maintain a reserve (the "Disputed Claims Reserve") to reserve for and fund the payment of Disputed Claims.  The amount of the Disputed Claims Reserve will be equal to the sum of the following: (i) the Face Amount of all unpaid Disputed Priority Tax Claims, (ii) the Face Amount of all unpaid Disputed Administrative Claims, (iii) the Face Amount of all Disputed Claims for the Secured Claims in Classes 1-14, (iv) the Face Amount of all Class 15 Disputed Claims, (v) the Face Amount of all Class 16(A) and Class 16(B) Disputed Claims, and (vi) the Victim Net Claim Amount of all Class 17 Disputed Claims.  The Trustee will, from time to time, recalculate the amount of the Disputed Claims Reserve.  The Trustee may use any Cash withdrawn from the Disputed Claims Reserve for distributions in accordance with the terms of this Plan.

(b)    The Operating Reserve.  From and after the Effective Date, the Trustee will establish and maintain a reserve (the "Operating Reserve") to fund the payments required to be made under this Plan on account of distributions to be made to holders of Allowed Claims, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Trustee to pay post-Effective Date fees and expenses, including those incurred or to be incurred by Professionals employed by the Trustee through the closing of this Bankruptcy Case and entry of a Final Decree.  The Trustee will determine the amount of the Operating Reserve and may, from time to time, recalculate the amount of the Operating Reserve.  The Trustee will not be liable if the Operating Reserve is inadequate.

(c)    Maintenance of the Disputed Claims Reserve, the Operating Reserve, and other Cash of the Debtor and the Estate.  Except as otherwise provided in this Plan, the Trustee may hold Cash of the Estate in one or more accounts that the Trustee determines to be in the best interests of the Estate.  Any reference to the establishment or maintenance of any reserves contained in this Plan, including the Disputed Claims Reserve and the Operating Reserve, will not require the Trustee to establish separate deposit or similar accounts for such reserves.  The establishment of reserves under this Plan may be accomplished by accounting, general ledger, paper, or other book entry, as the Trustee may determine.

**7.5**    **Method of Distributions Under the Plan.**

(a)    General.  After the Initial Distribution Date, the Trustee, in his sole discretion, may make one or more additional distributions if he determines, in his sole discretion, that sufficient funds exist to warrant such additional distributions.

(b)    Mailing.  All distributions under the Plan to be made by the Trustee to the holders of Allowed Claims shall be mailed by first class mail, postage prepaid, to the respective

42

addresses of such holders as listed on the Distribution Record Date (i) on the respective proofs of Claim by such holders, including amendments thereto, (ii) on any written notices of address changes delivered to the Trustee after the date of the filing of any applicable proof of Claim, or (iii) at the addresses reflected on the Schedules if no proof of Claim is filed and the Trustee has not received a written notice of change of address.

(c)     Form of Distributions.  Any payment of Cash made by the Trustee pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Trustee; provided, however, that after the occurrence of the Effective Date, the Trustee is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10.00); provided, further, that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to ten dollars ($10.00) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars ($10.00) is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.  To the extent that a final distribution would require a distribution of ten dollars ($10.00) or less to a holder of an Allowed Claim, such amount shall be deemed forfeited, and shall be redistributed to holders of Allowed Claims who are to receive a final distribution in excess of ten dollars ($10.00) on account of their Allowed Claim.  If, in the sole discretion of the Trustee, excess Cash exists as of the time of a final distribution that is so de minimis in amount that it cannot be reasonably redistributed to the holders of Allowed Claims, the Trustee may deposit such Cash in the unclaimed funds account of the Bankruptcy Court.

(d)     Distributions to be on Business Days/Timeliness.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after the Effective Date and, in any event, within thirty (30) days after the Effective Date.

(e)     Distributions to Holders as of the Distribution Record Date.  As of the close of business on the Distribution Record Date, the Randall Claim Docket and the Corporate Debtors Claim Dockets shall be closed.  The Trustee shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

(f)     Compliance with Tax Requirements.  In connection with the Plan, to the extent applicable, the Trustee shall comply with all withholding and reporting requirements imposed on it by a Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

**7.6     Unclaimed Funds.**

If (a) at the time a distribution to holders of Allowed Claims is to be made under this Plan, the Trustee is unable to deliver the portion of such distribution due to a holder of an

Allowed Claim, (b) any amount paid to the holder of an Allowed Claim is returned as undeliverable and the Trustee is unable, with reasonable effort, to ascertain a correct address for the holder entitled thereto within thirty (30) days of its return, or (c) any check distributed in payment of an Allowed Claim is neither returned nor negotiated within six (6) months of the date distributed, in every such case, the Allowed Claim shall be deemed reduced to zero in amount and the holder thereof shall have no further right to payment against or distribution from the Debtors, the Trustee or the Consolidated Estate in any way. The Cash that, but for this section, would have been payable to the holders of such Allowed Claims shall, to the extent applicable, revert to the Consolidated Estate and be available for application or distribution in accordance with the terms of the Plan. In regard to locating holders of Allowed Claims whose distributions or notices are properly mailed but nevertheless returned, the Trustee shall be required to take no more steps other than to compare the returned mail against addresses held for the holder of the Claim through filed documents or correspondence and general internet search for an alternative address.

## ARTICLE VIII

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1      Executory Contracts and Unexpired Leases.**

Although the Trustee is not aware of any executory contracts or unexpired leases to which the Debtors are a party, any such executory contracts or unexpired leases shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date of the Plan.

**8.2      Rejection Damage Claims And Contract Rejection Claim Bar Date.**

If the rejection of an executory contract or unexpired lease by the Debtors pursuant to this Article VIII results in a Claim for damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Consolidated Estate or their respective properties or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served on the Trustee on or before thirty (30) days following the Effective Date, which shall be the "Contract Rejection Claim Bar Date." Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of Claim are timely filed will be treated as Non-Investor Trade Creditor Unsecured Claims subject to the provisions of the Plan. The Trustee shall have the right to object to any rejection damage Claims.

## ARTICLE IX

### CONDITIONS PRECEDENT TO EFFECTIVE DATE

**9.1      Conditions Precedent to Effectiveness.**

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

      (a)    The Confirmation Order, in form and substance reasonably acceptable to the Trustee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

      (b)    All actions, other documents and agreements necessary to implement the Plan, if any, shall have been executed, delivered, and, if necessary, properly recorded, and shall have become effective; and

      (c)    The Consolidated Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date and the Initial Distribution Date.

**9.2    Waiver of Conditions.**

The Trustee in his sole discretion may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in Section 9.1 above, except that the Trustee may not waive the condition that the Consolidated Estate will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date and the Initial Distribution Date.

# ARTICLE X

# RETENTION OF JURISDICTION

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of and related to the Bankruptcy Case, the assets and liabilities of the Consolidated Estate existing both prior to and after entry of the Consolidation Order, and the Plan to the fullest extent permitted by law, including, but not limited to:

      (a)    Allowing, disallowing, determining, liquidating, classifying, estimating or establishing the priority or secured or unsecured status of any Claim not otherwise allowed under the Plan, including resolving any request for payment of any Administrative Expense Claim, resolving any objection to the allowance or priority of Claims, and resolving any dispute as to the subordination of any Claim;

      (b)    Approving compromises and settlements under Bankruptcy Rule 9019 to the extent required under or included in the Plan;

      (c)    Hearing and determining any and all Claims, Causes of Action or rights that have been or may be asserted or commenced by the Trustee;

(d)     Hearing and determining all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of Professionals for work performed after the Effective Date shall be made in the ordinary course of business by the Trustee and shall not be subject to approval by the Bankruptcy Court;

(e)     Hearing and determining any and all adversary proceedings, motions, applications, requests for disgorgement and contested or litigated matters arising out of, arising under or related to the Bankruptcy Case;

(f)     Effectuating performance of and payment under the provisions of any settlement agreement entered into by the Trustee on behalf of the Consolidated Estate and payment under any Final Order and judgment obtained in any Causes of Action or related to any Claims or Causes of Action asserted by the Trustee against any Person;

(g)     Entering such Orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(h)     Hearing and determining all matters and disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Disclosure Statement, the Plan and the Confirmation Order, including but not limited to disputes arising under agreements, documents or instruments executed in connection with the Plan;

(i)     Modifying the Plan and/or any documents executed in conjunction with the Plan at the request of the Trustee and as provided by applicable law, including to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

(j)     Issuing injunctions, entering and implementing other orders, or taking such other actions as may be necessary or appropriate to restrain interference by any Person with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(k)     Entering and implementing orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(l)     Enforcing all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Bankruptcy Case;

(m)     Determining any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein;

(n)     Hearing and determining all matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

46

(o)      Hearing and determining any and all matters relating to the administration of the Consolidated Estate by the Trustee either prior to or after the Effective Date; and

(p)      Entering a Final Decree and closing the Bankruptcy Case.

## ARTICLE XI

## MISCELLANEOUS

### 11.1    Continuation of Injunctions or Stays Until Effective Date.

All injunctions or stays provided for in the Bankruptcy Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 11.2    Notice of Effective Date.

As soon as practicable after the occurrence of the Effective Date, but no later than ten (10) days thereafter, the Trustee shall file and serve on each holder of an alleged Claim a written notice of the occurrence of the Effective Date.

### 11.3    Limitation of Liability.

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Trustee, his employees, officers, directors, agents or representatives, any Professionals, and the Consolidated Estate, shall not have or incur any liability to any Person for any authorized act taken or authorized omission made in good faith in connection with or related to the Bankruptcy Case or the Consolidated Estate, including the objections to or estimations of Claims, disposition of assets, or formulating, determining not to solicit acceptances or rejections to, or confirming the Plan, or any contract, instrument, release, or other agreement or document created in connection with the Plan or otherwise.

Consistent with Section 1125(e) of the Bankruptcy Code, to the extent acceptances or rejections of the Plan have been solicited, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, the Trustee and the Professionals are not liable on account of such solicitation or participation or for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

All actions by the Trustee and his employees, officers, directors, agents or representatives, including any Professionals, as contemplated in the Plan or otherwise in the administration of the Bankruptcy Case shall be conclusively deemed to be actions within the scope of the Bankruptcy Code.  Except as prohibited by applicable law, and excluding acts or omissions constituting gross negligence or willful misconduct, the Trustee and his employees, officers, directors, agents or representatives, including any Professionals, shall not be liable to any Person for any act taken or omitted by any of them in good faith and in compliance with the applicable provisions of the Bankruptcy Code or pursuant to the discretion, power, and authority

47

conferred by this Plan or Court Orders.  Except as prohibited by applicable law, the Trustee and his employees, officers, directors, agents or representatives, including any Professionals, shall not be liable to any individual Creditor, and shall be liable only to the Consolidated Estate, for acts or omissions related to performance of their duties for the Consolidated Estate that constitute willful misconduct or gross negligence.  In all respects, and except as prohibited by applicable law, the Trustee shall be entitled to rely upon the advice of counsel with respect to his duties and responsibilities under the Plan, and such reliance shall in no event constitute gross negligence or willful misconduct.  The Trustee shall not be responsible for any obligations or duties of the Debtors with respect to corporate or limited liability company governance, corporate or limited liability company reporting, or provision of information for securities law compliance, except any such duties that are expressly delegated to the Trustee in this Plan.

### 11.4    Execution of Documents and Corporate Action.

The Trustee may execute such documents or take such other action as is necessary to effectuate the transactions provided for in this Plan, to wind-down or dissolve any of the Debtors or any entities in the Randall Enterprise.

### 11.5    Default of Plan.

In the event of any default of the provisions of this Plan, a Creditor or party in interest aggrieved by such default may provide written notice to the Trustee.  The written notice of default must describe with specificity the nature of the default alleged and the steps required to cure such default.  The Trustee shall have thirty (30) days after receipt of notice of default to cure such default.  If the Trustee does not cure such default within thirty (30) days after receipt of a notice of default, then a Creditor or party in interest aggrieved by such default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan.  The Bankruptcy Court, after notice and a hearing, shall determine whether a default occurred, and if a default occurred, whether such default has been cured.  Upon finding a material default, the Bankruptcy Court may issue such orders as may be appropriate, including an order compelling compliance with the pertinent provisions of the Plan.

### 11.6    Setoffs and No Waiver.

Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Trustee and the Consolidated Estate of any rights of setoff the Consolidated Estate may have against any Person.  The failure of the Debtors or any other Person to object to any Claim for the purposes of voting shall not be deemed a waiver of the Trustee's right to object to or examine such Claim, in whole or in part.

### 11.7    Amendment or Modification of the Plan.

Alterations, amendments or modifications of the Plan may be proposed in writing by the Trustee at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Trustee shall have complied with Section 1125 of the Bankruptcy Code.  The Plan may be

altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Trustee may, without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any Exhibit attached to the Disclosure Statement or the Plan.

### 11.8    Revocation or Withdrawal of the Plan.

The Trustee reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of liquidation.  If the Trustee revokes or withdraws the Plan, or if confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the allowing, fixing or limiting to an amount certain any Claim or Class of Claims, rejection or assumption of any executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan) shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute a waiver or release of any Claims by or against the Consolidated Estate, the Debtors or the Consolidated Estate, (ii) prejudice in any manner the rights of the Debtors or Trustee in any further proceedings involving the Debtors or the Consolidated Estate, or (iii) constitute an admission of any sort by the Debtors or the Trustee.

### 11.9    Severability.

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Trustee, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

### 11.10   Exhibits.

Any Disclosure Statement Exhibits or Exhibits to the Plan not filed herewith will be filed no later than ten (10) days prior to the commencement of the Confirmation Hearing.  Unless otherwise ordered by the Bankruptcy Court, the Exhibits, if any, to the Plan may not be served

with the Plan, but rather copies of all such Exhibits may be provided to the requesting parties upon written request to Trustee's counsel.

**11.11   Binding Effect.**

The Plan and all rights, duties and obligations hereunder shall be binding upon and inure to the benefit of the Debtors, the Trustee and the Consolidated Estate, and any successors and assigns.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

**11.12   Notices.**

All notices, requests and demands to or upon the Trustee shall only be effective if in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by e-mail, when received and confirmed, addressed as follows:

Michael R. Johnson
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah  84111
Email:  mjohnson@rqn.com

**11.13   Governing Law.**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Utah, without giving effect to the principles of conflicts of law of such jurisdiction.

**11.14   Post-Confirmation Administration - Fees, Reports, Final Decree.**

On and after the Effective Date, the Trustee shall no longer be required to file monthly operating reports with the United States Trustee.

Until the entry of a Final Decree, the Trustee shall:

(a)   Pay the costs of administering the Consolidated Estates and any post-confirmation fees due pursuant to 28 U.S.C. §1930;

(b)   Unless otherwise ordered, file status reports related to the consummation of the Plan when, in his discretion, such reports would be beneficial to Creditors; and

(c)   Once the Consolidated Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Trustee shall file a final report and account of all receipts and disbursements, and serve that report via ECF with notice of said report served on Persons entitled

50

to notice in the Bankruptcy Case.  Any such report shall include a request that the Bankruptcy Court enter a Final Decree in the Bankruptcy Case.

**11.15   Headings.**

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**11.16   Inconsistency.**

In the event of any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern.

## ARTICLE XII

## REQUEST FOR CONFIRMATION

The Trustee hereby requests that the Court confirm the Plan pursuant to Section 1129 of the Bankruptcy Code.

DATED this 3rd day of April, 2013.

**RAY QUINNEY & NEBEKER P.C.**

/s/Douglas M. Monson
Michael R. Johnson
Douglas M. Monson
David H. Leigh
*Counsel for Gil A. Miller, Chapter 11*
*Trustee of the Consolidated Estate*

1215801.0910/dmm/rqn

51

**EXHIBIT A TO**
**CHAPTER 11 TRUSTEE'S LIQUIDATING PLAN OF REORGANIZATION DATED**
**APRIL 3, 2013**

**RANDALL PRIVATE ACTIONS TRUST AGREEMENT**

## TABLE OF CONTENTS

ARTICLE 1  ESTABLISHMENT OF THE PRIVATE ACTIONS TRUST ............................... 3
    1.1.    Establishment of Private Actions Trust and Appointment of the Original
        Trustee....................................................................................................................... 3
    1.2.    Transfer of Assets and Rights to the Private Actions Trustee............................. 3
    1.3.    Title to Victim Causes of Action ......................................................................... 5
    1.4.    Nature and Purpose of the Private Actions Trust. ............................................... 5
    1.5.    Incorporation of Plan. .......................................................................................... 6
    1.6.    Funding of the Private Actions Trust. .................................................................. 6
    1.7.    Appointment as Representative in Lieu of Assignment. ...................................... 7

ARTICLE 2  PRIVATE ACTIONS TRUST INTERESTS ............................................... 7
    2.1.    Allocation of Private Actions Trust Interests. ..................................................... 7
    2.2.    Interests Beneficial Only. ..................................................................................... 7
    2.3.    Evidence of Beneficial Interests. .......................................................................... 7
    2.4.    Securities Law Registration.................................................................................. 7
    2.5.    Interests Nontransferable. ..................................................................................... 8
    2.6.    Access to the Trust Register by the Private Actions Trust Beneficiaries............. 8
    2.7.    Absolute Owners. ................................................................................................. 8
    2.8.    Private Actions Trust Beneficiary's Trust Interest. ............................................. 8

ARTICLE 3  THE PRIVATE ACTIONS TRUSTEE .................................................. 9
    3.1.    Private Actions Trust Proceeds............................................................................. 9
    3.2.    Collection of Income. ........................................................................................... 9
    3.3.    Payment of Private Actions Trust Expenses......................................................... 9
    3.4.    Distributions. ...................................................................................................... 10
    3.5.    Tenure, Removal, and Replacement of the Private Actions Trustee.................. 10
    3.6.    Acceptance of Appointment by Successor Private Actions Trustee. ................. 11
    3.7.    Role of the Private Actions Trustee.................................................................... 11
    3.8.    Authority of Private Actions Trustee.................................................................. 11
    3.9.    Limitation of Private Actions Trustee's Authority............................................. 13
    3.10.   Books and Records. ............................................................................................. 14
    3.11.   Inquiries into Trustee's Authority. ..................................................................... 14
    3.12.   Compliance with Laws. ...................................................................................... 14
    3.13.   Compensation of the Private Actions Trustee. ................................................... 14
    3.14.   Reliance by Private Actions Trustee. ................................................................. 15
    3.15.   Investment and Safekeeping of Private Actions Trust Assets............................ 15

i

3.16.    Standard of Care; Exculpation...........................................................................16

ARTICLE 4  TAX MATTERS ......................................................................................16
4.1.    Federal Income Tax Reporting. ..............................................................16
4.2.    Allocations of Private Actions Trust Taxable Income. .......................17

ARTICLE 5  DISTRIBUTIONS .....................................................................................17
5.1.    Annual Distribution; Withholding..........................................................18
5.2.    Manner of Payment or Distribution........................................................19
5.3.    Delivery of Private Actions Trust Distributions....................................19
5.4.    Cash Distributions. ..................................................................................19

ARTICLE 6  REPORTS TO PRIVATE ACTIONS TRUST BENEFICIARIES......................19
6.1.    Reports.....................................................................................................19

ARTICLE 7  TERM; TERMINATION OF THE PRIVATE ACTIONS TRUST ...................20
7.1.    Term; Termination of the Private Actions Trust. ..................................20
7.2.    Continuance of Trust for Winding Up.....................................................20

ARTICLE 8  AMENDMENT AND WAIVER .................................................................21
8.1.    Amendment and Waiver. .........................................................................21

ARTICLE 9  MISCELLANEOUS PROVISIONS .............................................................22
9.1.    Intention of Parties to Establish the Private Actions Trust...................22
9.2.    Reimbursement of Trust Costs. ..............................................................22
9.3.    Laws as to Construction. .........................................................................22
9.4.    Jurisdiction...............................................................................................22
9.5.    Severability. .............................................................................................23
9.6.    Notices. ....................................................................................................23
9.7.    Fiscal Year. ..............................................................................................23
9.8.    Headings. ..................................................................................................23
9.9.    Counterparts..............................................................................................24
9.10.    Confidentiality. ......................................................................................24
9.11.    Entire Agreement....................................................................................24

## RANDALL VICTIMS PRIVATE ACTIONS TRUST AGREEMENT

This Randall Victims Private Actions Trust Agreement (the "Private Actions Trust Agreement"), dated as of April 3, 2013, by and between those Creditors of the Substantively Consolidated Bankruptcy Estate of Dee Allen Randall, Horizon Auto Funding, LLC, Independent Commercial Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage and Investment Inc., and Horizon Financial & Insurance Group Inc. (collectively the "Debtors") who were the holders as of the Corporate Debtors Petition Date of claims that would be classified as Class 17 Victim Claims under the "Chapter 11 Trustee's Liquidating Plan of Reorganization" dated as of April 3, 2013, as the same may be modified, amended, or supplemented, and including all exhibits and schedules thereto (the "Plan"), that have timely made a Private Actions Trust Election (collectively, the "Grantors"), and Gil A. Miller, as the original Private Actions Trustee (the "Original Trustee"), is executed in order to establish a liquidating litigation trust in connection with the Plan.  Capitalized terms used in this Private Actions Trust Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

### WITNESSETH

WHEREAS, on December 20, 2010 (the "Randall Petition Date"), Dee Allen Randall ("Randall") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court");

WHEREAS, Gil A. Miller (the "Chapter 11 Trustee") was appointed by the Bankruptcy Court as the Chapter 11 Trustee in the Randall case on September 29, 2011;

WHEREAS, on October 12, 2011 (the "Corporate Debtors Petition Date"), the Chapter 11 Trustee, in his capacity as the Chapter 11 trustee in the Randall Case, caused the following bankruptcy petitions to be filed by the following entities owned by Randall (the "Corporate Debtors") under Chapter 11 of Title 11 of the United States Code:

A.      In re Horizon Auto Funding, LLC, Case No. 11-34826;

B.      In re Independent Commercial Lending, LLC, Case No. 11-34830;

C.      In re Horizon Financial Center I, LLC, Case No. 11-34831;

D.      In re Horizon Mortgage and Investment Inc. ("Horizon Mortgage"), Case No. 11-34833; and

E.      In re Horizon Financial & Insurance Group Inc. ("Horizon Financial"), Case No. 11-34834;

WHEREAS, on January 27, 2012, the Bankruptcy Court entered its Order substantively consolidating the separate bankruptcy estates of Randall and each of the Corporate Debtors, with all cases being consolidated with and into the Randall case, but  effective only as of the date of the Bankruptcy Court's consolidation order;

WHEREAS, the Trustee filed the Plan on April 3, 2013;

WHEREAS, on _____, 2013, the Bankruptcy Court entered its Order finding that the Disclosure Statement for the Plan contained adequate information within the meaning of section 1125 of the Bankruptcy Code;

WHEREAS, on _____, 2013, the Bankruptcy Court entered the Confirmation Order confirming the Plan;

WHEREAS, this Private Actions Trust is created pursuant to, and to effectuate certain provisions of the Plan, and to hold certain Creditors' Victim Causes of Action;

WHEREAS, each Grantor elected to assign his or her Victim Causes of Action to the Private Actions Trust by making a Private Actions Trust Election;

WHEREAS, each Grantor making an assignment has agreed to reasonably cooperate with the Private Actions Trustee in the investigation and prosecution of any assigned Victim Causes of Action;

WHEREAS, this Private Actions Trust is established for the benefit of the Grantors who elect to assign their Victim Causes of Action to the Private Actions Trust (the "Private Actions Trust Beneficiaries" or the "Private Actions Trust Participating Creditors") and the Private Actions Trust Beneficiaries have a beneficial interest in the Private Actions Trust (the "Private Actions Trust Interest");

WHEREAS, the Private Actions Trust is organized for the primary purpose of pursuing the Victim Causes of Action and liquidating and distributing assets transferred to the Private Actions Trust, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Private Actions Trust; and

WHEREAS, this Private Actions Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and to operate in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the Grantors and the Original Trustee agree as follows:

2

ARTICLE 1
ESTABLISHMENT OF THE PRIVATE ACTIONS TRUST

1.1.    Establishment of Private Actions Trust and Appointment of the Original Trustee.

(a)     Pursuant to the Plan, the Grantors and the Original Trustee hereby establish a trust which shall be known as the "Randall Victims Private Actions Trust" on behalf of the Private Actions Trust Beneficiaries.

(b)     The Original Trustee is hereby appointed as trustee of the Private Actions Trust effective as of the Effective Date of the Plan and agrees to accept and hold the assets of the Private Actions Trust in trust for the Private Actions Trust Beneficiaries subject to the terms of the Plan and this Private Actions Trust Agreement.  The Original Trustee and each successor trustee serving from time to time hereunder (the "Private Actions Trustee") shall have all the rights, powers and duties set forth herein.

1.2.    Transfer of Assets and Rights to the Private Actions Trustee.

(a)     Effective as of the Effective Date (even if assigned at a later date), each Private Actions Trust Beneficiary hereby transfers, assigns, and delivers (i) to the Private Actions Trust, without recourse, all of such Private Actions Trust Beneficiary's right, title, and interest in and to Victim Causes of Action free and clear of any and all Liens, Claims, encumbrances or interests of any kind in such property of any other Person or entity and (ii) to the Private Actions Trustee, without waiver, all of such Private Actions Trust Beneficiary's right, title and interest in and to any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Victim Causes of Action (collectively, "Privileges"), which shall vest in the Private Actions Trustee, in trust, and, consistent with Section 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Private Actions Trust Beneficiaries.

(b)     On or as promptly as practicable after the date that each Private Actions Trust Beneficiary makes a Private Actions Trust Election, such Private Actions Trust Beneficiary shall: (i) locate and preserve any documents relating to the Victim Causes of Action (including those maintained in electronic format and original documents) within his or her possession, custody, or control; (ii) deliver or cause to be delivered to the Private Actions Trustee any documents in connection with the Victim Causes of Action (including those maintained in electronic format and original documents) within his or her possession, custody, or control; (iii) provide to the Private Actions Trustee access to such Private Actions Trust Beneficiary, his or her agents, advisors, attorneys, accountants or any other professionals hired by such Private Actions Trust Beneficiary with knowledge of matters relevant to the Victim Causes of Action; and (iv) otherwise assist the Private Actions Trustee and his professionals in their investigation and pursuit of the Victim Causes of Action.  Upon the reasonable request of the Private Actions Trustee, a Private Actions Trust Beneficiary shall use good faith efforts to provide the Private Actions Trustee with a list of all documents in connection with the Victim Causes of Action known to such Private Actions Trust Beneficiary but not held by such Private Actions Trust Beneficiary or any of his or her employees, agents, advisors, attorneys, accountants or any other

3

professionals.  Such list shall contain a description of each document, to the extent feasible, as well as the name of the entity or Person holding such document.

(c)      At any time and from time to time on and after the Effective Date, Private Actions Trust Beneficiaries agree (i) at the reasonable request of the Private Actions Trustee to execute or deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), (ii) to take, or cause to be taken, all such further actions as the Private Actions Trustee may reasonably request in order to evidence or effectuate the transfer of the Victim Causes of Action and the Privileges to the Private Actions Trust and the consummation of the transactions contemplated hereby and by the Plan and to otherwise carry out the intent of the parties hereunder and under the Plan, and (iii) to cooperate with the Private Actions Trustee in the prosecution, compromise, settlement or other resolution of the Victim Causes of Action.

(d)      Each Private Actions Trust Beneficiary shall reasonably cooperate with the Private Actions Trustee in the investigation, prosecution, compromise, settlement or other resolution of any Victim Causes of Action.

(e)      If the Private Actions Trustee is unable or unwilling to prosecute any Victim Causes of Action, then the Private Actions Trustee may, but is not required to, re-assign such Victim Causes of Action to the appropriate Private Actions Trust Beneficiary.

(f)      **THE PRIVATE ACTIONS TRUSTEE SHALL ALSO BE ENTITLED TO ACT IN HIS CAPACITY AS THE TRUSTEE OF THE CONSOLIDATED ESTATE FOR THE PURPOSE OF COORDINATING THE PURSUIT OF BOTH ESTATE LITIGATION CLAIMS (TO THE EXTENT BROUGHT BY THE CONSOLIDATED ESTATE) AND VICTIM CAUSES OF ACTION (TO THE EXTENT THAT THE PRIVATE ACTIONS TRUSTEE, IN HIS SOLE DISCRETION, CHOOSES TO PURSUE SUCH VICTIM CAUSES OF ACTION) IN ORDER TO MINIMIZE THE ADMINISTRATIVE EXPENSES TO THE PRIVATE ACTIONS TRUST BENEFICIARIES AND TO THE CONSOLIDATED ESTATE.  TO THE EXTENT THAT BOTH ESTATE LITIGATION CLAIMS AND VICTIM CAUSES OF ACTION ARE BEING PURSUED AGAINST THE SAME DEFENDANTS, SUCH ESTATE LITIGATION CLAIMS AND SUCH VICTIM CAUSES OF ACTION MAY BE SETTLED OR RESOLVED BY THE PRIVATE ACTIONS TRUSTEE AT THE SAME TIME, BUT WILL BE SETTLED OR RESOLVED BY THE PRIVATE ACTIONS TRUSTEE PURSUANT TO SEPARATE SETTLEMENTS OR RESOLUTIONS WITH SEPARATE PROCEEDS (IF SETTLEMENT PROCEEDS ARE BEING PAID BY SUCH DEFENDANTS).  BY MAKING A PRIVATE ACTIONS TRUST ELECTION, A PRIVATE ACTIONS TRUST BENEFICIARY ACKNOWLEDGES AND AGREES THAT: (i) THE PRIVATE ACTIONS TRUSTEE SHALL HAVE THE SOLE DISCRETION TO DECIDE WHETHER OR NOT TO PURSUE ANY VICTIM CAUSES OF ACTION; (ii) CONFLICTS OF INTEREST COULD ARISE AS A RESULT OF THE PRIVATE ACTIONS TRUSTEE SIMULTANEOUSLY ACTING AS THE TRUSTEE OF THE CONSOLIDATED ESTATE AND AS THE PRIVATE ACTIONS TRUSTEE; (iii) THERE IS A RISK THAT THE PRIVATE ACTIONS TRUSTEE ACTING IN BOTH**

4

**CAPACITIES COULD TAKE ACTIONS THAT MAY ADVERSELY IMPACT THE INTERESTS OF THE CONSOLIDATED ESTATE, SUCH PRIVATE ACTIONS TRUST BENEFICIARY, AND/OR THE INTERESTS OF THE PRIVATE ACTIONS TRUST, AND THE RISKS FROM SUCH POTENTIAL CONFLICTS OF INTEREST HAVE BEEN ADEQUATELY DISCLOSED TO SUCH PRIVATE ACTIONS TRUST BENEFICIARY; (iv) SUCH PRIVATE ACTIONS TRUST BENEFICIARY HAS HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL OF SUCH PRIVATE ACTIONS TRUST BENEFICIARY'S CHOOSING WITH RESPECT TO THE RISKS OF SUCH POTENTIAL CONFLICTS OF INTEREST; AND (v) SUCH PRIVATE ACTIONS TRUST BENEFICIARY EXPRESSLY WAIVES ANY AND ALL CONFLICTS OF INTEREST THAT MAY ARISE AS A RESULT OF THE PRIVATE ACTIONS TRUSTEE SIMULTANEOUSLY ACTING AS THE TRUSTEE OF THE CONSOLIDATED ESTATE AND AS THE PRIVATE ACTIONS TRUSTEE.**

     1.3.    Title to Victim Causes of Action.

The transfer of the Victim Causes of Action to the Private Actions Trust shall be made for the ratable benefit of the Private Actions Trust Beneficiaries, based upon the respective percentages attributable to each Private Actions Trust Beneficiary as outlined in Section 2.8 below (or as such values are subsequently adjusted by the Private Actions Trustee pursuant to the terms of Section 2.8 below), to the extent such Private Actions Trust Beneficiaries are entitled to Private Actions Trust Interests under the Plan.  In this regard, the Victim Causes of Action will be treated for federal income tax purposes as being a transfer by the Private Actions Trust Beneficiaries to the Private Actions Trust in exchange for Private Actions Trust Interests for the ratable benefit of the Private Actions Trust Beneficiaries, in accordance with the Plan.  Upon the transfer of the Victim Causes of Action, the Private Actions Trust shall succeed to all of the Grantors' rights, titles and interests in and to the Victim Causes of Action and the Grantors will have no further interest in or with respect to the Victim Causes of Action or this Private Actions Trust apart from their Private Actions Trust Interests.

     1.4.    Nature and Purpose of the Private Actions Trust.

     (a)    Purpose.  The Private Actions Trust is organized and established as a trust pursuant to which the Private Actions Trustee, subject to the terms and conditions contained herein and in the Plan, is to (i) hold the assets of the Private Actions Trust and dispose of the same in accordance with this Private Actions Trust Agreement and the Plan in accordance with Treasury Regulation Section 301.7701-4(d) and Rev. Proc. 94-45, 1994-2 C.B. 684, and (ii) oversee and direct the expeditious but orderly liquidation of the assets of the Private Actions Trust. Accordingly, the primary purpose of this Private Actions Trust is to liquidate the assets transferred to the Private Actions Trust with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Private Actions Trust.

     (b)    Actions of the Private Actions Trustee.  The Private Actions Trustee, except as set forth in Section 3.12 herein, and the exercise of his or her reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of

the Private Actions Trust, make timely distributions and not unduly prolong the duration of the Private Actions Trust.  The liquidation of the Victim Causes of Action may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all Claims, Causes of Action, or otherwise.  The Private Actions Trustee, except as set forth in Section 3.12 herein, shall have the absolute right to pursue, settle and compromise, or not pursue, any and all Victim Causes of Action and he or she determines is in the best interests of the Private Actions Trust Beneficiaries, and consistent with the purposes of the Private Actions Trust, and the Private Actions Trustee shall have no liability for the outcome of any such decision except for any damages caused by recklessness, gross negligence, willful misconduct, or knowing violation of law.

(c)     Relationship.  This Private Actions Trust is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Private Actions Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Private Actions Trustee or the Private Actions Trust Beneficiaries, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Private Actions Trust Beneficiaries to the Private Actions Trustee shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Private Actions Trust Agreement.

1.5.     Incorporation of Plan.

The Plan and the Confirmation Order are each hereby incorporated into this Private Actions Trust Agreement and made a part hereof by this reference; provided however, if there is conflict on matters arising from or related to the Private Actions Trust between the provisions of this Private Actions Trust Agreement, the provisions of the Plan, or the Confirmation Order, each such document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) this Private Actions Trust Agreement; and (3) the Plan.

1.6.     Funding of the Private Actions Trust.

On or after the Effective Date, upon the determination of the Private Actions Trustee, the Private Actions Trust may be funded from (i) a loan, including a loan secured by the assets of the Private Actions Trust or (ii) reserves maintained from the proceeds of the liquidation of Victim Causes of Action in accordance with Section 5.1.  If the Private Actions Trustee determines that it is appropriate to obtain any loans from the Consolidated Estate, any such loans in excess of $25,000 may only be made with the approval, after notice and a hearing, of the Bankruptcy Court.  Notice of the proposed loan in excess of $25,000 and an opportunity for a hearing shall be given to only the United States Trustee and those Creditors who have filed with the Bankruptcy Court after the date of the Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date.  Any failure or inability of the Private Actions Trust to obtain funding will not affect the enforceability of this Private Actions Trust Agreement.

6

1.7.    Appointment as Representative in Lieu of Assignment.

If any Victim Causes of Action cannot be transferred to the Private Actions Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Victim Causes of Action shall be deemed to have been retained by the Grantor, as applicable, and the Private Actions Trustee shall be deemed to have been designated as a representative of such Grantor to enforce and pursue such Victim Causes of Action on behalf of such Grantor.  Notwithstanding the foregoing, all net proceeds of the Victim Causes of Action shall be transferred to the Private Actions Trust Beneficiaries consistent with the provisions of this Private Actions Trust Agreement.

ARTICLE 2
PRIVATE ACTIONS TRUST INTERESTS

2.1.    Allocation of Private Actions Trust Interests.

The allocation and distribution of the Private Actions Trust Interests shall be made pursuant to Sections 2.8 and 5.1 below.  In no event shall the number of Private Actions Trust Interests distributed exceed the number of such interests issuable pursuant to the Plan.

2.2.    Interests Beneficial Only.

The ownership of a Private Actions Trust Interest shall not entitle any Private Actions Trust Beneficiary to any title in or to the assets of the Private Actions Trust as such (which title shall be vested in the Private Actions Trustee) or to any right to call for a partition or division of the assets of the Private Actions Trust or to require an accounting.

2.3.    Evidence of Beneficial Interests.

The Private Actions Trust Interests shall be represented by book entries on the books and records of the Private Actions Trust.  Any Person to whom a book entry is issued, shall be deemed to assent to and be bound by the terms and conditions of this Private Actions Trust Agreement and the Plan.

2.4.    Securities Law Registration.

The offering and issuance of Private Actions Trust Interests under the Plan shall be exempt from registration under any of the following, as applicable: Section 1145 of the Bankruptcy Code, Sections 3(a)(7), 3(a)(10) or 4(2) of the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities.  If the Private Actions Trustee determines, with the advice of counsel, that the Private Actions Trust is required to comply with registration and reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or the Investment Company Act of 1940, as amended (the "Investment Company Act"), then the Private Actions Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and file periodic reports with the Securities and Exchange Commission (the "SEC").  Notwithstanding the foregoing

procedure, nothing herein shall be deemed to preclude the Private Actions Trustee from amending this Private Actions Trust Agreement to make such changes as are deemed necessary or appropriate by the Private Actions Trustee, with the advice of counsel, to ensure that the Private Actions Trust is not subject to registration or reporting requirements of the Exchange Act, or the Investment Company Act.

2.5.    Interests Nontransferable.

(a)    Private Actions Trust Interests may not be transferred, assigned, pledged, hypothecated or otherwise encumbered, without the prior written consent of the Private Actions Trustee.

(b)    The Private Actions Trustee shall appoint a registrar, which may be the Private Actions Trustee (the "Registrar") for the purpose of recording ownership of the Private Actions Trust Interests as herein provided. For its services hereunder, the Registrar, unless it is the Private Actions Trustee, shall be entitled to receive reasonable compensation from the Private Actions Trust as a cost of administering the Private Actions Trust.

(c)    The Private Actions Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by them from time to time, a registry of the Private Actions Trust Beneficiaries of the Private Actions Trust (the "Trust Register") which shall be maintained pursuant to such reasonable regulations as the Private Actions Trustee and the Registrar may prescribe.

2.6.    Access to the Trust Register by the Private Actions Trust Beneficiaries.

Private Actions Trust Beneficiaries and their duly authorized representatives may, upon reasonable prior written notice to the Registrar and the Private Actions Trustee, and in accordance with the reasonable regulations prescribed by the Registrar and the Private Actions Trustee, inspect and, at the sole expense of the Private Actions Trust Beneficiary seeking the same, make copies of the Trust Register, in each case for a purpose reasonably related to such Private Actions Trust Beneficiary's interest in the Private Actions Trust.

2.7.    Absolute Owners.

The Private Actions Trustee may deem and treat the Private Actions Trust Beneficiaries of record in the Trust Register as the absolute owner of their respective Private Actions Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever, and the Private Actions Trustee shall not be charged with having received notice of any claim or demand to such Private Actions Trust Interests or the interest therein of any other Person.

2.8.    Private Actions Trust Beneficiary's Trust Interest.

**A Private Actions Trust Beneficiary's interest in the Private Actions Trust shall be calculated to equal the percentage assigned to such Private Actions Trust Beneficiary's Victim Causes of Action as calculated by the methodology in the following sentence. Each**

8

Private Actions Trust Beneficiary's interest shall be calculated as the percentage resulting from the following (the "Beneficial Interest Calculation"):

> Step 1: divide (i) the sum of such Private Action Trust Beneficiary's Victim Net Claim Amount and all premiums (if any) paid on such Private Action Trust Beneficiary's Terminated Policy or Terminated Policies, by (ii) the sum of all of the Victim Net Claim Amounts for all of the Private Action Trust Beneficiaries and all premiums (if any) paid on all Terminated Policies of all of the Private Action Trust Beneficiaries; and

> Step 2: multiply the resulting fraction by 100.

The Private Actions Trustee shall make the Beneficial Interest Calculations based upon the totality of the group of Private Actions Trust Beneficiaries who are participating in the Private Actions Trust by having made their Private Actions Trust Elections. If the Private Actions Trustee determines that his calculation of either the Victim Net Claim Amount of any Private Actions Trust Beneficiary or the amount of premiums on a Terminated Policy paid by any Private Actions Trust Beneficiary was incorrect, or if the Private Actions Trustee receives additional updated information (including information from the Private Actions Trust Beneficiaries) on the correct Victim Net Claim Amount of any Private Actions Trust Beneficiary or the correct amount of premiums paid on a Terminated Policy by any Private Actions Trust Beneficiary, then the Private Actions Trustee shall correct the percentage attributable to such Private Actions Trust Beneficiary pursuant to the Beneficial Interest Calculation (as applied with the correct information) and then adjust the values of all other participating Private Actions Trust Beneficiaries, so that the total of all of the percentages is still equal to 100.000%.

ARTICLE 3
THE PRIVATE ACTIONS TRUSTEE

3.1.    Private Actions Trust Proceeds.

All of the proceeds and avails of the prosecution, compromise and settlement of Victim Causes of Action (collectively, the "Private Actions Trust Proceeds") shall be added to the assets of the Private Actions Trust and held as a part thereof (and title to which shall be vested in the Private Actions Trustee).

3.2.    Collection of Income.

The Private Actions Trustee shall collect all income earned with respect to the assets of the Private Actions Trust, which shall thereupon be added to the assets of the Private Actions Trust and held as a part thereof (and which title shall be vested in the Private Actions Trustee).

3.3.    Payment of Private Actions Trust Expenses.

(a)    The Private Actions Trustee shall maintain a private actions expense fund (the "Private Actions Expense Fund") and expend such assets of the Private Actions Expense

9

Fund (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Private Actions Trust during liquidation, (ii) to pay reasonable administrative costs, including but not limited to, the costs and expenses of the Private Actions Trustee (including reasonable fees, costs, and expenses of professionals), any taxes imposed on the Private Actions Trust, and any other fees and expenses incurred in connection with, arising out of or related to the Victim Causes of Action, and (iii) to satisfy other liabilities incurred or assumed by the Private Actions Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Private Actions Trust Agreement.

(b)     The Private Actions Trustee may retain from the Private Actions Trust Proceeds and add to the Private Actions Expense Fund, at any time and from time to time, such amounts as the Private Actions Trustee deems reasonable and appropriate to ensure that the Private Actions Expense Fund will be adequate to meet the expenses and liabilities described in subsection (a) of this Section.

(c)     Notwithstanding any other provision of this Private Actions Trust to the contrary, the Private Actions Trustee shall not be required to take any action or enter into or maintain any claim, demand, action or proceeding relating to the Private Actions Trust unless it shall have sufficient funds in the Private Actions Expense Fund for that purpose.  The Private Actions Trustee shall have the right to, but shall not be obligated to, prosecute, settle, or choose to not pursue any Victim Causes of Action, notwithstanding the assignment of any Victim Causes of Action to the Private Actions Trust.

3.4.   Distributions.

The Private Actions Trustee shall distribute the net distributable assets of the Private Actions Trust in accordance with the provisions of Section 5.1 below.

3.5.   Tenure, Removal, and Replacement of the Private Actions Trustee.

(a)     Each Private Actions Trustee will serve until resignation and the appointment of a successor pursuant to subsection (b) below, removal pursuant to subsection (c) below, Disability (as defined in Section 3.17(c)(ii)), or death (if applicable).

(b)     The Private Actions Trustee may resign by giving not less than thirty (30) days' prior written notice to the Bankruptcy Court.  Such resignation will become effective on the later to occur of: (i) the day specified in such notice, and (ii) the appointment of a successor trustee as provided herein and the acceptance by such successor trustee of such appointment.  If a successor trustee is not appointed or does not accept his or her appointment within thirty (30) days following delivery of notice of resignation, the Private Actions Trustee may file a motion with the Bankruptcy Court, upon notice and hearing, for the appointment of a successor trustee.

(c)     In the event of a vacancy in the position of the Private Actions Trustee (whether by removal, resignation, Disability or death, if applicable), the vacancy will be filled by the appointment of a successor trustee by (i) the acceptance of the Private Actions Trust by the successor trustee in accordance with Section 3.6, or (ii) an order of the Bankruptcy Court after notice to the United States Trustee and those Creditors who have filed with the Bankruptcy Court

10

after the date of the Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date.

(d)     Immediately upon the appointment of any successor trustee, all rights powers, duties, authority, and privileges of the predecessor Private Actions Trustee hereunder will be vested in and undertaken by the successor trustee without any further act; and the successor trustee will not be liable personally for any act or omission of the predecessor Private Actions Trustee.

(e)     Upon the appointment of a successor trustee, the predecessor Private Actions Trustee (or the duly appointed legal representative of a deceased Private Actions Trustee) shall, if applicable, when requested in writing by the successor trustee, execute and deliver an instrument or instruments conveying and transferring to such successor trustee upon the trust herein expressed, without recourse to the predecessor Private Actions Trustee, all the estates, properties, rights, powers and trusts of such predecessor Private Actions Trustee, and shall duly assign, transfer, and deliver to such successor trustee all property and money held hereunder, and all other assets and documents relating to the Private Actions Trust, the Victim Causes of Action, or the Private Actions Trust Interests then in his or her possession and held hereunder.

3.6.   Acceptance of Appointment by Successor Private Actions Trustee.

Any successor trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations of the predecessor Private Actions Trustee hereunder and thereupon the successor trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of his or her predecessor in the Private Actions Trust hereunder with like effect as if originally named herein.

3.7.   Role of the Private Actions Trustee.

In furtherance of and consistent with the purpose of the Private Actions Trust and the Plan, the Private Actions Trustee, subject to the terms and conditions contained herein and in the Plan, shall have the power to (i) prosecute, compromise and settle, abandon or dismiss for the benefit of the Private Actions Trust Beneficiaries all claims, rights and causes of action transferred to the Private Actions Trustee (whether such suits are brought in the name of the Private Actions Trustee or otherwise), and (ii) to otherwise perform the functions and take the actions provided or permitted in the Plan or in this Private Actions Trust Agreement.  In all circumstances, the Private Actions Trustee shall act in the best interests of all the Private Actions Trust Beneficiaries of the Private Actions Trust and in furtherance of the purpose of the Private Actions Trust.

3.8.   Authority of Private Actions Trustee.

Subject to any limitations contained herein or in the Plan, the Private Actions Trustee shall have the following powers and authority:

11

(a)    to hold in trust legal title to any and all rights of the holders of the Private Actions Trust Interests in or arising from the Victim Causes of Action, including collecting, receiving any and all money and other property belonging to the Private Actions Trust and the right to vote any claim or interest relating to Victim Causes of Action in a case under the Bankruptcy Code and receive any distribution therein;

(b)    to perform the duties, exercise the powers, and assert the rights analogous to those of a trustee under Sections 704 and 1106 of the Bankruptcy Code, including commencing, prosecuting or settling causes of action, enforcing contracts or asserting claims, defenses, offsets and privileges; provided, however, that the Private Actions Trustee shall exercise those powers in a manner consistent with the Plan.

(c)    to protect and enforce the rights to the Victim Causes of Action by any method deemed appropriate including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(d)    to obtain reasonable insurance coverage with respect to the liabilities and obligations of the Private Actions Trustee under this Private Actions Trust (in the form of an errors and omissions policy or otherwise);

(e)    to obtain insurance coverage with respect to real and personal property that may become assets of the Private Actions Trust, if any;

(f)    to retain and approve compensation arrangements of counsel and other professionals for the Private Actions Trustee, including any professionals previously retained by the Private Actions Trust Beneficiaries or the Consolidated Estate, as the Private Actions Trustee shall select to assist the Private Actions Trustee in his or her duties, on such terms as the Private Actions Trustee deems reasonable and appropriate, without Bankruptcy Court approval; subject to the foregoing, the Private Actions Trustee may commit the Private Actions Trust to and shall pay such counsel and other professionals reasonable compensation (including on an hourly, contingency, or modified contingency basis) for services rendered and reasonable and documented out-of-pocket expenses incurred;

(g)    to retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Private Actions Trust as may be required by the SEC and applicable securities laws and as may be reasonable and appropriate in the Private Actions Trustee's discretion and to prepare and file any tax returns, informational returns, or periodic or current reports as required by applicable securities laws, for the Private Actions Trust as may be required; subject to the foregoing, the Private Actions Trustee may commit the Private Actions Trust to and shall pay such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred;

(h)    to retain and approve compensation arrangements of such third parties, including consultants and experts in order to assist counsel retained in accordance with Section 3.8(f) above, to assist the Private Actions Trustee in carrying out his or her powers and duties under this Private Actions Trust; subject to the foregoing, the Private Actions Trustee may

12

commit the Private Actions Trust to and shall pay all such persons or entities reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, as well as commit the Private Actions Trust to indemnify any such parties in connection with the performance of services (provided that such indemnity shall not cover any losses, costs, damages, expenses or liabilities that result from the recklessness, gross negligence, willful misconduct, or knowing violation of law by such party);

(i)    to waive any privilege (including the Privileges) or any defense on behalf of the Private Actions Trust or, with respect to the Victim Causes of Action, on behalf of the Private Actions Trust Beneficiaries, as applicable; provided, however, that such waiver shall be effectively limited to such matters;

(j)    to compromise, settle, adjust, arbitrate, sue on or defend, pursue, prosecute, abandon, waive, release, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle, in accordance with the terms set forth herein, all Causes of Action in favor of or against the Private Actions Trust;

(k)    to invest any moneys held as part of the Private Actions Trust in accordance with the terms of Section 3.15 hereof, limited, however, to such investments that are consistent with the Private Actions Trust's status as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684;

(l)    to request any appropriate tax determination with respect to the Private Actions Trust, including a determination pursuant to Section 505 of the Bankruptcy Code;

(m)    subject to applicable securities laws, if any, to establish and maintain a website for the purpose of providing notice of Private Actions Trust activities in lieu of sending written notice to holders of Private Actions Trust Interests, subject to providing notice of such website to such holders;

(n)    to seek the examination of any entity, subject to the provisions of Bankruptcy Rule 2004, to the extent applicable, or any other applicable law or rule;

(o)    to incur indebtedness and grant security interests in the assets of the Private Actions Trust in order to obtain funding for the Private Actions Trust; and

(p)    to take or refrain from taking any and all other actions that the Private Actions Trustee reasonably deems necessary or convenient for the continuation, protection and maximization of the Victim Causes of Action or to carry out the purposes hereof.

3.9.    Limitation of Private Actions Trustee's Authority.

(a)    Notwithstanding anything herein to the contrary, the Private Actions Trustee may not (i) be authorized to engage in any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Private Actions Trust, (ii) take such actions inconsistent with the orderly and timely liquidation of the assets of

13

the Private Actions Trust as are required or contemplated by applicable law, the Plan and this Private Actions Trust Agreement, or (iii) be authorized to engage in any investments or activities inconsistent with the treatment of the Private Actions Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684.

(b)      The Private Actions Trust shall not hold 50% or more of the stock (in either vote or value) of any entity that is treated as a corporation for federal income tax purposes, nor be the sole member of a limited liability company, nor have any interest in an entity that is treated as a partnership for federal income tax purposes, unless such stock, membership interest, or partnership interest was obtained involuntarily or as a matter of practical economic necessity in order to preserve the value of the assets of the Private Actions Trust.

3.10.   Books and Records.

(a)      The Private Actions Trustee shall maintain books and records relating to the assets of the Private Actions Trust and income of the Private Actions Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Private Actions Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting and securities law requirements of the Private Actions Trust.  Nothing in this Private Actions Trust Agreement requires the Private Actions Trustee to file any accounting or seek approval of any court with respect to the administration of the Private Actions Trust, or as a condition for managing any payment or distribution out of the assets of the Private Actions Trust.

(b)      The Private Actions Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Private Actions Trustee, to inspect and, at the sole expense of such Private Actions Trust Beneficiary seeking the same, make copies of the books and records relating to the Private Actions Trust on any business day and as often as may be reasonably desired, in each case for a purpose reasonably related to such Private Actions Trust Beneficiary's interest in the Private Actions Trust.

3.11.   Inquiries into Trustee's Authority.

Except as otherwise set forth in the Private Actions Trust or in the Plan, no Person dealing with the Private Actions Trust shall be obligated to inquire into the authority of the Private Actions Trustee in connection with the protection, conservation or disposition of the Victim Causes of Action.

3.12.   Compliance with Laws.

Any and all distributions of assets of the Private Actions Trust and proceeds of borrowings, if any, shall be in compliance with applicable laws, including applicable federal and state securities laws.

3.13.   Compensation of the Private Actions Trustee.

14

(a)     The Original Trustee shall be compensated for his services at the rate of $350.00 per hour, and reimbursed for his out of pocket expenses.  If a successor trustee is appointed, such successor shall be compensated for his or her services, and reimbursed for his or her expenses, as a cost of administering the Private Actions Trust, in accordance with and pursuant to the terms of, a separate agreement to be approved by the Bankruptcy Court.  Notice of such agreement and an opportunity for a hearing shall be given to only the United States Trustee and those Policyholders who have filed with the Bankruptcy Court after the date of the Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date.

(b)     If the Private Actions Trustee's appointment terminates by reason of (i) the death of the Private Actions Trustee, or (ii) the Private Actions Trustee's Disability, the Private Actions Trustee, or his or her estate, as applicable, shall be entitled to payment of any earned but unpaid portion of compensation, any earned but unpaid bonus, and any un-reimbursed business expenses incurred prior to such death, Disability or effective date of removal.

(c)     For purposes of <u>Section 3.13(b)</u>, the following term shall have the following meaning:

(i)     "<u>Disability</u>" of the Private Actions Trustee shall have occurred if, as a result of the Private Actions Trustee's incapacity due to physical or mental illness as determined by a physician selected by the Private Actions Trustee, the Private Actions Trustee shall have been substantially unable to perform his or her duties hereunder for three consecutive months, or for an aggregate of 180 days during any period of twelve consecutive months.

3.14.   <u>Reliance by Private Actions Trustee</u>.

Except as otherwise provided herein:

(a)     The Private Actions Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Private Actions Trustee to be genuine and to have been signed or presented by the proper party or parties; and

(b)     Persons dealing with the Private Actions Trustee shall look only to the assets of the Private Actions Trust to satisfy any liability incurred by the Private Actions Trustee to such Person in carrying out the terms of this Private Actions Trust, and neither the Private Actions Trustee nor any Private Actions Trust Beneficiary shall have any personal obligation to satisfy any such liability.

3.15.   <u>Investment and Safekeeping of Private Actions Trust Assets</u>.

The Private Actions Trustee shall invest all assets transferred to the Private Actions Trust (other than Victim Causes of Action), all Private Actions Trust Proceeds, the Private Actions Expense Fund and all income earned by the Private Actions Trust (pending periodic distributions in accordance with the provisions of the Plan) only in cash, cash equivalents, U.S. Treasury securities, money market investments, and similar temporary liquid investments; provided,

15

however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684, pursuant to the Treasury Regulations, or any modification in the guidelines of the United States Internal Revenue Service (the "IRS"), whether set forth in IRS rulings, other IRS pronouncements or otherwise, (b) the Private Actions Trustee may retain any Private Actions Trust Proceeds received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets in Cash; and (c) under no circumstances, shall the Private Actions Trustee segregate the assets of the Private Actions Trust on the basis of classification of the holders of Private Actions Trust Interests.

      3.16.   Standard of Care; Exculpation.

      Neither the Private Actions Trustee nor any of his or her duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Private Actions Trustee in good faith, other than acts or omissions resulting from the Private Actions Trustee's own gross negligence, recklessness, willful misconduct, or knowing violation of law. The Private Actions Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with his or her attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Private Actions Trustee shall be under no obligation to consult with his or her attorneys, accountants, financial advisors or agents, and his or her good faith determination not to do so shall not result in the imposition of liability on the Private Actions Trustee, unless such determination is based on gross negligence, recklessness, willful misconduct, or knowing violation of law.

ARTICLE 4
TAX MATTERS

      4.1.   Federal Income Tax Reporting.

      (a)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including receipt by the Private Actions Trustee of a private letter ruling if the Private Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Private Actions Trustee), the Private Actions Trustee shall file all tax returns for the Private Actions Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article 4. The Private Actions Trustee shall also annually send to each Private Actions Trust Beneficiary a separate statement setting forth such Private Actions Trust Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct all such Private Actions Trust Beneficiaries to report such items on their federal income tax returns in a manner consistent with such statement.

      (b)    As soon as practicable after the Effective Date, but in no event later than ninety (90) days thereafter, (i) the Private Actions Trustee will determine the fair market value as

16

of the Effective Date of all assets transferred to the Private Actions Trust, and such determined fair market value shall be used by the Private Actions Trustee and the Private Actions Trust Beneficiaries for all federal income tax purposes, and (ii) the Private Actions Trustee shall apprise the Private Actions Trust Beneficiaries, in writing of such valuation.  The Private Actions Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Private Actions Trust that are required by any governmental unit and pay taxes, if any, properly payable by the Private Actions Trust.

(c)      The Private Actions Trustee may request an expedited determination of taxes of the Private Actions Trust under Section 505(b) of the Bankruptcy Code or any analogous law, to the extent applicable, for all returns filed for, or on behalf of, the Private Actions Trust for all taxable periods through the dissolution of the Private Actions Trust.

(d)      For federal income tax purposes, all parties (including the Grantors, the Private Actions Trustee and the Private Actions Trust Beneficiaries) shall treat the transfer of Victim Causes of Action to the Private Actions Trust and issuance of Private Actions Trust Interests in accordance with the terms of the Plan, as a deemed transfer of the Victim Causes of Action to the Private Actions Trust Beneficiaries (to the extent applicable), followed by a deemed transfer of such Victim Causes of Action by the Private Actions Trust Beneficiaries to the Private Actions Trust in exchange for beneficial interests in the Private Actions Trust.

(e)      For federal income tax purposes, the Private Actions Trust Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Private Actions Trust.

4.2.    <u>Allocations of Private Actions Trust Taxable Income</u>.

Allocations of Private Actions Trust taxable income to the Private Actions Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Private Actions Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Private Actions Trust Beneficiaries, taking into account all prior and concurrent distributions from the Private Actions Trust.  Similarly, taxable loss of the Private Actions Trust will be allocated to the Private Actions Trust Beneficiaries by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Private Actions Trust (including Victim Causes of Action) (valued for this purpose at their tax book value) to the Private Actions Trust Beneficiaries, taking into account all prior and concurrent distributions from the Private Actions Trust (including all distributions held in escrow pending the resolution of Disputed Claims).  The tax book value of the Private Actions Trust's assets (including the Victim Causes of Action) for this purpose shall equal their fair market value on the Effective Date, adjusted in either case in accordance with tax accounting principles prescribed by the United States Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

ARTICLE 5
DISTRIBUTIONS

17

5.1.   <u>Distribution; Withholding</u>.

The Private Actions Trustee shall distribute, upon the settlement or other final resolution of all of the Victim Causes of Action that have been brought by the Private Actions Trustee within two years of the Effective Date, all net cash income plus all net cash proceeds (including Private Action Trust Proceeds) from the liquidation of assets; provided, however, that the Private Actions Trustee may retain and pay such amounts (i) as are reasonably necessary to meet contingent or potential liabilities and to maintain the value of the assets of the Private Actions Trust during liquidation, (ii) to pay or reserve for all administrative expenses of the Private Actions Trust, including the costs and expenses of the Private Actions Trust, the compensation, costs and expenses of the Private Actions Trustee, the fees, costs and expenses of all professionals retained by the Private Actions Trustee, including any contingency fee agreed to by the Private Actions Trustee for the purpose of litigating the Victim Causes of Action, and any taxes imposed on the Private Actions Trust or in respect of the assets of the Private Actions Trust, and (iii) to satisfy other liabilities incurred or assumed by the Private Actions Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Private Actions Trust Agreement.  After the payments or retentions by the Private Actions Trustee enumerated above have been made, the aggregate of all distributions if there is more than one distribution, or the single distribution if there is only one distribution, shall be made as follows:

**<u>First</u>, to repay the loans and/or other funding (including any fees, costs, or interest incurred in connection therewith) described in Sections 1.6 or 3.8(p) of this Private Actions Trust Agreement.**

**<u>Second</u>, to the Consolidated Estate in accordance with the following conditions and corresponding applicable amounts and/or percentages:**

**(i)  Thirty Percent (30%) for distributable amounts equal to or less than One Million Dollars ($1,000,000), plus**

**(ii) Twenty Percent (20%) for distributable amounts greater than One Million Dollars ($1,000,000) but equal to or less than Ten Million Dollars ($10,000,000), plus**

**(iii) Ten Percent (10%) for distributable amounts greater than Ten Million Dollars ($10,000,000).**

**<u>Third</u>, to the Private Actions Trust Beneficiaries on a prorata basis based upon the respective percentages attributable to each Private Actions Trust Beneficiary for distribution purposes in accordance with the Beneficial Interest Calculation formula and other provisions outlined in Section 2.8 of this Private Actions Trust Agreement.**

**<u>Fourth</u>, if all of the Private Actions Trust Beneficiaries have received the total amounts of their respective Victim Net Claim Amounts, then any remaining funds shall be distributed to the Consolidated Estate.**

All distributions will otherwise be subject to all of the terms of this Private Actions Trust Agreement.  The Private Actions Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Private Actions Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

5.2.    Manner of Payment or Distribution.

(a)     All distributions made by the Private Actions Trustee to holders of Private Actions Trust Interests shall be payable to the holders of Private Actions Trust Interests of record as of the 20th day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such day shall be the following Business Day.  If the distribution shall be in Cash, the Private Actions Trustee shall distribute such Cash by wire, check, or such other method as the Private Actions Trustee deems appropriate under the circumstances.

5.3.    Delivery of Private Actions Trust Distributions.

All distributions under this Private Actions Trust Agreement to any holder of Private Actions Trust Interests shall be made at the address of such holder as set forth in the Trust Register or at such other address or in such other manner as such holder of Private Actions Trust Interests shall have specified for payment purposes in a written notice to the Private Actions Trustee and the Registrar at least 20 days prior to such distribution date.  Each Private Actions Trust Beneficiary has the obligation to keep the Private Actions Trustee informed of his or her most current address.  In the event that any distribution to any holder is returned as undeliverable, the Private Actions Trustee shall be entitled to rely on the most current information available to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Private Actions Trustee has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such undeliverable or unclaimed distributions shall be deemed unclaimed property at the expiration of one year from the date of distribution.  The Private Actions Trustee shall reallocate the undeliverable and unclaimed distributions for the benefit of all other Private Actions Trust Beneficiaries.

5.4.    Cash Distributions.

No Cash distributions shall be required to be made to any Private Actions Trust Beneficiary in an amount less than $100.00.  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions.  Notwithstanding the foregoing, all cash shall be distributed in the final distribution of the Private Actions Trust.

ARTICLE 6
REPORTS TO PRIVATE ACTIONS TRUST BENEFICIARIES

6.1.    Reports.

(a)     The Private Actions Trustee shall cause to be prepared, as applicable, either at such times as may be required by the Exchange Act, if applicable, or, not less than annually, financial statements of the Private Actions Trust, to be delivered to the Private Actions

19

Trust Beneficiaries together with annual income tax reporting of the Private Actions Trust.  To the extent required by law, the financial statements prepared as of the end of the fiscal year shall be audited by an independent accountant in accordance with generally accepted accounting principles.  The materiality and scope of audit determinations shall be established between the Private Actions Trustee and the appointed auditors with a view toward safeguarding the value of the assets of the Private Actions Trustee, but nothing relating to the mutually agreed scope of work shall result in any limitation of audit scope that would cause the auditors to qualify their opinion as to scope of work with respect to such financial statements.

(b)      If necessary and appropriate, within ten (10) Business Days after the end of the relevant report preparation period, the Private Actions Trustee shall cause any information reported pursuant to Section 6.1(a) to be mailed to the Private Actions Trust Beneficiaries or posted on the website outlined in Section 6.1(c) below, and to be filed with the Bankruptcy Court.

(c)      The Private Actions Trustee may post any report required to be provided under this Section 6.1 on a website maintained by the Private Actions Trustee in lieu of actual notice to the Private Actions Trust Beneficiaries (unless otherwise required by law).

ARTICLE 7
TERM; TERMINATION OF THE PRIVATE ACTIONS TRUST

7.1.    Term; Termination of the Private Actions Trust.

(a)      The Private Actions Trust shall have an initial term of five (5) years, provided that if reasonably necessary to facilitate or complete the liquidation of the assets in the Private Actions Trust (which, for this purpose, may include preserving or enhancing the value of such assets as appropriate given the facts and circumstances) in a manner consistent with the treatment of the Private Actions Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684, the term of the Private Actions Trust may be extended for one or more one (1) year terms subject to the approval of the Bankruptcy Court (which such approval shall not occur more than six (6) months prior to the beginning of the extended term).  Notice of the extension of the term of the Private Actions Trust and an opportunity for a hearing shall be given to only the United States Trustee and those Creditors who have filed with the Bankruptcy Court after the date of the Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date.

(b)      The Private Actions Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing the Chapter 11 Case pursuant to Section 350(a) of the Bankruptcy Code; and (ii) the Private Actions Trustee has administered all assets of the Private Actions Trust and performed all other duties required by the Plan and this Private Actions Trust Agreement.

7.2.    Continuance of Trust for Winding Up.

After the termination of the Private Actions Trust and for the purpose of liquidating and

20

winding up the affairs of the Private Actions Trust, the Private Actions Trustee shall continue to act as such until his or her duties have been fully performed.  Prior to the final distribution of all of the remaining assets of the Private Actions Trust, the Private Actions Trustee shall be entitled to reserve from such assets any and all amounts required to provide for his or her own costs and expenses, in accordance with Section 3.13 herein, until such time as the winding up of the Private Actions Trust is completed.  Upon termination of the Private Actions Trust, the Private Actions Trustee shall retain for a period of two years, as a cost of administering the Private Actions Trust, the books, records, Private Actions Trust Beneficiary lists, the Trust Register, and certificates and other documents and files that have been delivered to or created by the Private Actions Trustee.  At the Private Actions Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two years from the completion and winding up of the affairs of the Private Actions Trust.  Except as otherwise specifically provided herein, upon the termination of the Private Actions Trust, the Private Actions Trustee shall have no further duties or obligations hereunder.

ARTICLE 8
AMENDMENT AND WAIVER

8.1.    Amendment and Waiver.

(a)    The Private Actions Trustee may amend, supplement or waive any provision of, this Private Actions Trust Agreement, without notice to or the consent of any Private Actions Trust Beneficiary or the need for any approval of the Bankruptcy Court: (i) to cure any ambiguity, omission, defect or inconsistency in this Private Actions Trust Agreement, provided that such amendments, supplements or waivers shall not adversely affect the distributions to be made under this Private Actions Trust Agreement to any of the Private Actions Trust Beneficiaries, or adversely affect the U.S. federal income tax status of the Private Actions Trust as a "liquidating trust"; (ii) to comply with any requirements in connection with the U.S. Federal income tax status of the Private Actions Trust as a "liquidating trust"; (iii) to comply with any requirements in connection with maintaining that the Private Actions Trust is not subject to registration or reporting requirements of the Exchange Act, or the Investment Company Act; (iv) to make the Private Actions Trust a reporting entity and, in such event, to comply with or seek relief from any requirements in connection with satisfying the registration or reporting requirements of the Exchange Act or the Investment Company Act; and (v) to evidence and provide for the acceptance of appointment hereunder by a successor trustee in accordance with the terms of this Private Actions Trust Agreement and the Plan.

(b)    Any substantive provision of this Private Actions Trust Agreement may be amended or waived by the Private Actions Trustee with the prior approval of the Bankruptcy Court upon notice and an opportunity for a hearing to only the United States Trustee and those Creditors who have filed with the Bankruptcy Court after the date of the Plan a specific request for notice requesting that notice be given to them in the Bankruptcy Case after the Effective Date; provided, however, that no change may be made to this Private Actions Trust Agreement that would adversely affect the distributions to be made under this Private Actions Trust Agreement to any of the Private Actions Trust Beneficiaries, or adversely affect the U.S. Federal income tax status of the Private Actions Trust as a "liquidating trust" within the meaning of

21

Treasury Regulation Section 301.7701-4(d) or be inconsistent with the terms of Rev. Proc. 94-45, 1994-2 C.B. 684.  Notwithstanding this Section 8.1, no amendments may be made to this Private Actions Trust Agreement if such proposed amendments are inconsistent with the purpose and intention of the Private Actions Trust to liquidate in an expeditious but orderly manner the Victim Causes of Action in accordance with Treasury Regulation Section 301.7701-4(d).

ARTICLE 9
MISCELLANEOUS PROVISIONS

9.1.    Intention of Parties to Establish the Private Actions Trust.

This Private Actions Trust is intended to create a liquidating trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Private Actions Trust Agreement may be amended in accordance with Section 8.1 to comply with such federal income tax laws and Treasury Regulations, which amendments may apply retroactively.

9.2.    Reimbursement of Trust Costs.

If the Private Actions Trustee or the Private Actions Trust is the prevailing party in a dispute regarding the provisions of this Private Actions Trust or the enforcement thereof, the Private Actions Trustee shall be entitled to collect any and all costs, reasonable and documented out-of- pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.  To the extent that the Private Actions Trust has advanced such amounts, the Private Actions Trust may recover such amounts from the non-prevailing party.

9.3.    Laws as to Construction.

This Private Actions Trust Agreement shall be governed by and construed in accordance with the laws of the State of Utah, without regard to whether any conflicts of law would require the application of the law of another jurisdiction.

9.4.    Jurisdiction.

Without limiting any Person or entity's right to appeal any order of the Bankruptcy Court or to seek withdrawal of the reference with regard to any matter, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Private Actions Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Private Actions Trust Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto, including the Private Actions Trust Beneficiaries, hereby jointly and severally consent to and submit to the jurisdiction and venue of the Bankruptcy Court.

22

9.5. <u>Severability</u>.

If any provision of this Private Actions Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Private Actions Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Private Actions Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

9.6. <u>Notices</u>.

All notices, requests or other communications to the parties hereto shall be in writing and shall be sufficiently given only if (i) delivered in person; (ii) sent by electronic or facsimile communication (as evidenced by a confirmed fax transmission report); (iii) sent by registered or certified mail, return receipt requested; or (iv) sent by commercial delivery service or courier. Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the following mailing addresses or email addresses:

If to the Private Actions Trustee, to:

Gil A. Miller
Rocky Mountain Advisory, LLC
215 South State Street, Suite 550
Salt Lake City, UT  84111
gmiller@rockymountainadvisory.com

If to the Grantors, to the persons identified on their respective Private Actions Trust Elections.  Each Grantor shall be obligated to keep the Private Actions Trustee at all times informed of such Grantor's most current address.

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, delivery service or courier, on the date of delivery; (ii) if by electronic mail communication, on the date of receipt or confirmed transmission of the communication; and (iii) if by mail, on the date of receipt.  Any party from time to time may change its mailing address, email address or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

9.7. <u>Fiscal Year</u>.

The fiscal year of the Private Actions Trust will begin on the first day of January and end on the last day of December of each year.

9.8. <u>Headings</u>.

The section headings contained in this Private Actions Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Private

23

Actions Trust Agreement or of any term or provision hereof.

     9.9.   <u>Counterparts</u>.

     This Private Actions Trust Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

     9.10.   <u>Confidentiality</u>.

     The Private Actions Trustee and each successor trustee (each a "<u>Covered Person</u>") shall, during the period that they serve in such capacity under this Private Actions Trust and following either the termination of this Private Actions Trust or such individual's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the assets of the Private Actions Trust relates or of which it has become aware in its capacity (the "<u>Information</u>"), except to the extent disclosure is required by applicable law, order, regulation or legal process.

     9.11.   <u>Entire Agreement</u>.

     This Private Actions Trust Agreement (including the Recitals), the Private Actions Trust Elections, the Plan, and the Confirmation Order constitute the entire agreement by and among the parties hereto, and there are no representations, warranties, covenants or obligations of any of such parties except as set forth herein or therein.  This Private Actions Trust Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein, in the Plan or in the Confirmation Order, nothing in this Private Actions Trust Agreement is intended or shall be construed to confer upon or to give any person other than the parties thereto and their respective heirs, administrators, executors, successors, or assigns any right to remedies under or by reason of this Private Actions Trust Agreement.

     IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Private Actions Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers, all as of the date first above written.

24

**THOSE GRANTORS THAT HAVE TIMELY
EXECUTED PRIVATE ACTIONS TRUST
ELECTIONS**

**- and –**

**PRIVATE ACTIONS TRUSTEE:**

_____

By: Gil A. Miller, Original Private Actions Trustee

25

# EXHIBIT B TO
## CHAPTER 11 TRUSTEE'S LIQUIDATING PLAN OF REORGANIZATION DATED APRIL 3, 2013

## LIST OF NON-INVESTOR TRADE CREDITOR UNSECURED CLAIMS OF $50,000 OR LESS

| Debtor Name | Scheduled or Claim # | Creditor Name | Scheduled Amount or Proof of Claim Amount |
|---|---|---|---|
| Horizon Mortgage & Investment Inc. | Scheduled | Sermon Service & Electric | $1,097.00 |
| Horizon Mortgage & Investment Inc. | Scheduled | A.R. Aluminum Inc. | $525.00 |
| Horizon Mortgage & Investment Inc. | Scheduled | Fuller Lock Service | $61.09 |
| Horizon Mortgage & Investment Inc. | Scheduled | Beeline Pest Control | $65.00 |
| Horizon Financial Center I, LLC | Scheduled | Schindler Elevator Corporation | $1,097.58 |
| Horizon Financial Center I, LLC | 252 | Schindler Elevator Corporation | $865.87 |
| Horizon Mortgage & Investment Inc. | 310 | Questar Gas Company | $515.25 |
| Horizon Financial & Insurance Group, Inc. | 276 | Questar Gas Company | $581.63 |
| Horizon Mortgage & Investment Inc. | 285 | Home Services at Ace | $639.00 |
| Horizon Mortgage & Investment Inc. | Scheduled | Aire Spring | $4,224.69 |
| Horizon Financial & Insurance Group, Inc. | 287 | AireSpring, Inc. | $465.90 |
| Dee Allen Randall | 567 | Valentine CPA | $1,098.00 |
| Dee Allen Randall | 568 | Valentine CPA | $622.00 |
| Dee Allen Randall | 799[2] | RJT Excavating, Inc. | $43,246.51 |

---

[2] This Claim (a mechanic's lien) was filed as a Secured Claim; however, the sales proceeds from the sale of the property to which this mechanic's lien attached may be exhausted in the payment of Claims with a higher priority than this Secured Claim.  Therefore, this Claim may end up as a Non-Investor Trade Creditor Unsecured Claim (to the extent that this Claim is Allowed).

26

**EXHIBIT C TO**
**CHAPTER 11 TRUSTEE'S LIQUIDATING PLAN OF REORGANIZATION DATED**
**APRIL 3, 2013**

**LIST OF ESTATE LITIGATION CLAIMS**

| DEFENDANTS | ADVERSARY NO. |
|---|---|
| Matthew Randall | 12-2377 |
| Brandon Randall | 12-2379 |
| Bank of America | 12-2380 |
| Aurora Loan Services | 12-2381 |
| Bank of America, fka Country Wide Financial Corp | 12-2382 |
| American Express Travel Related Services Co., Inc., & American Express Co.,Inc. | 12-2384 |
| Union Central  Life Insurance Co. and Ameritas Life Insurance Corp. | 12-2385 |
| Jack & Paula Phillips | 12-2389 |
| James Christensen | 12-2390 |
| Tom & Peggy Tibbs | 12-2391 |
| Guy Thayne | 12-2394 |
| Lori Call | 12-2395 |
| Ryan Willden | 12-2397 |
| Bart Christensen | 12-2400 |
| Marty Wilkinson | 12-2401 |
| Randy Lang | 12-2402 |
| Donald and Joy Anderson          (Chapter 7 Filed, Stayed) | 12-2403 |
| Bevan Wilde | 12-2404 |
| Alton Minton | 12-2405 |
| Evan Warner | 12-2406 |
| Golden Green | 12-2407 |
| D. Trent Fortner | 12-2408 |
| Cynthia Clements | 12-2409 |
| R. Austin Christensen | 12-2410 |
| Mark and Tracy Dustin | 12-2411 |
| Kurt Vanderslice          (Chapter 7 Filed; stayed) | 12-2412 |
| Craig Stansfield | 12-2414 |
| Russell Morley | 12-2415 |
| Keith Garff | 12-2416 |
| JaLee Harris aka Jalee Savage | 12-2418 |
| Mark and Rebecca Bell | 12-2419 |
| Trent Harrison | 12-2420 |
| Mark and Gina Hansen | 12-2421 |

| DEFENDANTS | ADVERSARY NO. |
|---|---|
| Burke Anglin | 12-2422 |
| Gary Clayburn | 12-2423 |
| Fred Simonsen | 12-2424 |
| Randy Guest | 12-2425 |
| Chris Cruz; Jerem Eyre; Brian Eyster; Alex Gayton; Matson Magleby; Dennis Myers; Lorenzo Pope; Justin Ryan; Adam Sessions; Tom Tibbs; Ron Weeks; David Wilcox; Steven Zimmerman | 12-2429 |
| Dean Powell | 12-2432 |
| Aaron and Tammy Evans | 12-2435 |
| Harold McGuire | 12-2436 |
| Grant Aagard | 12-2437 |
| Dale Parker | 12-2438 |
| Tom and Linda Day | 12-2439 |
| Stephen Powell | 12-2440 |
| Jim and Sharon Clark | 12-2441 |
| Lamar and Elaine Cook | 12-2442 |
| Tracie Anderson | 12-2443 |
| Wayne Andreason | 12-2445 |
| Garth Anderton | 12-2446 |
| Beryle Bird | 12-2447 |
| Lesley Walker | 12-2448 |
| Bradley Boyce | 12-2449 |
| Steven and Jarolen Brough | 12-2450 |
| Matthew Randall | 12-2451 |
| Destin Lindsay Thayne | 12-2452 |
| Gladys Banks | 12-2453 |
| Paula Marine | 12-2455 |
| Seth Schenfeld | 12-2456 |
| Duane Crabtree | 12-2457 |
| Shauna Orullian | 12-2459 |
| Rhonda Wilkinson | 12-2460 |
| Clem and Donna Fullmer | 12-2461 |
| Leland R. Thompson, Phillis N. Thompson, Carl Boyington, Janice Boyington | 12-2462 |
| F.R. Satterfield, as Trustee under F.R. Satterfield Family Trust dated January 29, 1997 and D. Carol Satterfield, as Trustee under the F.R. Satterfield Family Trust dated January 29, 1997 | 12-2463 |
| Allen D. Kendell, as Trustee under The Allen D. Kendell Living Trust dated June 6, 2006 and Patricia V. Kendell as Trustee under the Allen D. Kendell Living Trust dated June 6, 2006 | 12-2464 |
| Steven D. Zimmerman | 12-2467 |

2

| DEFENDANTS | ADVERSARY NO. |
|---|---|
| Jack David Hatch, Trustee | 12-2468 |
| Danita Hooper | 12-2469 |
| Jared D. Beckstrand                    (Chapter 7 Filed; stayed) | 12-2471 |
| Union Central Life Insurance Company | 13-2023 |
| Victor Wright | Not Yet Filed |
| Sharman & Linda Pitcher | 13-2110 |
| Edith Clift | 13-2111 |
| Birdie Higinbotham | 13-2116 |
| Richard Call | 13-2115 |
| Mark & Alyson Brown | 13-2112 |
| Harold Howe | 13-2113 |
| Richard Hooper | 13-2114 |
| Russell Hansen | 13-2120 |
| Addie Wilcken a/k/a Addie Checketts | 13-2117 |
| Jennifer Randall   (Proof of Claim on file in Bankruptcy Case No. 12-24458) | |
| Kristina McGuire, aka Kristina Hyer, individually and as Trustee of the Kristian Mc Guire Living Trust and David B. Boyce, individually and as Trustee of the Boyce Family Trust | Not Yet Filed |
| Katherine Muller aka Katherine Rose | Not Yet Filed |
| The Church of Jesus Christ of Latter-day Saints (LDS Church) | Not Yet Filed |
| Other Causes of Action by the Debtors against Union Central Life Insurance Company, Ameritas Life Insurance Company, Ameritas Mutual Holding Company, and all Affiliates, officers, directors, agents, attorneys, and employees of the foregoing companies. | Not Yet Filed |
| Prepetition Attorneys for each of the Debtors. | Not Yet Filed |
| Prepetition Accountants for each of the Debtors. | Not Yet Filed |
| Prepetition Auditors for each of the Debtors | Not Yet Filed |
| Prepetition Financial Advisors for each of the Debtors. | Not Yet Filed |
| **DISTRICT COURT CASE** | **CASE NUMBER** |
| Marine Credit | 2:12-cv-1041 |
| | |
| | |
| | |
| | |
| | |

1215801.~~09~~10/dmm/rqn